CAPITAL HABEAS UNIT
Oliver W. Loewy, IL #6197093
Teresa A. Hampton, ID #4364
Federal Defender Services of Idaho
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile:  (208) 331-5559
ECF:  Oliver_Loewy@fd.org
        Teresa_Hampton@fd.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **PAUL EZRA RHOADES,** | ) | |
| | ) | **CAPITAL CASE** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  11-445 |
| | ) | |
| **BRENT REINKE,** *et al.*, | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF EMERGENCY MOTION FOR** |
| Defendants. | ) | **PRELIMINARY INJUNCTION OR** |
| | ) | **STAY OF EXECUTION** |
| | ) | |
| | ) | |
| | ) | Expedited Oral Argument |
| | ) | and Evidentiary Hearing Requested |
| | ) | |
| | ) | **Execution Scheduled** |
| | ) | **November 18, 2011** |
| _____ | ) | |

On September 22, 2011, Mr. Rhoades commenced this lawsuit seeking an order permanently enjoining the Idaho Department of Correction ("IDOC") from executing him based on a lack of protocol or based on what he denominated in his Complaint as the 2006 Protocol or the Draft Protocol.[1]  Dkt. 001.  On October 14, Defendants filed a Motion to Dismiss and supporting memorandum.  Dkt.7-1 to 7-5 . In the supporting memorandum, Defendants revealed for the first time that the IDOC finally adopted that same day an "completely revised" SOP 135 setting out Idaho's execution procedures. Dkt. No. 7-1 at 11.

On October 19, 2011, the District Court for the Seventh Judicial District of Idaho entered an order in each of Mr. Rhoades's two capital cases directing the IDOC to execute Mr. Rhoades on November 18, 2011. Mr. Rhoades seeks a stay of execution or preliminary injunction barring the IDOC from executing him on November 18, 2011, and until resolution of this lawsuit.  *See* Fed. R. Civ. Proc. 65.

A stay is required where the applicant " establish[es] that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Recources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). *Landrigan v. Brewer*, 625 F.3d 1132, 1133 (9th Cir. 2010) (district court properly stayed execution after applying *Winter* factors), *rev'd on certiorari review on different grounds*,

---

[1] '2006 Protocol' referred to the IDOC execution procedure policy in place and last reviewed in 2006.  'Draft Protocol' referred to the draft execution procedures which the IDOC provided the University of California, Berkeley School of Law, in May, 2011, in response to that school's public records request for the IDOC execution procedures.  The IDOC had denied undersigned counsel's request in March, 2011, for those procedures.

Memorandum In Support of Emergency Motion
For Preliminary Injunction or Stay of Execution -2

131 S.Ct. 445 (2010). The standard for issuance of a preliminary injunction requires

consideration of the same factors. *Nken v. Holder*, 556 U.S. 418, 129 S.CT. 1749, 1761

(2009). In *Baze v. Rees*, 553 U.S. 35 (2008), the Supreme Court held that a stay may not

be granted unless the applicant shows that the lethal injection protocol "creates a

demonstrated risk of severe pain" and "that the risk is substantial when compared to the

known and available alternatives." *Id.* at 61. Further, a State "with a lethal injection

protocol substantially similar to the protocol we uphold today [including daily

experience] would not create a risk that meets this standard." *Id.*

For the reasons below, Idaho's execution procedures create a demonstrated risk of

severe pain, does not provide safeguards relied upon in *Baze*, and is not substantially

similar to the Kentucky protocol upheld in *Baze*. Mr. Rhoades meets the standard for a

stay. This Court should enter an order enjoining or staying his execution pending

resolution of this lawsuit.

Alternatively, a stay should be granted pending resolution of this lawsuit because

the IDOC execution facility is incomplete, precluding the IDOC from complying with

SOP 135.

## I.    RHOADES IS LIKELY TO SUCCEED ON THE MERITS

Incorporating the *Baze* safeguards into SOP 135 or adopting a one-drug protocol is

a feasible, readily implemented procedure which would significantly reduce the

substantial risk of severe pain created by SOP 135 as established below. *Baze*, 553 U.S.

at 52. Other states, including Ohio, South Dakota, and Washington, have adopted a one-

drug protocol exclusively or as one of multiple alternatives. *See* Exhibits 1, 2, 3 (lethal injection protocols).

      A.     SOP 135 Clearly Creates A Demonstrated Risk Of Severe Pain.

IDOC adopted SOP 135 less than two weeks ago. Dkt.7-4 (SOP 135). SOP 135 provides for administering three chemicals through an intravenous catheter ("IV") in the following order: sodium pentothal ("thiopental"), an anesthetic; pancuronium bromide, a paralytic; and potassium chloride, a cardiac-arrest inducing chemical. *Id.* at 2-3. SOP 135 provides that, if the IDOC is unable to secure a sufficient amount of thiopental, then pentobarbital should substitute as the anesthetic. Thiopental is a barbiturate. Pentobarbital is also a barbiturate.

Pancuronium bromide is the second chemical administered in accordance with SOP 135. When an appropriate dose of pancuronium bromide is administered intravenously to a human being, motor weakness progresses to a total muscular paralysis. The paralytic effect starts first in the small muscles (eyes, jaw). It then progresses to the limbs. The paralytic effect progresses, finally, to the muscles of the rib cage and diaphragmatic muscles, which results in cessation of breathing. Pancuronium bromide does not affect consciousness and does not prevent the perception of pain.

Pancuronium bromide precludes an accurate assessment of consciousness by visual and auditory observations. Pancuronium bromide paralyzes all muscles that would otherwise move when an individual is in excruciating pain. Dkt. 1-5, Exhibit 17 at paras. 5, 17 (Sworn declaration of David Lubarsky, M.D., *Arthur v. Thomas, et al.*, No. 11-CV-438-MEF-TFM). A conscious individual who receives a therapeutic or greater dose of

pancuronium bromide would experience suffocation and be unable to move or otherwise respond.  Exhibit 1 at para. 10.

Potassium chloride is the last chemical administered. Dkt. 7-4 at 36-37.  At a sufficient dose, potassium chloride disrupts the normal electrical activity of the heart, inducing cardiac arrest.  Potassium chloride does not affect consciousness and does not prevent the perception of pain.  As it travels in the bloodstream from the site of the injection towards the heart, potassium chloride activates all of the nerve fibers inside the blood vessel.  This activation causes an extraordinarily painful burning sensation absent anesthesia.  Exhibit 4 at para. 7.

"The proper administration of [the anesthetic thiopental] ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs."  *Baze*, 553 U.S. at 44.  If an anesthetic is not used or if it does not reach the brain, and the remaining chemicals are administered, the inmate will experience suffocation caused by the paralytic; then an extreme burning throughout his blood vessels as the potassium chloride is distributed; and, finally, cardiac arrest.  Exhibit 4 at para. 10, 13, 20.

> 1.    Botched Lethal Injection Executions Are a Contemporary
>        Reality.

Botched lethal injection executions are not a new phenomenon, but they are a continuing one.  Deborah W. Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution And Lethal Injection And What It Says About Us*, 63 Ohio St. L.J. 63, 139-41 (2002) (listing by inmate name thirty-one botched lethal

injection executions between 1982 and 2001, and describing evidence of error).  Denno's

list includes cases where inmates needlessly suffered after the administration of the

chemicals.  For example, in each of the following botched executions, the protocol called

for administering a series of the same types of chemicals in the same order as called for

by SOP 135.  When using thiopental, an anesthetic, the following botched executions

were recorded:

- Witnesses reported that during his 1992 Oklahoma execution, Robyn Lee Parks "violently gagged and bucked in his chair after the drugs were administered."  Denno at 140.

- Justin Lee May, executed by the State of Texas in 1992, "gasped and reared against his restraints during his nine-minute death."  *Id.*

- After the chemicals started to flow into Luis M. Mata during his 1996 Arizona execution, his "head jerked, his face contorted, and his chest and stomach sharply heaved."

- Scott Dawn Carpenter, executed by the State of Oklahoma in 1997, "gasped and shook for three minutes following the injection."

Botched lethal injections continue even after *Baze*.  Very recently, on June 23,

2011, the State of Georgia executed Roy Blankenship by lethal injection.  In executing

Mr. Blankenship, the State of Georgia used pentobarbital as the first chemical in its three-

chemical protocol.  An Associated Press reporter who witnessed Mr. Blankenship's

execution wrote:

> He was laughing and chatting with a prison chaplain in the moments before his execution, at one point trying to converse with the observers sitting behind a glass window.

> As the injection began, he jerked his head toward his left arm and made a startled face while blinking rapidly.  He

Memorandum In Support of Emergency Motion
For Preliminary Injunction or Stay of Execution -6

> soon lurched to his right arm, lunging with his mouth
> agape twice.  He then held his head up, and his chin
> smacked as he mouthed words that were inaudible to
> observers.

Dkt. 1-4, Exhibit 6, p. 4 (Affidavit and attached newspaper article of Associated Press

reporter Greg Bluestein, *DeYoung v. Owens*, No. 11-cv-2324-SCJ (N.D. Ga.)).

2.    A Substantial Risk for Botched Executions:  Problems Relating to
the Initiation, Maintenance and Administration of Chemicals
through IVs.

Absent proper training and practice in initiating and maintaining IVs, there is a

substantial risk that an IV will not serve as a reliable mechanism for delivering chemicals

into the bloodstream.  Exhibit 4 at 5, 6, 20, passim.  In the lethal injection context, this

means that there is a substantial risk that an insufficient amount of anesthetic will reach

the prisoner, leaving him to experience the pain and suffering caused by a paralytic

chemical and a cardiac-arrest inducing chemical which do reach him.  *Baze,* 553 U.S. at

53.

The necessary training and experience needed to avoid this substantial risk is

reserved for advanced healthcare professionals.  For example, the training of basic EMTs

and phlebotomists—two kinds of healthcare professionals which SOP 135 allows to

initiate and maintain IVs—does not cover establishing or maintaining IVs, or delivering

any fluids through IVs. Dkt. 1-5, Exh. 23 at 21, Exh. 22.. Nor do these particular kinds of

healthcare providers typically gain experience in these regards.  *Id.*

Submitted in support of this motion is the affidavit from Mark J.S. Heath, M.D., a

practicing anesthesiologist with approximately 21 years experience and an Assistant

Professor of Clinical Anesthesiology at Columbia University School of Medicine.  In it,

Dr. Heath addresses some potential difficulties in initiating and maintaining an IV and

administering chemicals through an IV.  When initiating an IV, the needle or cannula

"may . . . puncture[], tear[], or otherwise perforate the wall of the vein[.]"  Exhibit 1 at 6.

After an IV is initiated, the cannula "can shift position so [some or all of] the fluid travels

into the surrounding tissue rather than the blood vessel."  *Id.*  "Regardless the particular

mechanism, inadvertent delivery of fluid into the tissues surrounding the vein is referred

to as 'extravasation' and/or 'infiltration."  *Id.*

     Dr. Heath addresses the consequences of infiltration of IVs used during an SOP

135 execution:

> The Idaho lethal injection protocol mandates using pancuronium
> bromide and potassium chloride to execute inmates.  Absent
> adequate anesthetic depth (i.e., a deep level of unconsciousness
> from which a highly noxious stimulation will not produce arousal),
> the infiltration of either of those chemicals into the surrounding
> tissue will result in severe pain and suffering.  In particular, if all
> three drugs infiltrate into the tissue surrounding the vein, the first
> drug, thiopental, will not reach sufficient levels in the bloodstream
> to produce anesthesia.  By contrast, the second drug, pancuronium,
> will reach sufficient levels to produce generalized paralysis.  The
> third drug, potassium, causes a severe burning sensation when
> infiltrated into tissues.  I do not know whether infiltrated
> potassium, in the doses contemplated in lethal injection procedures,
> will reach sufficient blood levels to cause cardiac arrest.  The
> important point is that infiltration of the three lethal injection drugs,
> in part or in whole, is highly likely to produce an agonizing and
> torturous execution.

Exhibit 4 at para. 7.

     Assessing whether an IV is infiltrated is a hands-on process in which a properly

trained and experienced individual inspects the site, visually and tactilely "for swelling,

discoloration, and temperature changes, as well as monitoring of the IV equipment."

Exhibit 4 at para. 11.  Importantly, "[t]he signs of an infiltrated IV are often very subtle,

and can easily be missed by an inexperienced practitioner.  Indeed, even a highly

experience practitioner may initially fail to detect an infiltrate IV, although the likelihood

of this error occurring is reduced by accrued practice experience."  *Id.* at para. 12.

IVs may also fail through leakage.  "Leakage may occur anywhere there is fluid,

including any of the various points of connection through which the fluid being

administered flows."  Exhibit 4 at para. 8.  It may occur "where the IV line connects to

the saline bag, where it connects to additional  IV lines, at any point where additional

lengths of tubing ("IV extension sets") are connected, at any point where an injection

stopcock is inserted, at the site where the syringe (or needle on the syringe) is introduced

to the IV apparatus, or where it connects to the hub of the cannula."  Exhibit 4 at para. 8.

Specific to Idaho,

> [T]he . . . protocol calls for using chemical filled syringes
> connected to a 3-Gang, 3-Way Manifold.  For the chemicals to
> reach the inmate, the Manifold will need to be connected to the IV
> line, and there may be leakage at any of the resulting multiple
> points of connection.

Exhibit 4 at para. 9.

Importantly, "[i]nfiltration and leakage are not necessarily 'all-or-nothing' events.

Nor are they mutually exclusive causes of IV failure."  Exhibit 1 at para. 10.

> Using Idaho's lethal injection protocol as an example: infiltration
> and/or leakage could cause an insufficient amount of thiopental or
> pentobarbital to reach the prisoner's brain to sufficiently
> anesthetize him for the next two steps of the execution, paralysis

and cardiac arrest.  In this scenario, if partial or complete doses of the pancuronium bromide and potassium chloride are subsequently delivered into the inmate's bloodstream, the inmate would experience the extreme pain and suffering of conscious paralysis and cardiac arrest.  Moreover, an insufficiently anesthetized person would experience burning in his or her veins upon administration of concentrated potassium chloride, and any amount of potassium chloride delivered to the surrounding tissue or to the bloodstream would cause extreme pain absent sufficient anesthetic. . . . Of note, the doses of pancuronium bromide and potassium chloride called for in the Idaho protocol are so large that the delivery of a fraction of the dose would lead to paralysis and possibly cardiac arrest.

*Id.*

> 3.  The Supreme Court's Answer To The Substantial Risk Of Severe Pain:  Particular Safeguards Must Be In Place.

*Baze* requires safeguards against the severe pain which an inmate will suffer if the IVs do not function properly.  Initiating and maintaining a functioning, open and unblocked IV, and delivering chemicals through an IV are complex skills which require training, experience, and competence.  The Supreme Court agreed "that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."  *Id.* at 53.

The Supreme Court approved the Kentucky lethal injection protocol but only because it included "several important safeguards to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner."  *Id.* at 55.  Absent those safeguards, there is a substantial risk of serious harm in violation of the Eighth Amendment.  *Id.* at 55.  These safeguards are: relevant credentials; contemporary and

continuing daily experience; adequate in-house training; redundancy; and a meaningful consciousness check.

       4.     IDOC SOP 135 Contains None of the *Baze* Safeguards.

          a.     SOP 135 does not contain the "most significant" safeguard, a required medical credential "combined with at least one year of professional experience."

The first "most significant" safeguard on which the *Baze* court relied was that "members of the IV team must have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman[.]" *Baze*, 533 U.S. at 55.  Under the Kentucky protocol at issue in *Baze*, the IV team is responsible for establishing the IV lines.  Exhibit 5 (Kentucky Protocol).

SOP 135's Medical Team is responsible for much more, including establishing the IV lines, "ensur[ing] the line is functioning properly through the procedure" and monitoring the offenders "level of consciousness."  Dkt. 7-4 at 9. Additionally, SOP 135's Appendix A sets out a detailed description of the Medical Team members' responsibilities, which relate to IV initiation and maintenance, central line placement, consciousness checks, and EKG monitoring:

- "determine the best sites on the offender to insert a primary IV catheter and a backup IV catheter in two (2) separate locations in the peripheral veins utilizing appropriate medical procedures."  Dkt. 7-4 at 39.

- "Both primary and backup IV lines will be placed [by the Medical Team] unless in the opinion of the Medical Team leader it is not possible to reliably place two (2) peripheral lines." *Id.*

- "To ensure proper insertion in the vein, the assigned Medical Team members should watch for the dark red flashback of blood at the catheter hub in compliance with medical procedures." *Id.*

- If the Medical Team Leader determines that "it is not possible to reliably place a peripheral line in the offender, a Medical Team member may utilize a central line catheter in the offender's femoral vein in the thigh if, in the opinion of a qualified Medical Team member, such a line may be reasonably placed. The Medical Team member responsible for placing a central line catheter in the offender's femoral vein shall have at least one year of regular and current professional experience conducting that procedure." *Id.* at 40.

- In the event a central line catheter is employed, the Medical Team member "will place the central line catheter in the offender's femoral vein utilizing appropriate medical procedures which includes the use of an ultrasound to assist in properly inserting the catheter and anesthetic such as Lidocaine." *Id.*

- "Continually monitor the offender's level of consciousness and electrocardiograph readings, maintaining constant observation of the offender using one or more of the following methods: direct observation, audio equipment, camera, and television monitor as well as any other medically approved method(s) deemed necessary by the medical team leader." *Id.* at 39.

SOP 135's main text and Appendix A also provides a detailed description of the

Medical Team leader's duties, which related to IVs, delivery of chemicals through IVs,

consciousness checks, EKG machines, and debribrillators:

- Seven to two days before an execution, the Medical Team leader is to "[e]nsure serviceability of all medical equipment including electrocardiogram (EKG) machines and/or defibrillator, and the

availability of graph paper [and] [e]nsure heart monitor lead lines are sufficient in length." *Id.* at 27.

• "Attach two (2) complete sets of the prepared and labeled syringes to the 3-Gang, 3-Way Manifold in the order in which the chemicals are to be administered." *Id.* at 35.

• Must, prior to attaching the syringes, check "the flow of each gauge on the manifold . . . by . . . running heparin/saline solution through the line to confirm there is no obstruction." *Id.*

• "After the Medical Team prepare all syringes with the proper chemicals and labels as provided in the applicable Chemical Chart, the Medical Team leader shall ensure the IV setup is completed." *Id.* at 39.

• "The insertion sites in order of preference shall be: arms, hands, ankles and feet, as determined medically appropriate by the Medical Team leader." *Id.*

• Must, "[o]nce the offender is secured, . . . attach the leads from the electrocardiograph to the offender's chest and confirm that the electrocardiograph is functioning properly[.]" *Id.*

• "[S]hall be responsible for monitoring the offender's level of consciousness." *Id.*

• Must opine whether "it is . . . possible to reliably place a peripheral line in the offender[.]" *Id.* at 40.

• "After the sodium pentothal/or pentobarbital and heparin/saline have been administered and before the Injection Team members begin administering the pancuronium bromide, the Medical Team leader shall confirm the offender is unconscious by direct examination of the offender.  The Medical Team leader . . . will enter the room where the IMSI warden and offender are located to physically confirm the offender is unconscious by using all necessary medically appropriate methods." *Id.* at 40.

• While in the execution chamber to conduct a consciousness check, the Medical Team leader "will also confirm that the IV line remains affixed and functioning properly." *Id.* at 40.

SOP 135 provides that each Medical Team member possess one of the following credentials:

- Emergency Medical Technician;
- Licensed Practical Nurse (LPN) or Registered Nurse (RN);
- Military Corpsman;
- Paramedic;
- Phlebotomist;
- Physician Assistant;
- Physician; or
- Other medically trained personnel including those trained in the United States Military.

Dkt. 7-4 at 9.

Though SOP 135's Medical Team is responsible for IV initiation and maintenance as well as supervision of administering chemicals via IV, it does *not* require that Medical Team members "have at least one year of professional experience."

Additionally, while the minimum requirements for Medical Team membership includes certain skilled occupations—e.g., physician, registered nurse, licensed practical nurse, physician assistants, EMT, Paramedic—SOP 135 does not state that those workers be currently licensed or have any actual experience in initiating IV catheters. Consequently, a Medical Team member may have earned his qualifying credential years ago, have no intervening experience, and have no contemporary relevant and reliable skills.  Some of the skilled occupations are unlicensed and require no certification or recertification.  So, while individual Medical Team members may have earned their particular credentials in the distant past when they may have been competent in IV initiation and maintenance, they need not retain that competence today.  This contrasts starkly with the *Baze* requirements which are designed as safeguards.  Team membership

requirements which do not ensure relevant and adequate training and experience are not safeguards.

While the Medical Team is responsible for IV initiation and maintenance as well as supervising the administration of the chemicals via IV, it is the Injection Team which administers those chemicals. SOP 135 at 9 ("The Injection Team members shall be responsible for administering the chemicals[.]"). SOP 135 provides that each Injection Team members "have at least one year of medical experience as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, or military medical corpsman."

Certified medical assistants, phlebotomists, and EMTs have no required training or experience in administering medicinal substances via IV push. Nor does SOP 135 require that the Injection Team members have any training or experience allowing them to acquire the skill set needed to fulfill their responsibility. This deficiency is not negated by the fact that the Injection Team leader reports directly to and take direction from the Medical Team leader, for SOP 135 does not require that the Medical Team leader have that training or experience in administering substances through an IV either. The minimum training and experience requirements are no greater for Medical Team Leaders than for regular Medical Team members.

IV medication administration is outside the scope of Certified Medical Assistant practice and certification. *See* Dkt. 1-5 at Ex. 21. According to Dr. Hodges, the Medical Director the Medical Assistant Program at the College of Western Idaho and a practicing physician:

> In my opinion[,] I cannot think of an incident [sic] in which it
> would be appropriate for a Medical Assistant to start or manage IV
> fluids, or administer intravenous medication.

Dkt. 1-5 at Ex. 21.

Regarding phlebotomists, a College of Western Idaho Phlebotomy instructor and

nationally certified Phlebotomist with over twelve years' experience in the field writes:

> The [S]tate of Idaho does not regulate what training or experience a
> phlebotomist must have to work in Idaho.  Anyone can start
> working in Idaho as a phlebotomist with no previous training or
> experience needed. . . .
>
> We do however have voluntary guidelines which the course at CWI
> [i.e.- College of Western Idaho] is modeled after.  These national
> guidelines are set out by the Clinical Laboratory Standards Institute
> (CLSI).  According to CLSI, phlebotomists are not allowed to start
> IV's or use implanted devices.  This rule has proved true in my 12
> years' experience, as I have never been allowed to access devices
> (including but not limited to starting IV's and administering
> medications).  This is something I teach my students as out of their
> "scope of practice."

Dkt. 1-5 at Ex. 22.

EMTs are not trained in IV drug administration either. The State of Idaho licenses

and regulates the training and scope of practice of Emergency Medical Technicians

("EMTs") and Paramedics. The Idaho legislature has invested the Idaho Emergency

Medical Services Physician Commission ["EMS Physician Commission"] with the

authority and obligation to "adopt appropriate rules defining the allowable scope of

practice and acts and duties which can be performed by persons licensed by the EMS

bureau[.]" I.C. §56-1023(1).  The EMS Physician Commission Standards Manual ("Standards Manual") fulfills this legislative mandate. Dkt. 1-5 at Ex. 23 (EMS Physician Commission Standards Manual).

The Standards Manual distinguishes between EMTs and Advanced EMTs ("AEMTs") for training and scope of practice purposes. Id. at 16-18, 21-24.  The Standards Manual allows only Advanced EMTs and Paramedics to initiate an IV and administer non-medicinal substances via IV infusion. Id. at 22-23.  The Standards Manual allows only Paramedics to administer medicinal substances via IV infusion or to administer any substance via IV push. Id. at 23.

In accordance with SOP 135, the Injection Team may be composed entirely of members with no training and experience allowing them to reliably administer any of the three chemicals.

Members of neither the SOP 135 Medical Team nor its Injection Team are required to have a medical credential "combined with one year of professional experience" relevant to their IV and injection responsibilities.

> b.    SOP 135 does not contain the second *Baze* requirement, daily experience.

SOP 135 does not require that Medical Team members "have daily experience establishing IV catheters."  *Baze*, 553 U.S. at 55.  Nor does SOP 135 require that the Medical Team members have experience in ensuring that the lines are functioning properly, mixing chemicals, preparing syringes, administering medication, or—critically—assessing levels of consciousness.

The fact that the SOP 135 requires no training or experience in any of these regards is clear from the fact that no such training or experience is necessary to qualify as a Basic EMT, Phlebotomist, or as some kinds of military corpsman.  Dkt. 1-5, Exh. 22, 23.  The daily experience necessary to meet *Baze* cannot be inferred.  As Justice Alito notes in his concurring opinion in *Baze*, the American Medical Association, the American Nurses Association, and the National Association of Emergency Medical Technicians each have adopted positions forbidding participation in executions. *Baze*, 553 U.S. at  64-5.  Additionally, the final credential category making one eligible for Medical Team membership, being "medically trained personnel," is so vague as to include those certified by the Red Cross in First Aid/CardioPulmonary Resuscitation/Automatic External Defibrillator or in Responding to Emergencies.  Neither course of instruction includes training or experience with IVs or EKGs.  *See* http://editiondigital.net/publication/?i=64159  (First Aid/CPR/AED manual) and  http://editiondigital.net/publication/?i=55906 (Responding to Emergencies manual).

SOP 135 specifically provides that "[t]he Medical Team can be comprised of any combination of" the above enumerated disciplines. Dkt. 7-4 at 9.  Notwithstanding ethical concerns, while SOP 135 does allow physicians to be Medical Team members, it does not *require* that a physician or anyone else with the needed training and experience be a member of the Medical Team. In short, the entire Medical Team, including the Medical Team leader, may consist of individuals with no relevant training or experience.

No one else charged with monitoring the execution process has the necessary medical training and experience either.  The only individuals other than the offender authorized to be in the execution chamber are:

- Execution Escort Team members; (up to two [2] total);
- The director of the IDOC; and
- The IMSI warden.

Dkt. 7-4 at 15.  Among these, only the IMSI warden is responsible for monitoring "the offender and the primary and backup IV sites for any potential problems and [he] shall immediately notify the Medical Team leader and director should any issue occur."  *Id.* at 39.

If sufficient training and experience were present, the IMSI warden's monitoring responsibility *could* be a safeguard against the prisoner suffering severe pain, allowing reliable assessments of consciousness and IV functioning.  However, SOP 135 does not require that the warden have any medical training and experience relevant to either assessment.  Consequently, the warden cannot reliably assess the offender and the IV sites for any potential problems.  Absent the warden's ability to competently assess these things, his presence is no safeguard against the prisoner suffering severe pain.  Exhibit 4 at paras. 11, 12, 14, 15 & 21 (IV failure assessment is subtle and requires training and experience; consciousness assessment requires appropriate stimuli use not provided for in SOP 135).

SOP 135 does not require that the Medical Team have the necessary continuing, daily experience. Neither does SOP 135 require it of the Injection Team.

      c.     SOP 135 does not contain the
                third *Baze* safeguard, in-house training.

The *Baze* court relied on a third safeguard: that the "IV team members, along with the rest of the execution team, participate in at least 10 practice session per year."  *Baze, 553* U.S. at 56.  The court emphasized that those sessions "encompass a complete walk-through of the execution procedures, including the siting of IV catheters into volunteers."  *Baze* at 55.  SOP 135 does not require that the in-house training cover all (or any particular) aspects of its mandated execution procedures.

SOP 135's in-house training provision does not require that the training sessions involve anyone other than Medical Team members.  Consequently, there is no requirement that the training be conducted by someone with the necessary skills which, in accord with SOP 135, every Medical Team member may lack.  Nor does the training requirement extend to the Injection Team, creating a substantial risk of severe pain due to IV failure from improper rate or force of injection.  Exhibit 4 at para. 13 (if injection rate or injection force is too high, can cause leakage at connection points, damage to vein wall, or the cannula to dislodge –any of which could result in inadequate anesthesia reaching the inmate).

SOP 135 requires that all Medical Team members participate in only "four (4) training sessions prior to participating in an actual execution[.]" Dkt. 7-4 at 10.  Those individuals may have no daily experience—*indeed no prior training or experience at all*—in establishing and maintaining IVs.  This means that a phlebotomist—a "credential" which requires no training or experience to acquire in Idaho, *see* Dkt. 1-5,

Exh. 22—or an individual certified in First Aid, Cardiopulmonary Resuscitation, and Automatic External Defibrillator use and who has no other medical training and experience, may become eligible for Medical Team membership after only four so-called training sessions, allowing them to establish an IV and then monitor it for proper functioning.  This plainly violates *Baze*.

> d.  SOP 135 does not contain the fourth *Baze* safeguard, meaningful redundancy.

In addition to the training and contemporary and continuing experience safeguards, the Kentucky protocol includes a fourth safeguard  – that the IV team prepare two sets of lethal injection chemicals before the execution commences as well as a primary and secondary IV line.  The Supreme Court held, "These redundant measures ensure that if an insufficient dose of sodium thiopental is initially administered through the primary line, an additional dose can be given through the backup line before the last two drugs are injected."  *Baze*, 553 U.S. at 55.  These redundancies constituted a safeguard in Kentucky because that state's protocol requires that the chemical preparation and placement of the lines be accomplished by trained and experienced personnel.

SOP 135 likewise requires a backup IV, and backup chemical preparation and readiness as well.  However, it does not require that the individuals initiating, maintaining, or delivering chemicals through the IV have any relevant training and experience in doing so.  Where no such training and experience requirements exist, such as in Idaho, the redundancies do not become a safeguard.  Having that same untrained

and inexperienced person do the task twice does not materially improve the chances of it being done correctly.

                    e.       SOP 135 does not contain the final *Baze* safeguard, a meaningful consciousness check.

The Kentucky "protocol specifically requires the warden to redirect the flow of chemicals to the backup IV site if the prisoner does not lose consciousness within 60 seconds."  Baze 553 U.S. at 56.  This determination is made by a physical check of the offender.

SOP 135 provides for a consciousness check, which is to be performed after the administration of thiopental or pentobarbital and heparin/saline but before the administration of pancuronium bromide:

> The Medical Team leader, dressed in a manner to preserve his anonymity, will enter into the room where the IMSI warden and offender are located to physically confirm the offender is unconscious by using all necessary medically appropriate methods.

Dkt.7-4 at 40.  All that can fairly be discerned from this is that the consciousness check is performed by the Medical Team leader, that it requires physical confirmation, and that it must use "all necessary medically appropriate methods."  *Id.*  Physical confirmation may mean merely direct visual and aural inspection.  SOP 135 does not require that the Medical Team leader actually touch the offender or apply different noxious stimuli to him to determine the offender's level of unconsciousness.  Visual and aural consciousness checks are inadequate to determine whether the offender is sufficiently unconscious to allow the administration of pancuronium bromide and potassium chloride without his experiencing the severe pain associated with those chemicals.

Dr. Heath notes that:

> A person who is unconscious but not aroused by lighter forms of
> stimulation may still be arousable by an intense or highly noxious
> stimulus.  The levels of stimulation produced by pancuronium
> injection (which causes suffocation due to the inability to draw
> breath) or by potassium injection (which causes excruciating pain)
> are the types of highly noxious stimuli that could easily arouse an
> unconscious person and revert them to a state of consciousness in
> which they would experience the agonizing effects of pancuronium
> and potassium.

Exhibit 4 at para. 15.  *See also* Dkt. 1-5 at pp. 40, 74 (Dr. Waisel testimony in *DeYoung*

*v. Owens*, No. 1:11-cv-2324-SCJ (N.D. Ga. July 19, 2011)).

Requiring an appropriate consciousness check by an adequately trained individual

experienced in conducting consciousness checks is an alternative which would

significantly reduce the risk of needless severe pain inherent in administering the

remaining two chemicals.  A person experienced and either certified or adequately

trained in conducting consciousness checks is necessary because discerning levels of

consciousness is a nuanced skill.

> The sophistication necessary comes not only from theoretical
> knowledge, but from training under supervision and feedback and
> experience.  Patients respond differently, and the educated eye
> needs to be able to give an increasing level of stimulation and
> needs to be looking for subtle signs, such as, . . . fluttering of the
> eyes, wincing, finger movement, toe movement, any of those, and
> it takes a practiced eye to do that.

Dkt. 1-5 at Ex. 15, pp. 74-5 (Dr. Waisel testimony, DeYoung v. Owens, et al., No. 11-

CV-2324-SCJ (N.D. Ga.)).  A person needs training in order to adequately assess an

individual's consciousness following the administration of anesthesia.  Id. at 75.

Memorandum In Support of Emergency Motion
For Preliminary Injunction or Stay of Execution -23

4.      SOP 135 Allows For A "Cut Down" To Establish A Central
Line.

SOP 135 contemplates that the Medical Team leader may opine that it is " not

possible to reliably place a peripheral line in the offender."  Dkt. 7-4 at 40.  In that event,

a "Medical Team member may utilize a central line catheter in the offender's femoral

vein in the thigh. . .utlizing appropriate medical procedures which includes the use of an

ultrasound to assist in properly inserting the catheter and anesthetic such as Lidocaine."

*Id.*  Among the medical procedures considered appropriate among medical professionals

is a "cut down" (i.e.- making an incision in the thigh to access the femoral vein).  This is

a "dangerous" procedure which should "be performed only by a trained physician in a

clinical environment with a patient  under deep sedation."  *Nelson v. Campbell*, 541 U.S.

637, 642 (2004) (paraphrasing affidavit of Dr. Mark J.S. Heath).  SOP 135 contemplates

the use of Lidocaine, a local anesthetic.  However, there are alternative ways to establish

a central line which are "'less invasive, less painful, faster, cheaper, and safer,'"

including "'percutaneous central line placement.'"  *Nelson*,541 U.S. at 646 (2004)

(quoting affidavit of Dr. Mark J.S. Heath).  The Sixth Circuit Court of Appeals rejected

an Eighth Amendment attack on a lethal injection protocol which failed to explicitly ban

the use of cut-down procedures, but it did so only because the director of the state

department of correction represented that a cut-down procedure would not be used.

*Cooey v. Strickland*, 589 F.3d 210, 228 (6th Cir. 2009).

> 5.     SOP 135 Does Not Address What To Do In The Event The
>        Offender Regains Consciousness After Or During The
>        Administration Of Potassium Chloride.

Dr. Heath opines that "absent proper training and experience on the part of the

personnel who are charged with placing the IV cannulae and injecting the drugs, there is

a high risk that . . . an insufficient amount of anesthetic agent will reach the prisoner's

brain[.]"  Exhibit 4 at para. 20.  He notes elsewhere in his affidavit that because IV failure

is not all-or-nothing, a partial dose of the paralytic and potassium chloride could reach an

offender, causing severe pain.  Exhibit 4 at para. 10.  The protocol does not contemplate a

prisoner awakening from a non-fatal but still severely painful dose of potassium chloride.

The protocol has no provision for relieving the offender's severe pain.  This violates *Baze*

and the Eighth Amendment prohibition against cruel and unusual punishment.


> B.     IDOC Officials Are Not Subjectively Blameless For Purposes Of The
>        Eighth Amendment

To prevail on a claim of future harm as cruel and unusual punishment, "there must

be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that

prevents prison officials from pleading that they were 'subjectively blameless for

purposes of the Eighth Amendment.'  *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and

n.9 (1994)."  *Baze*, 553 U.S. at 50;  Dkt. 7-1 at 15 (Memorandum In Support Of Motion

To Dismiss).  In stating "a lethal injection protocol substantially similar to the protocol

we uphold today would not create a risk that meets this standard[,]" the *Baze* court was

referring to the "demonstrated risk of severe pain" standard which it grounded in *Farmer*.

*Baze*, 553 U.S. at 61.  As the court held, "[T]he proffered alternatives must effectively address a 'substantial risk of serious harm.' *Farmer*, [511 U.S.] at 842."  *Id.* at 52.  Where the risk of severe pain is increased due to unattended matters within the prison's control, such as last minute, inadequately timed and rehearsed procedures due to inexplicable delays in crafting a protocol and constructing an execution chamber, the prison officials are not subjectively blameless.  Their actions contributed to a substantial risk of serious harm or an objectively intolerable risk of harm.  Where the prison officials were not subjectively blameless, the prison officials' failures constitute evidence meeting the petitioner's burden.

In the instant case, IDOC officials are not subjectively blameless.   They have known since 2008 that they needed to establish execution procedures in compliance with *Baze*.  Yet they adopted SOP 135 only two weeks ago.  IDOC officials have known for several years that one or more death sentenced inmates' cases were drawing to a conclusion. Yet they chose to remodel an execution facility on a timetable precluding the SOP 135 required training of execution teams in time for an execution in accord with SOP 135.  Exhibit 6 (news article noting incomplete facility).  IDOC officials are not subjectively blameless where they prevent compliance with the SOP 135 in a way which increases the likelihood of a substantial risk of harm.

Here, IDOC officials' failure to adopt SOP 135 until 14 days ago and their failure to have a facility at which the Medical and Injection Teams may meet their training requirements unquestionably increases the likelihood of a substantial risk of harm.  Together with the

IDOC officials' failure, the evidence Mr. Rhoades proffers above demonstrates a

likelihood of success on the merits.

> C.   The IDOC Execution Facility Is So Incomplete As To Preclude SOP 135
> Mandated Training

News media report that the IDOC execution facility is not complete.  Exhibit 6

(Associated Press article noting that facility not yet complete).

SOP 135 requires that:

- each of the three teams—Escort, Medical, and Injection—conduct 10
  training sessions annually,

- after receiving a death warrant, each of the teams will train weekly
  before the execution date,

- each team will participate in a minimum of four training sessions prior
  to participating in an actual execution, and

- in the 48 hours prior to any scheduled execution, each team must
  conduct at least two rehearsal sessions.

Dkt. 7-4 at 10.  In light of the incomplete nature of the execution facility, none of the

SOP 135 required weekly trainings can have been completed.  Additionally, that required

training cannot be completed before Mr. Rhoades's scheduled execution date.

II.   Absent A Stay, Mr. Rhoades Will Suffer Irreparable Harm.

This second factor is incorporated in the *Baze* stay standard.  Because the *Baze*

safeguards are not incorporated in SOP 135, there is substantial likelihood that Mr.

Rhoades will suffer irreparable harm—severe pain and suffering—should his execution

move forward.

III.    The Balance Of Equities Strongly Tips In Mr. Rhoades's Favor.

In March, 2011, the IDOC refused undersigned counsel's public records request for the IDOC execution protocol.  Dkt. 1-4 at Exh. 13.  In May, 2011, the IDOC provided to the University of  California, Berkeley School of Law, a draft revision of the predecessor to SOP 135, a revision which they disclaimed and stated was not in effect. Dkt. 1-4 at Ex. 2, 3. Finally, two weeks ago, on October 14, the IDOC adopted and released for publication its final execution procedures.  Dkt. 7-4.  The predecessor to SOP 135 identified three chemicals to be used in executions, but it provided no specific procedures for using those chemicals to execute an inmate.  Dkt. 1-4 at 23-4.  The State variously describes SOP 135 as "extensively revised" and "completely revised" from the draft which the IDOC refused to provide undersigned counsel in March.  Dkt. 7-1 at 4, 11.  Defendants were long aware that they needed to create execution procedures in compliance with *Baze v. Kentucky*, 533 U.S. 35 (2008), but failed to adopt any specific procedures until earlier this month.  *See* Dkt. 7-2 at 28 (IDOC Grievance Listing, noting 2009 grievances re execution process).  In delaying both the construction of its facility and the drafting and release of SOP 135 until the eve of execution, IDOC has unclean hands and laches that tip the balance of equities strongly in Mr. Rhoades's favor.

IV.    A Stay Or Injunction Is In The Public Interest

The public has a strong interest in the enforcement of federal Constitutional rights and against state government violation of those rights.  It has an especially strong interest in the government not killing a citizen when the State's delays caused insufficient time for the court to resolve this matter in a deliberate fashion.  The strong public interest is in

Memorandum In Support of Emergency Motion
For Preliminary Injunction or Stay of Execution -28

an orderly and deliberate decision of the important issues raised.   If Idaho is to exact the ultimate penalty, it should only do so in a humane manner, without inflicting severe and unnecessary pain on the condemned inmate.

Conclusion

Mr. Rhoades meets his burden for a stay.  He has established that SOP 135 creates a demonstrated risk of severe pain.  That risk is substantial when compared to the known and available alternatives, a one-drug protocol or the incorporation of the *Baze* safeguards into SOP 135.  The Court should issue a preliminary injunction or stay of execution pending the resolution of this lawsuit.

Dated this 28th day of October, 2011.

Respectfully submitted,

_____/s/_____
Oliver W. Loewy
Teresa A. Hampton
Capital Habeas Unit
Federal Defenders Services of Idaho, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of October, 2011, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which is designed to send a Notice of Electronic Filing to persons including the following:

Krista Howard

<u>khoward@idoc.idaho.gov</u>

      /s/       <br>
Teresa A. Hampton