COUNTY OF NEW YORK

STATE OF NEW YORK

AFFIDAVIT OF MARK HEATH, M.D.

I, Mark Heath, M.D., swear under penalty of perjury that the following is true:

1. My name is Mark J.S. Heath, M.D.. I am over the age of eighteen and competent to testify to the truth of the matters contained herein.

2. I am a practicing anesthesiologist at Columbia University Medical Center in New York City and an Assistant Professor of Clinical Anesthesiology at Columbia University School of Medicine. I have been practicing clinical anesthesiology for approximately 21 years. I am a board certified anesthesiologist.

3. The placement and utilization of intravenous catheters ("IV catheters", also "IV cannulae" or "IV cannulas") represents an integral element of the practice of clinical anesthesiology. In my clinical practice, the care of every single patient includes the use of intravenous access.

4. A peripheral IV line consists of a short catheter (a few centimeters long) for insertion through the skin into a peripheral vein. Typically, the part of the catheter inserted into the vein consists of a cannula-over-needle device, in which a flexible plastic cannula is mounted on a hollow metal needle. After the tip of the needle is inserted into the appropriate position inside the vein, the catheter is threaded over the needle into the lumen of the vein, and the needle is then withdrawn and

discarded. The connecting hub of the catheter remains outside the skin. It is typically connected to an intravenous infusion line, or capped for later use.

5. Successfully placing an intravenous catheter is a complex task which requires training and experience. It requires knowing how to assess veins for suitability, how to insert the IV needle into the vein, and how to assess whether the needle and catheter are properly situated within the vein.

6. If the cannula is not properly sited in the vein, or if the vein is sufficiently fragile, fluid delivered through the IV may travel into the surrounding tissue rather than into the blood vessel. This can happen because the needle or cannula punctures, tears or otherwise perforates the wall of the vein, or if the cannula dislodges from the vein. Even if the cannula is initially properly inserted and secured, it can shift position so that fluid travels into the surrounding tissue rather than the blood vessel. Regardless the particular mechanism, inadvertent delivery of fluid into the tissues surrounding the vein is referred to as "extravasation" and/or "infiltration." (Some texts and practitioners draw a slight distinction between these two terms, while others do not).

7. The Idaho lethal injection protocol mandates using pancuronium bromide and potassium chloride to execute inmates. Absent adequate anesthetic depth (i.e., a deep level of unconsciousness from which a highly noxious stimulation will not produce arousal), the infiltration of either of those chemicals into the surrounding tissue will result in severe pain and suffering. In particular, if all three drugs in the protocol infiltrate into the tissue surrounding the vein, the first drug, thiopental,

will not reach sufficient levels in the bloodstream to produce anesthesia. By contrast, the second drug, pancuronium, will reach sufficient levels to produce generalized paralysis. The third drug, potassium, causes a severe burning sensation when infiltrated into tissues. I do not know whether infiltrated potassium, in the doses contemplated in lethal injection procedures, will reach sufficient blood levels to cause cardiac arrest. The important point is that infiltration of the three lethal injection drugs, in part or in whole, is highly likely to produce an agonizing and torturous execution.

8. IVs may also fail due to faulty equipment. Leakage may occur anywhere there is fluid, including any of the various points of connection through which the fluid being administered flows. Leakage may occur where the IV line connects to the saline bag, where it connects to additional IV lines, at any point where additional lengths of tubing ("IV extension sets") are connected, at any point where an injection stopcock is inserted, at the site where the syringe (or needle on the syringe) is introduced to the IV apparatus, or where it connects the hub of the cannula.

9. Leakage may also occur wherever another line is joined to the primary line to allow for the injection of chemicals. For example, the Idaho lethal injection protocol calls for using chemical filled syringes connected to a 3-Gang, 3-Way Manifold. For the chemicals to reach the inmate, the Manifold will need to be connected to the IV line, and there may be leakage at any of the resulting multiple points of connection.

10. Infiltration and leakage are not necessarily "all-or-nothing" events. Nor are they mutually exclusive causes of IV failure. In other words, an IV can partially or fully infiltrate and/or partially or fully leak. Using Idaho's lethal injection protocol as an example: infiltration and/or leakage could cause an insufficient amount of thiopental or pentobarbital to reach the prisoner's brain to sufficiently anesthetize him for the next two steps of the execution, paralysis and cardiac arrest. In this scenario, if partial or complete doses of the pancuronium bromide and potassium chloride are subsequently delivered into the inmate's bloodstream, the inmate would experience the extreme pain and suffering of conscious paralysis and cardiac arrest. Moreover, an insufficiently anesthetized person would experience burning in his or her veins upon administration of concentrated potassium chloride, and any amount of potassium chloride delivered to the surrounding tissue or to the bloodstream would cause extreme pain absent sufficient anesthetic. IV failures are not hypothetical risks. Because of infiltration, leakage, or any other of a number of potential problems with intravenous access, it is entirely possible that an insufficient amount of thiopental or pentobarbital could reach the inmate to anesthetize him against the severe suffering and pain caused by the subsequent delivery of full or partial doses pancuronium bromide and potassium chloride. Of note, the doses of pancuronium bromide and potassium chloride called for in the Idaho protocol are so large that the delivery of a fraction of the dose would lead to paralysis and possibly cardiac arrest.

11. Successfully assessing whether IV fluids have been successfully delivered or, rather, whether an IV has failed, requires training and experience. It is a hands-on process that requires includes both visual and tactile inspection of the IV site for swelling, discoloration, and temperature changes, as well as monitoring of the IV equipment.

12. The signs of an infiltrated IV are often very subtle, and can easily be missed by an inexperienced practitioner. Indeed, even a highly experienced practitioner may initially fail to detect an infiltrated IV, although the likelihood of this error occurring is reduced by accrued practice experience.

13. Another source of IV failure relates to the rate of injection and force of injection used for drugs being injected into the IV line. If the injection rate or injection force is too high, this could cause leakage at the connection points or damage to the wall of the vein. It could also cause the cannula to dislodge. In the context of Idaho's lethal injection protocol, either of these events could result in inadequate anesthesia while at the same time allowing sufficient pancuronium and or potassium to reach the inmate and cause a torturous death (or a torturous but failed execution).

14. The Idaho protocol makes the Medical Team leader responsible for assessing unconsciousness. In this context, the term "unconsciousness" is nuanced, and it is important to understand the interplay between unconsciousness and arousability. A person can be unconscious but easily aroused, for example by touching their shoulder or saying their name. Alternatively, a person can be unconscious but

unarousable, such that no stimulus, no matter how noxious or intense, can bring them to consciousness or elicit any response at all.  Colloquially, a person who is unconscious and unarousable is often referred to as being "deeply unconscious". To some degree there is a parallel with the use of the term "anesthetized", in that anesthetic patients may be described as being "deeply anesthetized" or "lightly anesthetized", based on how responsive they are to various intensities of stimulation.

15. A person who is unconscious but not aroused by lighter forms of stimulation may still be arousable by an intense or highly noxious stimulus.  The levels of stimulation produced by pancuronium injection (which causes suffocation due to the inability to draw breath) or by potassium injection (which causes excruciating pain) are the types of highly noxious stimuli that could easily arouse an unconscious person and revert them to a state of consciousness in which they would experience the agonizing effects of pancuronium and potassium.  Whether or not pancuronium and potassium could exert this effect would depend in part on how much thiopental had reached the circulation (and thus reached the brain) of the prisoner.

16. The Idaho protocol contemplates using a central line catheter to achieve intravenous access in the event peripheral IV access cannot be achieved.   The protocol directs placing a "central line catheter in the offender's femoral vein". This is a procedure which is associated with severe life-threatening and painful complications, and it does not appear that the prison has the necessary equipment

and systems in place to deal with these known and foreseeable complications. Until such equipment and systems are in place it would be improper and unduly risky to proceed with a lethal injection procedure.

17. Further, unlike other states, the Idaho protocol does not appear to place a time limit on efforts to initiate intravenous access. Thus, the protocol allows an excessive amount of time for allowing the prisoner to be subjected to incessant and futile needling in order to obtain intravenous access. The failure to impose a reasonable time limit on the attempts to obtain intravenous access renders the Idaho lethal injection protocol both intrinsically defective and defective when compared with the lethal injection protocols of other states.

18. Additionally, unlike other states, the Idaho lethal injection protocol does not appear to contemplate the possibility that the team will not be able to achieve intravenous access. The protocols of other states recognize this possibility--which is important given that the possibility has been actualized--and thus include instructions and guidance about initiating correspondence with high level state administrators to postpone the execution. The failure of the Idaho lethal injection protocol to incorporate such language renders it both intrinsically deficient and deficient with respect to the protocols of other states.

19. The Idaho protocol does not explicitly prohibit the use of a cutdown procedure for obtaining IV access. The protocol states (Appendix A, section F) "The Medical Team member will place the central line catheter in the offender's femoral vein using appropriate medical procedures". The protocol does not limit the universe of

7

"appropriate medical procedures", and while some executioners have considered a cutdown procedure to be appropriate for use in executions, the emerged "standard of care" in lethal injection protocols explicitly eschews this technique. The Idaho lethal injection protocol is thus both intrinsically deficient and deficient with respect to other states in its failure to explicitly forbid the use of cutdown procedures for obtaining intravenous access.

20. In summary, absent proper training and experience on the part of the personnel who are charged with placing the IV cannulae and injecting the drugs, there is a high risk that an IV will not serve as a reliable mechanism for delivering chemicals into the bloodstream. With particular regard to Idaho's lethal injection protocol, this means that there is a high risk that an insufficient amount of anesthetic agent will reach the prisoner's brain, leaving him to experience the pain and suffering caused by a paralytic chemical and a cardiac-arrest inducing chemicals which do reach his body.

21. In further summary, the inadequacies of the Idaho protocol's consciousness check procedures present a gratuitous and substantial risk that the prisoner will be subjected to the torturous effects of pancuroinum and potassium chloride.

22. Due to the litigation schedule in this case, I have had only a few hours to review the Idaho lethal injection protocol (which is very complicated and confusing compared with other states' protocols) and to draft this affidavit. Given more time I would be able to provide more opinions about the numerous problems with the Idaho protocol and would be able to provide more detail and support for the

opinions provided above. I reserve the right to supplement this affidavit if additional information is made available to me.


Dated this 28th__ day of October, 2011.

_____
Mark J. S. Heath, M.D.