# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| PAUL EZRA RHOADES, | Case No.: 1:11-cv-00445-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION** |
| vs. | |
| BRENT REINKE, RANDY BLADES, DOES 1-50, and/or UNKNOWN EXECUTIONERS, | |
| Defendants. | (Docket No. 17) |

Currently pending before the Court is Plaintiff's Emergency Motion for Preliminary Injunction or Stay of Execution (Docket No. 17).  Having carefully reviewed the record, participated in oral argument, and otherwise being fully advised, the Court enters this Memorandum Decision and Order.

## SUMMARY OF DECISION

Plaintiff Paul Ezra Rhoades contends that there is a substantial risk that the State of Idaho will carry out his planned execution by lethal injection on November 18, 2011 in a manner that will result in serious harm by causing him excruciating pain and suffering.  Rhoades contends that the execution protocol adopted by the Idaho Department of Correction does not contain adequate written and actual protection in its implementation against the possibility that he might be insufficiently anesthetized at the beginning of the execution process.  The Court agrees with the parties that if Rhoades is not rendered sufficiently unconscious from the first drug used in the three-drug lethal injection protocol, then he will certainly suffer excruciating suffocation and

**MEMORANDUM DECISION AND ORDER - 1**

pain from the remaining two drugs.  The Court also finds, as agreed by the parties, that if properly anesthetized, there will be no risk of pain for Rhoades.

Rhoades asks the Court to rule that such a risk violates his rights under the Eighth Amendment of the U.S. Constitution to be protected from cruel and unusual punishment.  He asks the Court to issue a stay upon the scheduled execution, so that his claim can be more fully heard and considered.

In order for Rhoades to be entitled to a stay of his execution, he must prove that he is likely to succeed on the merits of his claim that Idaho's method of execution violates the Eighth Amendment, that he is likely to suffer irreparable harm if a stay is not entered, that the balance of equities tips in his favor, and that a stay is in the public interest.

For the reasons described in this decision, the Court denies Rhoades's request for a stay of his execution.  The Court finds that the Idaho Department of Correction, in setting out its formal protocol for the manner in which the execution will be conducted and in choosing and training the persons who will be involved in the execution, has provided appropriate safeguards to protect against a substantial risk that Rhoades will not be adequately anesthetized at the beginning of the execution process.  The Court finds that although Rhoades has raised questions that present the possibility of error or mistake in the execution process, the safeguards of the Idaho protocol are substantially similar to those contained in execution protocols approved by the United States Supreme Court and by the Ninth Circuit Court of Appeals in similar cases. The Court also finds that the State of Idaho is not required to implement a different, one-drug, protocol in its executions without a more certain showing by Rhoades that Idaho's existing

**MEMORANDUM DECISION AND ORDER - 2**

protocol raises a substantial risk of serious harm and that the alternative protocol significantly reduces such a risk, is feasible, and readily implemented.

The Court also finds, and acknowledges with a full understanding of the practical meaning of this decision, that if Rhoades's request for a stay is not granted, then the very nature of an execution means that he will suffer irreparable harm.

In regard to the equities of the case, the Court concludes that the equities in this case do not tip toward Rhoades any more than toward the Defendants.  Rhoades did not bring this lawsuit, nor his request for a stay, until his execution date was on the near horizon.  However, the Idaho Department of Correction did not even release its planned execution protocol until October 14, 2011, less than a week before new death warrants were issued in Rhoades's state criminal cases.

The Court finds that the public interest favors denial of the request for a stay of the execution.  Rhoades has previously appealed the convictions and the sentences that brought him to this fast-approaching execution date, and has sought relief from the federal courts under federal habeas claims.  Those appeals and collateral proceedings have run their course, and those issues are not before this Court.   It has been over 23 years since Rhoades was first sentenced to death.  The State of Idaho allows imposition of the death penalty for crimes such as committed by Rhoades.  Rhoades was sentenced to death in two separate criminal cases, involving kidnapping and murder. The State of Idaho has an interest in seeing that its laws are enforced, and further delay will not meet that interest. Similarly, the uncertainties and expense that come from the delay that often follows death-penalty cases, as well as the impact of such delay upon the families of victims and their communities, will only be compounded by a stay of the

**MEMORANDUM DECISION AND ORDER - 3**

execution.  The public has an interest, independent of the difficult debate over the death penalty as a form of punishment at all, to have such proceedings reach a conclusion.  Therefore, the Court finds that the public interest would not be served by a stay of the execution.

In summary, Rhoades has failed to show a right to have injunctive relief entered in this case, in the form of a stay of his execution.  His motion for such relief is denied.

## I.  INTRODUCTION

The Eighth Amendment of the Constitution of the United States, made applicable to the States through the Fourteenth Amendment, provides that:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

This is a case which asks how the Eighth Amendment should be applied to an execution scheduled for November 18, 2011.  The condemned man, who is the Plaintiff in this case and who stands convicted of four capital punishment crimes, contends that the protection of the Eighth Amendment against cruel and unusual punishment should stop his execution.  His claim is *not* that the death penalty is unconstitutional.  Rather, he argues, through his counsel, that the manner in which the State of Idaho intends to go about his execution – through the use of lethal injection – will subject him to a substantial risk of serious harm in the form of severe pain, and is therefore unconstitutional as a form of cruel and unusual punishment.  *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, p. 3 (Docket No. 18).  Alternatively, Plaintiff maintains that a stay should be granted "because the IDOC execution facility is incomplete, precluding the IDOC from complying with SOP 135."  *See id*.

**MEMORANDUM DECISION AND ORDER - 4**

On March 24, 1988, Paul Ezra Rhoades ("Rhoades") was sentenced to death in Idaho's Seventh Judicial District state court for the kidnapping and murder of Susan Michelbacher.[1]  On May 13, 1988, in the same state judicial district but in a separate criminal case, Rhoades again was sentenced twice to death, for the kidnapping and murder of Stacy Baldwin.[2]

In the over 23 years that have followed, Rhoades pursued appeals and petitions for post-conviction relief in state court.  He has also pursued habeas claims in federal court.  All such appeals and other collateral proceedings have run their course, with their denouement coming when the United States Supreme Court denied certiorari review of Rhoades's federal habeas claims in the Bonneville County case on October 11, 2011, and in the Bingham County case on October 13, 2011.

Following the denials of certiorari, the cases returned to Idaho state court.  On October 19, 2011, a new death warrant was issued by the state court in both the Bonneville County and Bingham County cases.  The death warrants, directed at Brent Reinke, the Director of the Idaho Department of Correction, and Randy Blades, the Warden of the Idaho Maximum Security Institution, ordered that Reinke and Blades "cause the execution of said sentence of death to take place" on November 18, 2011, unless said sentence were to be stayed by law.

On September 22, 2011, Rhoades filed this lawsuit against Reinke and Blades, seeking an order permanently enjoining the State of Idaho from executing him (Docket No. 1).  The death warrants issued on October 19, 2011, heightened the urgency of Rhoades's lawsuit, and, on

---

[1]  *State v. Rhoades*, Case No. C-87-04-547, Seventh Judicial District of the State of Idaho, in and for the County of Bonneville.

[2]  *State v. Rhoades*, Case No. 4283, Seventh Judicial District of the State of Idaho, in and for the County of Bingham.

**MEMORANDUM DECISION AND ORDER - 5**

October 28, 2011, he filed an Emergency Motion for Preliminary Injunction or Stay of Execution

(Docket No. 17).  Since that date, the Court has considered the written arguments and evidence

of the parties, and heard testimony and additional argument during a lengthy hearing on

November 10, 2011.  This written decision resolves the issues of constitutional law concerning

cruel and unusual punishment raised by Rhoades's motion asking to stay the execution.  This

decision does not revisit the challenges made by Rhoades against his conviction and his

sentence.  Those have been decided.  This decision does not consider whether the death penalty,

as a form of punishment, is constitutional for the crimes committed by Rhoades at issue here.

The Supreme Court has said that it is.  *Gregg v. Georgia*, 428 U.S. 153 (1976).  Each State is

free to decide on its own whether to provide for the death penalty.  Idaho, through its elected

legislature, has chosen to do so, and has further decided to inflict the death penalty through lethal

injection.[3]

Idaho, with the large majority of states that impose the death penalty, employs a three-

drug lethal injection protocol.  That protocol is identified as Idaho Department of Correction

("IDOC") Standard Operating Procedure 135.02.01.001 ("SOP 135").  Under SOP 135,

executions are carried out through the sequential administration of three chemicals: a barbiturate

(sodium thiopental, also known as sodium pentothal), pancuronium bromide, and potassium

---

[3] "The punishment of death shall be inflicted by continuous, intravenous administration of a lethal quantity of a substance or substances approved by the director of the Idaho department of correction until death is pronounced by a coroner or a deputy coroner.  The director of the Idaho department of correction shall determine the procedures to be used in any execution. This act shall apply to all executions carried out on and after the effective date of this enactment, irrespective of the date sentence was imposed."  Idaho Code § 19-2716.

**MEMORANDUM DECISION AND ORDER - 6**

chloride.[4] The barbiturate drug anesthetizes the inmate by inducing unconsciousness, permitting the other two chemicals to be administered without causing pain.  Pancuronium bromide is a paralytic neuromuscular blocking agent that causes complete paralysis and accompanying suffocation.  Finally, potassium chloride induces cardiac arrest.  Both Rhoades and the IDOC agree that if an inmate is not properly anesthetized by the sodium pentothal at the start of the execution, he will experience significant pain and suffering from the subsequent administration of the pancuronium bromide and potassium chloride.  However, if the sodium pentothal is administered properly, it is equally uncontested that there is no risk of pain during the execution.  This understanding of the three-drug protocol is discussed in both of the most significant cases for this Court, dealing with challenges such as the one brought by Rhoades in this case.  *See Baze v. Rees*, 553 U.S. 35, 49, 53 (2008); *Dickens v. Brewer*, 631 F.3d 1139, 1142 (9th Cir. 2011).

## II.  <u>STANDARD OF LAW</u>

The pending motion seeks injunctive relief in the form of an order staying the execution.  Therefore, the Court considers the argument and the evidence under the so-called "*Winter*" standards, namely that Rhoades "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  A preliminary injunction "is an 'extraordinary and drastic

---

[4]  SOP 135 also calls for a heparin/saline solution "flush" to be injected after the administration of the barbiturate and before the administration of the pancuronium bromide, and then again after the administration of the pancuronium bromide and before the administration of the potassium chloride.  *See* SOP 135, Appx. A at pp. 6-7 (Docket No. 7, Att. 4).

**MEMORANDUM DECISION AND ORDER - 7**

remedy' . . . never awarded as of right." *Munaf v. Geren,* 553 U.S. 674, 689-690 (2008) (internal citations omitted).  Significantly, although the threat of irreparable harm is inescapable, the condemned prisoner is not entitled to "an order staying an execution as a matter of course.  Both the State and the victims of crime have an important interest in the timely enforcement of a sentence."[5] *Hill v. McDonough*, 547 U.S. 573, 583-584 (2006), *citing Calderon v. Thompson*, 523 U.S. 538, 556 (1998).  "[I]nmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay . . . ." *Hill,* 547 U.S. 573, 584.

When assessing these factors, the court must bear in mind that "a stay of execution is an equitable remedy" and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill*, 547 U.S. at 584.

### III.  DISCUSSION

**A.      Rhoades is Not Likely to Succeed on the Merits**

       1.      The Analysis Required by *Baze v. Rees*

The Eighth Amendment prohibits "punishments that involve the unnecessary and wanton infliction of pain, or that are inconsistent with evolving standards of decency that mark the progress of a maturing society." *Cooper v. Rimmer*, 379 F.3d 1029, 1032 (9th Cir. 2004). For a prisoner to establish an Eighth Amendment violation based on his future exposure to pain during

---

[5]  It has been over 23 years since Rhoades was sentenced to death for these crimes, an extraordinary length of time even in the world of death-penalty cases.  The paradox of extended periods of incarceration upon death row, which average nearly 15 years, has been discussed in cases which raise Eighth Amendment challenge to execution after such lengthy incarceration under a pending, but not yet implemented, sentence of death.  *See, e.g., Valle v. Florida,* 564 U.S. ___ (2011) (Breyer, J., dissenting) (expressing support for certiorari in case seeking to prevent execution after condemned man had been on death row for 33 years.).

**MEMORANDUM DECISION AND ORDER - 8**

an execution, he must demonstrate that "the conditions presenting the risk must be '*sure or very*

*likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent*

dangers.'" *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion) (emphasis in

original and quoting *Helling v. McKinney*, 509 U.S. 25, 33, 34–35 (1993)). Put another way,

"there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that

prevents prison officials from pleading that they were 'subjectively blameless for purposes of the

Eighth Amendment.'" *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 & n.9 (1994)).

 In *Baze*, the Supreme Court held that Kentucky's method of execution by lethal injection

– using the same three drugs – did not violate the Eighth Amendment. *See Baze*, 553 U.S. at 63.

The decision was comprised of seven separate opinions, which fell into three groups of Justices.

In *Ventura v. State*, 2 So. 3d 194, 200 (Fla. 2009), the Florida Supreme Court observed that the

*Baze* plurality:

> adopted a version of the substantial-risk standard, while Justice Breyer, concurring
> in the judgment, and Justices Ginsburg and Souter, adopted a version of the
> unnecessary-risk standard.  In contrast, Justices Thomas and Scalia renounced any
> risk-based standard in favor of a rule of law that would uphold any method of
> execution which does not involve the *purposeful* infliction of "pain and suffering
> beyond that necessary to cause death."  Justice Stevens did not provide a separate
> standard but, instead, expressed general disagreement with (1) the death penalty
> based upon his long experience with these cases and the purported erosion of the
> penalty's theoretical underpinnings (deterrence, incapacitation, and retribution), and
> (2) the allegedly unnecessary use of the paralytic drug pancuronium bromide.

*Id*. at 199-200 (emphasis in original; citations and footnotes omitted).  Justice Stevens also said

he believed that the plurality opinion concerning lethal injection procedures "would generate

debate" in future cases, a concern Chief Justice Roberts answered thusly:

> [T]he standard we set forth here resolves more challenges than [Justice Stevens]
> acknowledges.  *A stay of execution may not be granted on grounds such as those
> asserted here unless the condemned prisoner establishes that the State's lethal*

**MEMORANDUM DECISION AND ORDER - 9**

> *injection protocol creates a demonstrated risk of severe pain.  He must show that the*
> *risk is substantial when compared to the known and available alternatives.  A State*
> *with a lethal injection protocol substantially similar to the protocol we uphold today*
> *would not create a risk that meets this standard.*

*Baze*, 553 U.S. at 61, 71 (emphasis added).[6]  "Simply because an execution method may result in

pain, either by accident or as an inescapable consequence of death, does not establish the sort of

'objectively intolerable risk of harm' that qualifies as cruel and unusual."  *Id.*

Thus, *Baze* creates a constitutional "safe harbor" for those lethal injection protocols that

are substantially similar to Kentucky's lethal injection protocol.  *See Dickens,* 631 F.3d at 1146.

Seeking a stay of his execution, Rhoades argues that SOP 135[7] is not substantially similar to

Kentucky's lethal injection protocol (on its face and/or as applied), such that it necessarily

violates the Eighth Amendment.  *See* Mem. in Supp. of Mot. for Prelim. Inj. or Stay of

Execution, p. 3 (Docket No. 18) ("Idaho's execution procedures create a demonstrated risk of

severe pain, do[ ] not provide safeguards relied upon in *Baze*, and [are] not substantially similar

---

[6]  The Ninth Circuit has agreed with every other circuit to consider the issue and has held that Chief Justice Roberts's opinion for a three-Justice plurality sets out the controlling standard.  *See Dickens v. Brewer*, 631 F.3d 1139, 1146 (9th Cir. 2011) ("Every circuit that has considered a challenge to a lethal injection protocol following *Baze* has analyzed the protocol under the plurality's substantial risk standard.").  Indeed, the Supreme Court has since applied the plurality's standard when vacating a temporary restraining order barring an execution in Arizona because the sodium thiopental to be used had been obtained from a foreign source.  *See Brewer v. Landrigan*, 131 S. Ct. 445 (2010) (holding execution could proceed because there was no evidence that drug was "'sure or very likely to cause serious illness and needless suffering'" (citing *Baze*, 553 U.S. at 50)).  "We are, therefore, in good company in holding that the *Baze* plurality's substantial risk standard is the controlling standard for assessing the constitutionality of an execution protocol."  *Dickens*, 631 F.3d at 1145-46.

[7]  SOP 135 was originally attached as an exhibit to Defendants' October 14, 2011 Motion to Dismiss.  *See* SOP 135, attached as Ex. 4 to Defs' 12(b)(6) Mot. to Dismiss (Docket No. 7, Att. 4).  Although Defendants have since withdrawn their Motion to Dismiss in light of Plaintiff's Amended Complaint, the parties acknowledge that SOP 135 remains a part of the Court's record.

**MEMORANDUM DECISION AND ORDER - 10**

to the Kentucky protocol upheld in *Baze*.").  Additionally, Rhoades argues that the availability and effectiveness of a one-drug lethal injection protocol alternative – adopted in Ohio, Washington, and South Dakota after the *Baze* decision was issued – further establishes that SOP 135 violates the Eighth Amendment.  *See* Reply to Resp. to Mot. for Stay, pp. 3-9.  IDOC disputes each of these arguments in defending SOP 135's constitutionality.

    2.    <u>SOP 135 is Substantially Similar to Kentucky's Lethal Injection Protocol as Discussed and Upheld in *Baze*</u>

The parties agree that, if an inmate is not properly anesthetized by the sodium pentothal at the start of the execution, he will experience significant pain and suffering from the subsequent administration of the pancuronium bromide and potassium chloride.  If the sodium pentothal is administered properly, there is no risk of pain during the execution.  *See Dickens,* 631 F.3d at 1142.  Therefore, the manner in which the sodium pentothal is administered is of critical importance when weighing a State's three-drug lethal injection protocol against the Eighth Amendment.

The *Baze* Court acknowledged the concern raised by the petitioner that IV[8] catheters could malfunction, and the sodium pentothal could infiltrate into surrounding tissue rather than just into the vein, possibly causing an inadequate dose of sodium pentothal to be delivered to the circulation system and, ultimately, the brain.  *See Baze*, 553 U.S. at 53-54.  However, *Baze* held that such potential problems "do not establish a sufficiently substantial risk of harm to meet the requirements of the Eighth Amendment" where  Kentucky had put safeguards into place "to

---

[8]  The abbreviation "IV" means "an apparatus used to administer a fluid (as of medication, blood, or nutrients) intravenously."  MERRIAM-WEBSTER DICTIONARY, *available at* http://www.merriam-webster.com/dictionary/iv (site last visited Nov. 14, 2011).

ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner." *Id.*, at 55. These standards were described as follows:

- "The most significant of these is the written protocol's requirement that members of the IV team must have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman." *Id.*[9]

- "Moreover, these IV team members, along with the rest of the execution team, participate in at least 10 practice sessions per year. These sessions, required by the written protocol, encompass a complete walk-through of the execution procedures, including the siting of IV catheters into volunteers." *Id.*

- "In addition, the protocol calls for the IV team to establish both primary and backup lines and to prepare two sets of the lethal injection drugs before the execution commences. These redundant measures ensure that if an insufficient dose of sodium thiopental is initially administered through the primary line, an additional dose can be given through the backup line before the last two drugs are injected." *Id.*

- "The IV team has one hour to establish both the primary and backup IVs, a length of time the trial court found to be 'not excessive but rather necessary . . . .'" *Id.*

- "The qualifications of the IV team also substantially reduce the risk of IV infiltration." *Id.* at 56.

- "In addition, the presence of the warden and deputy warden in the execution chamber with the prisoner allows them to watch for signs of IV problems, including infiltration." *Id.*

- "Kentucky's protocol specifically requires the warden to redirect the flow of chemicals to the backup IV site if the prisoner does not lose consciousness within 60 seconds." *Id.*

---

[9] Chief Justice Roberts noted that the actual experience of the execution team IV members was even more extensive than called for by the standard: "Kentucky currently uses a phlebotomist and an EMT, personnel who have daily experience establishing IV catheters for inmates in Kentucky's prison population." *Baze*, 553 U.S. at 55.

**MEMORANDUM DECISION AND ORDER - 12**

*Id.* "In light of these safeguards, [the Supreme Court could not] say that the risks identified by petitioners are so substantial or imminent as to amount to an Eighth Amendment violation." *Id.*; *see also id.* at 60 ("Again, the risk [of administering the second and third drugs before the sodium thiopental has taken effect] is already attenuated, given the steps Kentucky has taken to ensure the proper administration of the first drug."); *id.* at 62 ("Kentucky's decision to adhere to its protocol despite these asserted risks [of "maladministration"], while adopting safeguards to protect against them, cannot be viewed as probative of the wanton infliction of pain under the Eighth Amendment.").

Rhoades argues that SOP 135 "contains none of the *Baze* safeguards." *See* Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, p. 11 (Docket No. 18). Specifically, Rhoades maintains that SOP 135 (1) "does not contain the 'most significant' safeguard, a required medical credential 'combined with at lease one year of professional experience'"; (2) "does not contain the second *Baze* requirement, daily experience"; (3) "does not contain the third *Baze* safeguard, in-house training"; (4) "does not contain the fourth *Baze* safeguard, meaningful redundancy"; and (5) "does not contain the final *Baze* safeguard, a meaningful consciousness check." *See id.* at pp. 11-23. This Court concludes, however, that SOP 135 is a substantially similar protocol to that approved in *Baze.*

First, Rhoades overstates the holding of *Baze* to the extent he equates the identified "safeguards" as mandatory requirements that must each be in place in order for a State's three-drug lethal injection protocol to pass constitutional muster. *See* Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, pp. 10-11, 14 (Docket No. 18). The Kentucky safeguards emphasized in *Baze* are among the means that Kentucky has chosen to protect against the risk of

**MEMORANDUM DECISION AND ORDER - 13**

a failed administration of the first drug – the anesthetic – of the three-drug protocol.  In other words, *Baze* neither operates as a doctrinal blueprint, instructing States on the exact type or quantum of safeguards needed to insulate a three-drug lethal injection protocol from challenge, nor does it foreclose the possibility that different, more, or even fewer safeguards could offer the same assurances against the understood risks presented in similar cases.  *Baze* stands for the proposition that Kentucky's lethal injection protocol, as well as substantially similar lethal injection protocols, are constitutional.  *See Baze*, 553 U.S. 35, 61 ("[a] State with a lethal injection protocol substantially similar to [Kentucky's lethal injection protocol] would not create a [demonstrated risk of severe pain].").  If Chief Justice Roberts intended that only Kentucky's precise protocol could meet Eighth Amendment scrutiny, he did not say so.

Second, even if the safeguards identified in *Baze* are understood to be more-or-less safety requirements as Rhoades contends, this Court is persuaded that the record developed thus far reveals that the safeguards contained in SOP 135 – as further elaborated upon by Jeff Zmuda[10] in his affidavit and his testimony during the evidentiary hearing – satisfies these requirements in

---

[10]  Zmuda has been an employee of IDOC for approximately 24 years and is currently the Deputy Chief of the Bureau of Prisons.  *See* Zmuda Aff. at ¶ 2 (Docket No. 50).  In his position as the Deputy Chief of the Bureau of Prisons, Zmuda works in conjunction with the Idaho Maximum Security Institution to plan, prepare, and implement IDOC execution procedures.  *See id*. at ¶ 3.  Zmuda was closely and directly involved in SOP 135's development.  *See id*. at ¶ 6.

**MEMORANDUM DECISION AND ORDER - 14**

any event.[11]  Indeed, on its face, SOP 135 contains even more safeguards than those referenced

and relied upon in *Baze*.

> a.    *SOP 135 Ensures that Members of the Medical and Injection Teams Have at Least One Year of Professional, Medical Experience*

Under Kentucky's lethal injection protocol, members of its IV team – those individuals

responsible for establishing the IV lines – must have at least one year of professional experience

as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman.  *See Baze*,

553 U.S. at 55.  SOP 135's "Medical Team" is similarly responsible for inserting the IV

catheters[12] and can be comprised of any combination of the following disciplines: (1) emergency

medical technician; (2) licensed practical nurse or registered nurse; (3) military corpsman; (4)

paramedic; (5) phlebotomist; (6) physician assistant; (7) physician; or (8) other medically trained

personnel including those trained in the United States Military.  *See* SOP 135, p. 9 (Docket No.

7, Att. 4).  As Rhoades points out, however, SOP 135 does not require Medical Team members

to "'have at least one year of professional experience'" as was the case in *Baze*.  *See* Mem. in

---

[11]  The Court considers Zmuda's affidavit and evidentiary hearing testimony as supplementing SOP 135, like similar cases in other courts.  *See, e.g.*, *Dickens*, 631 F.3d at 1142 ("During the course of this litigation, Arizona agreed to amend the November 1, 2007 protocol to address some concerns raised by Dickens. . . .  The amendments are set forth in a Joint Report submitted to the district court on April 9, 2009.  The district court considered the constitutionality of the November 1, 2007 protocol, as amended by the Joint Report (the "Protocol"), and our analysis on appeal is similarly constrained.").

[12]  Pursuant to SOP 135, the Medical Team is also responsible for:

> ensuring the line is functioning properly throughout the procedure, mixing the chemicals, preparation of the syringes, monitoring the offender (including the level of consciousness), and supervising the administration of the chemicals.

*See* SOP 135, p. 9 (Docket No. 7, Att. 4).

**MEMORANDUM DECISION AND ORDER - 15**

Supp. of Mot. for Prelim. Inj. or Stay of Execution, p. 14 (Docket No. 18).  Still, Zmuda's affidavit addresses this concern.

SOP 135 requires verification of the Medical Team and Injection Team[13] candidates' professional licensure or certification before approval.  *See* SOP 135, p. 9 (Docket No. 7, Att. 4). Selection of the Team members includes a review of each member's professional qualifications, training, experience, professional license(s) and certification(s), criminal history, with a personal interview.  *See id.* at pp. 9-10.  According to Zmuda, all the members of the current Medical Team and Injection Team are qualified medical providers[14] and "have professional qualifications and experience exceeding one year of professional training and experience."  *See* Zmuda Aff. at ¶ 13 (Docket No. 50).  Going further, Zmuda says that "[t]he team member with the least amount of experience has 15 years experience in his/her professional field."  *See id.*

Speaking to Plaintiff's additional argument that "SOP 135 does not state that [either Medical Team members or Injection Team members] be currently licensed or have any actual experience in initiating IV catheters (*see* Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, pp. 14-17 (Docket No. 18)),[15] Zmuda goes on to state:

_____

[13]  Pursuant to SOP 135, "Injection Team" members "shall be responsible for administering the chemicals as described in Appendix A, *Execution Chemicals Preparation and Administration*" and [m]ust have at least one year of medical experience as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, or military medical corpsman."  *See* SOP 135, p. 9 (Docket No. 7, Att. 4).

[14]  To maintain the Medical and Injection Team members' anonymity, with the exception of the Medical Team leader (a registered nurse), the undersigned redacted their respective employment titles from Zmuda's affidavit, generically listing them as "medical provider[s]." *See* Zmuda Aff. (Docket No. 50).

[15]  Aside from what may have *actually* existed by way of the Kentucky's IV team members' make-up (*see Baze*, 553 U.S. at 55), it cannot be said that *Baze* identified either (1) medical license currency, or (2) experience using IVs as "safeguards."  Regardless,  Zmuda

**MEMORANDUM DECISION AND ORDER - 16**

all members of the Medical Team and Injection Team are certified in CPR, have venous access currency, which means they have current professional practice in insertion of IVs on a regular basis. Additionally, all members have experience in Pharmco Dynamic Currency, which means the team members understand medical orders, can read and understand medical labels, draw medications, and deliver medications through either an injection or IV.

*** 

SOP 135 does not state that the Medical Team members have at least one year of professional training and practical experience, however, all Medical Team members selected for the preparation of chemicals have at least one year of professional training and practical experience necessary to prepare the chemicals.

*See* Zmuda Aff. at ¶¶ 18, 24 (Docket No. 50).  With Zmuda's testimony in mind, this Court cannot agree with Plaintiff that SOP 135's Medical and Injection Team members do not (or, in the case of replacements, will not) have the requisite medical credentials and experience over time.  *See* Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, p. 14 (Docket No. 18). To the contrary, consistent with *Baze*, SOP 135 ensures that members of the Medical and Injection Teams have at least one year of professional, medical experience.

        **b.**      ***SOP 135 Ensures that Medical and Injection Team Members Have Regular Experience Establishing IV Catheters***

In *Baze*, Chief Justice Roberts stated that "Kentucky currently uses a phlebotomist and an EMT, personnel who have daily experience establishing IV catheters for inmates in Kentucky's prison population."  *Baze*, 553 U.S. at 55.  Rhoades contends that this language means that a State's lethal injection protocol must require "daily" professional experience on the part of the team members in the various procedures of the protocol.  *See* Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, p. 17 (Docket No. 18).  This Court is not so persuaded.  Rather, after

_____

addresses these subjects in his affidavit.

**MEMORANDUM DECISION AND ORDER - 17**

speaking to the "most significant" safeguard within Kentucky's lethal injection protocol ("at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman"), Chief Justice Roberts noted that the actual experience of the Kentucky IV team members exceeded the minimum experience requirement.  Nothing more.  *Cf. Nooner v. Norris*, 594 F.3d 592, 605 n.7 (8th Cir. 2010) ("The Inmates assert that the *Baze* plurality found that the daily experience of the IV team members was equally significant.  This argument mischaracterizes *Baze*.").

Zmuda testified that all Medical and Injection Team members "have current professional practice in insertion of IVs on a regular basis" and "can draw medications and deliver medications through either an injection or IV."  *See* Zmuda Aff. at ¶ 18 (Docket No. 50).[16] Hence, even if ongoing experience is part of the *Baze* list of safeguards, SOP 135 is much like the Kentucky protocol in terms of the qualifications of medical personnel employed.  Therefore, SOP 135 does contain assurances that there will be Medical and Injection Team members with regular experience establishing IV catheters.

c. <em>SOP 135 Provides for In-House Training</em>

Plaintiff takes issue with SOP 135's outlined training procedures, arguing that the protocol neither requires that the in-house training cover all aspects of the execution procedure, nor involves anyone other than Medical Team members.  *See* Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, p. 20 (Docket No. 18).  A review of SOP 135 indicates otherwise.

---

[16] If it is not possible to reliably place a peripheral line in the offender, the utilization of a central line catheter into the femoral vein in the offender's thigh may be necessary.  *See* SOP 135, Appx. A at p. 6 (Docket No. 7, Att. 4).  "The Medical Team member responsible for placing a central line catheter in the offender's femoral vein shall have at least one year of regular and current professional experience conducting that procedure."  *Id*.

**MEMORANDUM DECISION AND ORDER - 18**

Pursuant to SOP 135, the Idaho Maximum Security Institution ("IMSI") Warden ensures an annual training schedule is established, identifying dates for periodic on-site practice by the various teams.  *See* SOP 135, p. 10 (Docket No. 7, Att. 4).  The prescribed training is to include the following:

- The schedule shall include a minimum of 10 training sessions for the Execution Escort Team, Injection Team, and Medical Team annually;

- After receiving a death warrant, the teams will train weekly before the scheduled execution date;

- Team members must participate in a minimum of four (4) training sessions prior to participating in an actual execution; and

- Prior to any scheduled execution, the Execution Escort Team, Medical Team, and Injection Team shall conduct a minimum of two (2) rehearsal sessions during the 48 hours before the scheduled execution.

*Id*.  Thirty to 21 days before the scheduled execution, the Deputy Chief of the Bureau of Prisons ensures that staff members participating in the execution have received adequate training, written instruction and practice, and that all training has been documented (*id*. at 21); and the IMSI Warden ensures that the assigned Medical Team members physically evaluate the offender to predetermine appropriate venous access locations (*id*. at 24).  Twenty-one to seven days before the scheduled execution, the IMSI Warden ensures that the Specialty Teams[17] "are conducting training and exercises in preparation."  *Id*. at 26.  Seven to two days before the scheduled execution, the Medical Team leader ensures the serviceability of all necessary medical equipment, that heart monitor lines are sufficient in length, and that a mild sedative is available to the offender (*id*. at 27); and the IMSI Warden ensures that the teams "have completed

---

[17]  Pursuant to SOP 135, the "Specialty Teams" are the Execution Escort Team, the Medical Team, and the Injection Team.  *See* SOP 135, p. 8 (Docket No. 7, Att. 4).

**MEMORANDUM DECISION AND ORDER - 19**

adequate training and practice" (*id*.).  Twenty-four to 12 hours before the scheduled execution,

the IMSI Warden ensures that the Medical Team leader checks the electrocardiograph

instruments to confirm they are functioning properly.  *Id*. at 30.

With these procedures as a backdrop, Zmuda details what has already occurred, and what

will occur, by way of training before the scheduled execution:

> The Escort, Medical, and Injection Teams have been engaged in training sessions
> since October 20, 2011, using the execution unit.  Between October 20, 2011 and the
> scheduled execution, there will be a total of 10 training sessions, which includes two
> full rehearsals as provided for in SOP 135 for the Escort Team, Injection Team, and
> Medical Team.  All members of the Specialty Teams are familiar with SOP 135, the
> execution process, and skill sets needed to complete the execution.  All team
> members were placed into their respective roles for the execution procedure based
> on their professional experience, training, and practice.  All team members will have
> participated in a minimum of four training sessions prior to the actual execution.
> Medical Team members will have practiced IV insertion on volunteers.  The training
> schedule outlined in SOP 135 is consistent with the *Baze* safeguards.  Additionally,
> all team members exceed the one year of training and experience in their respective
> professions.

*See* Zmuda Aff. at ¶ 19 (Docket No. 50).  Additional details were provided during Zmuda's

courtroom testimony, in which he more fully described the training that had occurred through the

date of the hearing, and the training, including full rehearsal training, that was scheduled for the

following seven days.  During the argument portion of the hearing, after the Court expressed its

concern over the seemingly compressed nature of the training in light of the relatively recent

adoption of SOP 135, the Court allowed the Defendants to recall Zmuda to the witness stand,

over Rhoades's objection.  At that time, Zmuda said that there will be five trainings, to include

several full rehearsals, before the execution date which will include placing IV lines in volunteer

subjects, who will be Zmuda and two other wardens.

**MEMORANDUM DECISION AND ORDER - 20**

SOP 135, the training done to date, and the training planned to occur are substantially similar to the training called for by the Kentucky protocol at issue in *Baze*. The Court is troubled, as was described during the evidentiary hearing, about the short period of time in which the IDOC is trying to meet the requirements of its own execution protocol. The day of an execution is, as the Court stated in the hearing, a day unlike any other day, and it seems inescapable that the enormity of the act that is to take place will make adequate and effective training of utmost importance to the IDOC. If the record before the Court showed only the fact of a training structure and schedule, with no evidence of actual training intended to gain, gauge, and rehearse proficiency in the steps and skills necessary to conduct the execution, the Court might be persuaded that safeguards to avoid the substantial risk of serious harm are not sufficiently present. But here, the training is underway, the prison official (Zmuda) in charge of the training and the success of the training, even though not medically-trained himself, is a credible witness who has described a plan to accomplish a full course of training, with qualified and experienced execution team members.

Additionally, the IDOC has no control on when the "first" time that an execution under a new protocol, and new and different safeguards than might have been used in the past, will take place. Idaho has not had an execution since 1994, conducted by lethal injection. The last execution prior to that occurred in 1957, by hanging. There is no certain predictability to when the  collateral proceedings that stay a prior death warrant will run their course, nor, for that matter, whether those proceedings will undo the conviction or the sentence. Then, as here, when the collateral proceedings have been completed, Idaho law requires that the case return immediately to the sentencing court, and that a new death warrant be issued in short order.

**MEMORANDUM DECISION AND ORDER - 21**

Finally, Idaho law requires that an execution date be set within 30 days of the issuance of the death warrant. *See* Idaho Code § 19-2715(2).

These circumstances combine to persuade the Court that SOP 135 contains sufficient training practices and actual implementation of such practices, consistent with *Baze*.

    d.  *SOP 135 Outlines Meaningful Redundancy Safeguards*

In *Baze*, the establishment of both a primary and backup line, as well as the preparation of two sets of the lethal injection drugs before the execution begins, ensures that, if necessary, additional doses of sodium pentothal can be administered before the remaining two drugs – pancuronium bromide and potassium chloride – are injected. *See Baze*, 553 U.S. at 55. Similar redundant measures exist with respect to SOP 135.

SOP 135 requires that the Medical Team prepare three complete sets of chemicals; "one full set of syringes is used in the implementation of the death sentence and two full sets are to be available and ready for use as backup." *See* SOP 135, Appx. A at p. 1 (Docket No. 7, Att. 4); *see also* Zmuda Aff. at ¶ 24. The Medical Team also "determine[s] the best sites on the offender to insert a primary IV catheter and a backup IV catheter in two separate locations in the peripheral veins using appropriate medical procedures." *See* SOP 135, Appx. A at p. 5 (Docket No. 7, Att. 4).[18] Finally, according to SOP 135, "[t]he primary IV catheter will be used to administer the

---

[18] Pursuant to SOP 135, "[b]oth primary and backup IV lines will be placed unless in the opinion of the Medical Team leader, it is not possible to reliably place two peripheral lines. *See* SOP 135, Appx. A at p. 5 (Docket No. 7, Att. 4). As discussed during the evidentiary hearing, the Court notes that the Medical Team leader's discretion in establishing *both* the primary and backup IV lines was not mentioned in *Baze*. *See Baze*, 553 U.S. at 55. Even so, this is not material enough to conclude that SOP 135 is not substantially similar to Kentucky's lethal injection protocol, especially when considering that, in the event a peripheral line is not possible, the Medical Team may utilize a central line catheter in the offender's femoral vein in the thigh, using an ultrasound to assist in properly inserting the catheter and related anesthetic. *See* SOP

**MEMORANDUM DECISION AND ORDER - 22**

chemicals and the backup catheter will be reserved in the event of the failure of the first line."
*Id*.

Rhoades agrees that SOP 135 contains the redundancy safeguards discussed in *Baze*.
*See* Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, p. 21 (Docket No. 18) ("SOP 135 likewise requires a backup IV, and backup chemical preparation, and readiness as well."). But Rhoades questions the meaningfulness of these redundancy safeguards, arguing that SOP 135 "does not require that the individuals initiating, maintaining, or delivering chemicals through the IV have any relevant training and experience in doing so."  *Id*.

As already discussed, SOP 135 ensures that the Medical and Injection Team members – those responsible for establishing the IV lines, mixing the chemicals, preparing the syringes, and injecting the chemicals – have the relevant training and experience in accomplishing these respective tasks.  Therefore, like *Baze*, SOP 135 outlines meaningful redundancy safeguards.

   e. *SOP 135 Includes Meaningful Consciousness Checks*

In *Baze*, another safeguard was found in Kentucky's requirement that the warden redirect the flow of chemicals to the backup IV site if the prisoner does not lose consciousness within 60 seconds.  *Baze*, 553 U.S. at 56.  Although the plurality decision in *Baze* does not specifically speak to "how" Kentucky's warden is to determine a prisoner's consciousness, Rhoades argues that this portion of *Baze* requires that SOP 135 incorporate meaningful consciousness checks. *See* Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, p. 22-23 (Docket No. 18).  Said

---

135, Appx. A at p. 6 (Docket No. 7, Att. 4); *see also* Zmuda Aff. at ¶ 26.  This procedure does not require an incision, or "cut down" and is to be performed by personnel with regular experience inserting central lines in their professional practice.  *See* Zmuda Aff. at ¶ 26 (Docket No. 50).

**MEMORANDUM DECISION AND ORDER - 23**

another way, even though *Baze* does not address the manner in which consciousness checks are to be performed, Rhoades still maintains that "SOP 135 does not contain the final *Baze* safeguard, a meaningful consciousness check." *Id*. at 22.  This Court disagrees.

Like *Baze*, SOP 135 contemplates what is to occur in the event the offender remains conscious.  First, "the Medical Team shall assess the situation to determine why the offender is conscious"; then, "[t]he Medical Team leader shall communicate this information to the IMSI Warden, along with all Medical Team input." *See* SOP, Appx. A at p. 6 (Docket No. 7, Att. 4). At that point, the IMSI Warden "will determine how to proceed or, if necessary, to start the procedure over at a later time or stand down." *Id*.  If deemed appropriate, the IMSI Warden "may instruct the Injection Team to administer an additional 5 grams of sodium pentothal or pentobarbital,[19] followed by the heparin/saline flush from Backup Set 2." *Id*. at pp. 6-7.  Thus, whether characterized as a "consciousness check" or, simply, a contingency plan in the event an offender remains conscious, SOP 135 incorporates the same safeguards as *Baze*.

But, unlike *Baze*, SOP 135 is not silent on the nature of consciousness checks to be used following the administration of the sodium pentothal.  According to SOP 135:

- A microphone will be positioned to enable the Medical Team [and] Injection Team Leader . . . to hear any utterances or noises made by the offender throughout the procedure.  The Medical Team leader will confirm the microphone is functioning properly, and that the offender can clearly hear from their affixed position, and be heard in the chemical room.

- The IMSI Warden shall ensure there is a person present throughout the execution who is able to communicate with the offender in the offender's

---

[19]  Pursuant to SOP 135, pentobarbital is to be used "[i]n the event of an unavailability of a sufficient quantity of sodium pentothal from available resources . . . ." *See* SOP 135, Appx. A at p. 3 (Docket No. 7, Att. 4).

**MEMORANDUM DECISION AND ORDER - 24**

primary language.  This person will be positioned to clearly see, hear, and speak to the offender throughout the execution.

• Once the offender is secured, the medical Team leader will attach the leads from the electrocardiograph to the offender's chest and confirm that the electrocardiograph is functioning properly and that the proper graph paper is used.  A backup electrocardiograph shall be on site and readily available if necessary.

• A Medical Team member shall be assigned to monitor the EKG, and mark the EKG graph paper at the commencement and completion of the administration of each chemical.  The assigned identifier of the Medical Team member monitoring the electrocardiograph shall be noted at each juncture.

• Throughout the procedure, the Medical Team members shall continually monitor the offender's level of consciousness and electrocardiograph readings, maintaining constant observation of the offender using one or more of the following methods: direct observation, audio equipment, camera, and television monitor, as well as any other medically approved method(s) deemed necessary by the Medical Team leader.  The Medical Team leader shall be responsible for monitoring the offender's level of consciousness.

• After the sodium pentothal or pentobarbital and heparin/saline have been administered and before the Injection Team members begin administering the pancuronium bromide, the Medical Team leader shall confirm the offender is unconscious by direct examination of the offender.

• The Medical Team leader, dressed in a manner to preserve his anonymity, will enter into the room where the IMSI Warden and offender are located to physically confirm the offender is unconscious by using all necessary medically appropriate methods.  The Medical Team leader will also confirm that the IV line remains affixed and functioning properly.

**MEMORANDUM DECISION AND ORDER - 25**

*See* SOP 135, Appx. A at pp. 4-6 (Docket No. 7, Att. 4).[20]  Zmuda further confirms and

elaborates on these consciousness checks, stating:

> The execution procedure contains provisions for the consciousness checks of the offender once the drugs have been administered.  Once the sodium pentothal or pentobarbital has been administered, the Medical Team leader will enter the execution chamber and confirm the offender is unconscious by direct examination.  The [Medical Team][21] leader will physically assess the offender for signs of consciousness through verbal stimulus, solicit an auditory response, touch the offender's eyelashes, pinch the offender, and conduct a sternal rub.  The Medical Team leader is competent in conducting levels of consciousness checks.  These consciousness checks are consistent with the safeguards set forth in *Baze*.

*See* Zmuda Aff. at ¶ 21 (Docket No. 50).  Together, these checks offer meaningful ways in which

to monitor an offender's consciousness prior to administering the pancuronium bromide,

followed by the potassium chloride.[22]  *Baze* is therefore satisfied in this respect.[23] [24]

---

[20]  Pursuant to SOP 135, if a backup set of drugs is used:

> the Medical Team shall confirm the offender is unconscious by sight and sound, utilizing the audio equipment, camera, and monitor.  The Medical Team leader will again physically confirm the offender is unconscious using proper medical procedures and verbally advise the IMSI Warden of the same.  Throughout the entire procedure, the Medical Team members, the Injection Team members and the IMSI Warden shall continually monitor the offender using all available means to ensure that the offender remains unconscious and that there are no complications.

*See* SOP 135, Appx. A at p. 7 (Docket No. 7, Att. 4).

[21]  Zmuda's affidavit references "Execution Team leader."  *See* Zmuda Aff. at ¶ 21 (Docket No. 50).  During his testimony, however, Zmuda confirmed that this individual is, indeed, the Medical Team leader.

[22]  Interestingly, in dissenting from Justice Roberts's opinion in *Baze*, Justice Ginsburg, joined by Justice Souter, stated that Kentucky's protocol does not include "any of the most basic tests to determine whether the sodium thiopental has worked.  No one calls the inmate's name, shakes him, brushes his eyelashes to test for a reflex, or applies a noxious stimulus to gauge his response."  *Baze*, 553 U.S. at 118 (dissent).  Justice Ginsburg further indicated that Kentucky does not "monitor the effectiveness of the sodium thiopental using readily available equipment, even though the inmate is already connected to an electrocardiogram (EKG)."  *Id.*  Though apparently not present in Kentucky's lethal injection protocol upheld in *Baze*, these "safeguards"

**MEMORANDUM DECISION AND ORDER - 26**

f.      *SOP 135 Incorporates Even More "Safeguards" than Baze*

Notwithstanding the above-referenced protections existing in substantial compliance with

the *Baze* safeguards, SOP 135 includes *additional* safeguards against the inadequate

administration of the three lethal injection protocol drugs used in Idaho:

**Medical Services On-Site:**

- A licensed physician will be on-site, staged near the Execution Unit.  The physician will have access to an on-site medical crash cart, including applicable medications, and defibrillator.  *See* SOP 135, p. 10 (Docket No. 7, Att. 4).

- The physician must be a medical doctor licensed by the Idaho Board of Medicine.  *See id.*

---

are, by-and-large, outlined in SOP 135.

[23]  During the evidentiary hearing, Rhoades's medical expert, Mark Heath, M.D., warned of the risks associated with injecting pancuronium bromide and potassium chloride to a conscious individual, and expressed his opinion about the difficulty of assessing the level of unconsciousness without the sort of monitoring equipment ordinarily found in an operating room.  Dr. Heath's opinion implies a safeguard that would call for the presence of medical professionals whose code of ethics preclude them from participating in an execution.  *Baze* is clear that such a step is not required for Eighth Amendment purposes, and the practical implications of such a requirement if judicially imposed in Idaho could easily replicate the quandary that has brought capital punishment to a *de facto* standstill in California.  *See Morales v. Cate*, 757 F. Supp. 2d 961 (N.D. Cal. 2010).  This Court will not cast its line into this debate but will, as it must, follow the direction from the Supreme Court in *Baze*.

[24]  Dr. Heath was also the medical expert for the petitioner in *Baze*, and Justice Ginsberg made particular note of his testimony from another lethal injection case in which the issue of consciousness had been raised.  In reference to that case, arising in Florida, Justice Ginsberg pointed out that Dr. Heath had testified that "the eyelash test is 'probably the most common first assessment that we use in the operating room to determine...when a patient might have crossed the line from being conscious to unconscious'"...and that '[a] conscious person, if you touch their eyelashes very lightly, will blink; an unconscious person typically will not.'"  *Baze*, 553 U.S. at 120, n.6. Justice Ginsberg also made mention that Dr. Heath further testified that the "'shaking and name-calling tests...are similar to those taught in basic life support courses.'"  *Id*. Justice Ginsberg drew upon such testimony to support her view that something more than Florida's protocol was called for on the question of assessing the inmate's level of consciousness.  Idaho has essentially incorporated those safeguards into SOP 135.

**MEMORANDUM DECISION AND ORDER - 27**

- The physician will not be a part of the execution team or specialty teams and will not participate in the execution in any way. *See id.*

- The physician will provide the following services: (1) first aid: providing emergency care if needed to any person in the immediate area; and (2) resuscitation: assisting in any necessary resuscitation effort of the offender should a problem occur with the execution process. *See id.*

- Emergency medical technicians and ambulance service will be staged near the Execution Unit to provide emergency medical assistance and transport to anyone requiring such care during the process. *See id.*

- Trained medical personnel and emergency transportation, neither or which is involved in the execution process, shall be available in proximity to respond to the offender should any medical emergency arise at any time before the order to proceed with the execution is issued by the director of the IDOC. *See id.* at Appx. A at p. 8 (Docket No. 7, Att. 4).

**Monitoring Potential IV Problems:**

- The offender will be positioned to enable the Medical Team and Injection Team leader to view the offender, the offender's arms (or other designated IV location) and face with the aid of a color camera and a color monitor. *See id.* at Appx. A at p. 1.

- Prior to attaching the syringes to the 3-Gang, 3-Way Manifold, the flow of each gauge on the manifold shall be checked by the Medical Team leader running heparin/saline solution through the line to confirm there is no obstruction. *See id.*

- To ensure proper insertion in the vein, the assigned medical Team members should watch for the dark red flashback of blood at the catheter hub in compliance with medical procedures. *See id.* at Appx. A at p. 5.

- The assigned Medical Team members shall ensure the catheter is properly secured with the use of tape or adhesive material, properly connected to the IV line and out of reach of the offender's hands. A flow of heparin/saline shall be started in each line and administered at a slow rate to keep the line open. *See id.*

- Any failure of a venous access line shall be immediately reported to the IMSI Warden. *See id.*

**MEMORANDUM DECISION AND ORDER - 28**

- The IV catheter in use shall not be covered and shall remain visible throughout the procedure. *See id.*

- The IMSI Warden shall physically remain in the execution chamber with the offender throughout the administration of the chemicals in a position sufficient to clearly observe the offender and the primary and backup IV sites for any potential problems and shall immediately notify the medical Team leader and director should any issue occur. Upon receipt of such notification, the director of the IDOC will stop the proceedings and take all steps necessary in consultation with the Medical Team leader prior to proceeding further with the execution. *See id.*

- The Medical Team will take measures to ensure that there is no leakage in the tubing of the IV. *See* Zmuda Aff. at ¶ 25 (Docket No. 50).

**Timing Between Administration of Chemicals:**

- No further chemicals shall be administered until the Medical Team leader has confirmed the offender is unconscious, has verbally advised the IMSI Warden and three minutes have elapsed since commencing the administration of the sodium pentothal/or pentobarbital. *See* SOP 135, Appx. A at p. 6 (Docket No. 7, Att. 4); *see also* Zmuda Aff. at ¶ 22 (Docket No. 50).[25]

**Equipment Condition and Drug Chain of Custody:**

- Ensure that execution chemicals and other medical supplies have been purchased and/or that sources have been established. *See* SOP 135, p. 24 (Docket No. 7, Att. 4).

- When chemicals are received, the IMSI Warden shall immediately start a chain of custody document and secure the chemicals in a safe. Access to the safe must be limited and controlled. The IMSI Warden will establish in a field memorandum the individuals who have access to the safe. The chain of custody form must be updated each time the safe is opened. *See id.*

- If chemicals are on site, the IMSI Warden will check the expiration dates on each item to ensure they will not expire before the execution date. If any

---

[25]   In dissenting from Chief Justice Roberts's opinion in *Baze*, Justice Ginsburg, joined by Justice Souter, stated that "Kentucky's protocol does not include an automatic pause in the 'rapid flow' of the drugs . . . ." *Baze* 553 U.S. at 118 (dissent). SOP 135's three-minute break (also applied in the event backup lines are used) addresses this issue. *See* SOP 135, Appx. A at pp. 6-7 (Docket No. 7, Att. 4)

**MEMORANDUM DECISION AND ORDER - 29**

item will expire before the execution date, the IMSI Warden will immediately contact the deputy chief of prisons.  *See id.*

- The IMSI Warden will consult with Medical Team members regarding the equipment for the procedure and ensure all equipment necessary to properly conduct the procedure is on site, immediately available for use, and functioning properly.  *See id.*

- The IMSI Warden will ensure that all backup medical equipment, including a backup electrocardiograph, crash cart, defibrillator, and two complete sets of backup chemicals, are on site, immediately available for use, and functioning properly.  *See id.*

- With technical assistance, the IMSI Warden will review lethal substances, amounts, methods, and the offender's physical and historical characteristics to evaluate compliance with SOP 135 and the appropriate facility field memorandum.  *See id.* at pp. 27-28.

- The IMSI Warden shall confirm preventive maintenance of the execution chamber is current.  *See id.* at p. 28.

- The IMSI Warden will confirm that the inventory of equipment, necessary supplies, and backup materials are on-site.  *See id.*

- Within 24 to 12 hours prior to the execution, the IMSI Warden shall ensure that the Medical Team leader checks the electrocardiograph instruments to confirm they are functioning properly.  *See id.* at p. 30.

- Within 24 to 12 hours prior to the execution, the IMSI Warden shall ensure that the crash cart and defibrillator are in place and functioning properly.  *See id.*

- Within 24 to 12 hours prior to the execution, the IMSI Warden shall check the medical supply and chemical inventory.  *See id.*

- The IMSI Warden will re-check the medical supplies and chemicals to ensure that each item is ready, expiration dates have not been exceeded, items are properly packaged, and, if applicable, sterilized.  *See id.*

As an alternative to a stay of execution, Rhoades requests that *Baze's* safeguards extend

to SOP 135.  *See* Pl.'s Reply to Resp. to Mot. For Stay of Execution, p. 18 ("Alternatively,

[Rhoades] requests that the safeguards integral to the *Baze* protocol be implemented by the

**MEMORANDUM DECISION AND ORDER - 30**

Director and incorporated into SOP 135.").  In light of *Baze*, this Court has conducted a review of SOP 135 and concludes that it is substantially similar to Kentucky's lethal injection protocol.

    3.    <u>Rhoades Has Not Shown a Substantial Risk that SOP 135 Will be Implemented in an Unconstitutional Manner</u>

Rhoades contends that even if Idaho's lethal injection protocol contains adequate safeguards to minimize the risk of pain, there is still a substantial risk that IDOC officials will commit mistakes in implementing the protocol, exposing him to severe pain.  To support his argument, he relies on selected reports of problems that have occurred during executions in other States that use a three-drug protocol.  He also contends that the current members of Idaho's execution teams were not fully vetted because no IDOC official confirmed employment history, training, or relevant medical experience, as called for by SOP 135.  Additionally, Rhoades argues that Idaho's adoption of the final version of SOP 135 five weeks before his scheduled execution has resulted in an unnecessarily rushed atmosphere with little time to practice, and, moreover, that the training sessions that have occurred and will occur before the scheduled execution are inadequate to ensure his safety.

In *Dickens*, the Ninth Circuit acknowledged that *Baze* did not foreclose prisoners from bringing claims that go beyond a written protocol and rely on errors in implementation, but it noted that a prisoner making such a claim "faces an uphill battle."  631 F.3d at 1146.  This is so because the prisoner must "raise issues of fact as to whether there is a substantial risk that he will be improperly anesthetized *despite* the Protocol's safeguards, including those added through amendment."  *Id*. (citing *Baze*, 553 U.S. at 56).  This is "not an impossible task, but it is a difficult one."  *Id*. at 1147.

**MEMORANDUM DECISION AND ORDER - 31**

As an initial matter, the Court has considered Rhoades's argument regarding problems during executions in other jurisdictions.  In his briefing, he provides a list of 31 "botched executions" between 1982 and 2001, and he cites a few more recent examples from media accounts since *Baze*.  *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. or Stay of Execution, pp. 5-6 (Docket No. 18).  At oral argument, Rhoades's counsel argued that 12% of executions under three-drug protocols since the *Baze* decision had been "botched," resulting in serious pain to the prisoner.

The Court is unsure precisely how counsel reached this statistic, but he appears to have relied on a much smaller sample size than the hundreds of executions that have occurred since States moved to lethal injection in the early 1980s.  He also has not specified the conditions under which these executions were carried out, and the protocols may have differed significantly from Idaho's current protocol.  And while problems have occurred, this does not mean that, in each such case, the prisoner experienced serious pain and an unconstitutional punishment, as Rhoades assumes. *See*, *e.g.*, *DeYoung v. Owens*, 646 F.3d 1319, 1325-27 (11th Cir. 2011) (discussing different witness accounts of Roy Blankenship's movements during his execution and concluding that, whatever caused them, "it is clear that Blankenship's execution did not proceed to the second drug until after he was fully unconscious.").  Although of obvious concern,  mishaps of varying degree in other states with different personnel under varying protocols are not necessarily probative of how Idaho will implement its own protocol.

Rhoades next contends that Zmuda failed to verify the employment history and relevant medical experience of the current execution team members.  He asserts that there is no way of

**MEMORANDUM DECISION AND ORDER - 32**

knowing whether the team members have the experience that they claim they have and, consequently, some of the members may not be qualified to complete the tasks assigned to them.

At the evidentiary hearing, Zmuda testified that criminal background checks of the prospective team members were conducted, and that the candidates provided him with their qualifications and certificates, but to maintain confidentiality he did not contact prior employers or institutions to corroborate the information that was given to him.  Zmuda and two other Wardens interviewed each candidate personally.  Once the Medical Team leader was selected, the Medical Team leader also participated in interviews and asked relevant questions.  Zmuda said that he later "verified" that the team members had the necessary skills and experience from direct observation during subsequent training sessions.

The Court finds Zmuda to be a credible witness who has been acting in good faith to minimize the potential risk of error, and it is satisfied with his explanations on this point. Additionally, there is an enormity to Zmuda's responsibilities that he appears to understand.  He is responsible for the organization and implementation of an execution.  If there were to be problems with that process, it would carry personal and professional consequences.  He appears to the Court to be carrying out his responsibilities with a full understanding of the gravity of his duties.  He was candid in his courtroom testimony about where his knowledge started and where it stopped, particularly on medical issues.  His testimony reflected an appropriate emphasis on hiring team members with the input of others, to include a highly trained medical professional hired as the Medical Team leader (here, a registered nurse with many years of experience), and his emphasis upon confirming, with the assistance of the Medical Team leader, the actual, hands-on, competencies of the team members.  Although Rhoades asserts that Zmuda is not a medical

**MEMORANDUM DECISION AND ORDER - 33**

professional and would be unable to assess a team member's proficiency in such tasks, he overlooks that the Medical Team leader, at least, has significant experience in these matters, is qualified to make such assessments, and Zmuda has that person's assistance.

Rhoades also argues, with understandable concern, that he is in a difficult position due to the combination of the relative anonymity of the execution team members and the expedited nature of these proceedings, which he contends impede the investigation he wants to make on his own into their credentials and qualifications. But it is Rhoades who is seeking injunctive relief, and he has the burden to demonstrate that such relief is warranted. *Hill v. McDonough*, 547 U.S. 573, 583-84 (2006). This issue – the request to seek discovery or the time for investigation about unknowns that might raise Eighth Amendment concerns – was recently before the Ninth Circuit, and then the U.S. Supreme Court. In *Landrigan v. Brewer*, 625 F.3d 1132 (9th Cir. 2011), the court upheld a district court's temporary restraining order putting on hold a scheduled execution. In *Landrigan*, the petitioner was scheduled to be executed on October 26, 2010. On October 21, 2010, he sought a stay, based upon the State of Arizona's refusal to provide information "about the provenance and efficacy of the foreign-source drug [sodium thiopental]" to be used in the execution. *Landrigan*, 625 F.3d at 1133. In approving the stay, both the district court and the circuit panel emphasized that the petitioner ought to permitted to conduct discovery to obtain information about the particular drug to be used in the execution. The circuit panel further stated: "[o]ur courts operate on an adversarial basis . . . . A party and his lawyers may, through research, additional evidence, and advocacy, succeed in proving that information that appears benign to a judge is not." *Landrigan*, 625 F.3d 1135.

**MEMORANDUM DECISION AND ORDER - 34**

Additionally, in *Landrigan*, the petitioner was able to state a seemingly colorable concern – *i.e.*, that drugs manufactured abroad are more likely to contain harmful contaminants, which would have implications about the efficacy of the foreign manufactured drug in the execution procedure. *Landrigan v. Brewer*, 2010 WL 4269559, *10 (D. Ariz. Oct. 25, 2010).  The Supreme Court, however, vacated the temporary restraining order, making clear in doing so that – on facts immediately analogous to this case – the prisoner's speculation or even scientifically-based suspicions about potential errors or problems in the manner in which an execution will be conducted, even without an opportunity to investigate such possibilities, will not justify a stay. *Brewer v.  Landrigan*, 131 S.Ct. 445 (2010) ("speculation cannot substitute for evidence that the use of the drug is "'*sure or very likely* to cause serious illness and needless suffering.'") (citing *Baze*, 553 U.S. at 50, and *Helling*, 509 U.S. at 33).

This Court is drawn to the intuitive, equitable tilt of the district court and circuit decisions in *Landrigan* toward allowing discovery on some subject that *might* raise questions about whether a planned execution should proceed.  No judge considers questions such as raised in this case in a vacuum.  There is no way to make this judicial proceeding, and the starkness of the decision before the Court, appear as if it is either mundanely routine or somehow freighted with great wisdom because the decision is made by someone who wears a judicial robe. Similarly, the heartwood of logic and adherence to the Rule of Law that the Court seeks to bring to the question cannot hide the ultimate end of a decision adverse to Rhoades.  In that particular space, the mind instinctively is concerned about the possibility of error.  But, when the Supreme Court acted in the posthaste manner it did in *Landrigan*, the message is unmistakable.  *Baze* and the decisions upon which it drew*, particularly in the context of injunctive relief, *are* to be

**MEMORANDUM DECISION AND ORDER - 35**

followed.  Speculation cannot substitute for evidence that some component of the protocol, or

the actual implementation of the protocol, is "*sure or very likely* to cause serious illness and

needless suffering."  *Id.*  The possibility that some team member might have misstated or

exaggerated his or her credentials is not "sure or very likely" evidence of a substantial risk of

serious illness and needless suffering, particularly when actual performance of duties in the

training and rehearsals corroborate the team members' stated credentials.

Rhoades also asks the Court to consider the timing of IDOC's issuance of SOP 135.  The

Court is troubled by IDOC's adoption of a final version of SOP 135 on October 14, 2011, a day

after the last of the two denials of certiorari in Rhoades's federal habeas cases.  As the Court

noted at the evidentiary hearing, having implemented a new protocol just as newly-issued death

warrants in the Rhoades criminal cases were nearly certain to be headed its way, IDOC now

appears to be "playing catch-up" so that it will be sufficiently prepared for the execution. Ideally,

IDOC would have devised a final protocol more quickly after *Baze* set the parameters of a

constitutional lethal injection procedure.  Yet state officials waited more than three years after

*Baze* was decided – even while knowing that prisoners such as Rhoades potentially were nearing

the end of their appeals – before finalizing SOP 135.

Despite this concern, the Court finds no evidence in the record that IDOC intentionally

delayed adopting SOP 135 to gain a tactical advantage in litigation.  The record shows that state

officials were slowly but steadily progressing toward a goal of a final SOP and that they did not

hurriedly put together a slapdash plan.  Zmuda testified that IDOC has been re-evaluating and

revising the protocol over the last few years.  To that end, he contacted officials in other states to

inquire about their protocols, focusing primarily on Arizona.  In 2010, Zmuda and other IDOC

**MEMORANDUM DECISION AND ORDER - 36**

officials conducted an on-site visit to Arizona's execution facilities, where they discussed Arizona's procedures with officials there.  To be sure, IDOC did itself no favors by not completing the process until October 2011, but Zmuda and others were attempting to devise and implement a protocol that will comport with the Eighth Amendment, as construed by *Baze* in the time leading up to that date.

IDOC has also since made up for much of the lost time, and the Court is reassured by the steps that it has taken since SOP 135 was adopted.  Between late October and November 10, the execution teams have practiced a total of five times, and they intend to practice five more times with live volunteers, including two complete rehearsals of the execution process, before November 18.  These last five training sessions will include the insertion of IV catheters into live volunteers, the use of a saline solution to simulate the lethal injection, and a rehearsal of the consciousness checks by the Medical Team on volunteers.

At the evidentiary hearing, Zmuda testified that the initial practice sessions involved inserting IV catheters into a mannequin.  The Court expanded the record to include a new affidavit from Dr.  Heath, in which he states that practicing on a mannequin arm "does not make a person competent to establish and maintain an IV on a human being." *See* Heath Aff. at ¶ 11 (Docket No.  51, Att. 1).  The Court's conclusion is not altered by Dr. Heath's opinion, both because Zmuda testified that the Medical Team members already have experience in IV insertion and because the Medical Team will be practicing IV insertion five more times on live volunteers before the execution.[26]

---

[26]  Rhoades has also alleged that the execution facility is incomplete.  Zmuda testified that the "execution chamber" has been completed but that the first training sessions may have occurred without a "monitoring system" fully installed in the chamber, though he could not

**MEMORANDUM DECISION AND ORDER - 37**

Rhoades has put forward understandable concerns, particularly with respect to IDOC's slow development of its protocol, and there is always a *possibility* that an error could occur during implementation. Nonetheless, "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'" *Baze*, 553 U.S. at 50. Based on the evidence before it, this Court concludes that Rhoades has not shown a substantial likelihood that he will be able to prove a *substantial risk* that the protocol will be implemented in a manner that will cause serious pain.

    4.    <u>Idaho is Not Required to Use an Alternative One-Drug Protocol</u>

Rhoades also contends that the Court must take into consideration the availability of a one-drug protocol – the injection of a single barbiturate – which he asserts would significantly minimize the risk of serious pain because the pain-causing chemicals would be omitted entirely. A similar argument was rejected in *Baze*. There, the controlling opinion formulated the test for stating an Eighth Amendment claim based on available alternative methods of execution:

> Given what our cases have said about the nature of the risk of harm that is actionable under the Eighth Amendment, a condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative.
>
> * * *
>
> Instead, the proffered alternatives must effectively address a "substantial risk of serious harm." To qualify, the alternative procedure must be feasible, readily

_____

recall specifically. *See* Zmuda Aff. at ¶ 19 (Docket No. 50); Tr. of Evid. Hearing, p. 96. The Court is satisfied that, to whatever extent a few items of equipment may have not been in place for the initial training sessions, the training has occurred and will occur under conditions that replicate the execution in all material respects and there is no substantial risk of serious harm to Rhoades.

**MEMORANDUM DECISION AND ORDER - 38**

implemented, and in fact significantly reduce a substantial risk of severe pain. If a State refuses to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for adhering to its current method of execution, then a State's refusal to change its method can be viewed as "cruel and unusual" under the Eighth Amendment

553 U.S. at 49-51 (internal citation omitted).

Rhoades argues that he has satisfied this test in light of developments since *Baze*, including evidence that three States have adopted a one-drug protocol. He contends, through the testimony of his medical expert, Dr. Heath, that 14 executions have occurred under a one-drug protocol without incident, suggesting that this demonstrates a constitutionally dispositive reduction in the risk when weighed against his proffered error rate for executions under a three-drug protocol. The Court is not so persuaded.

For the Court to consider the question of whether there is a feasible and significantly safer alternative, Rhoades must first show a substantial risk of harm from the protocol that Idaho has chosen. *See Baze*, 553 U.S. at 50 ("[t]o qualify, the alternative procedure must be feasible, readily implemented, *and in fact significantly reduce a substantial risk of severe pain*.") (emphasis added). This requirement is consistent with Chief Justice Roberts's admonition in *Baze* that federal courts are not "boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new an improved method of execution." *Id*. at 51. The Ninth Circuit has confirmed that "under *Baze*, the failure to adopt an alternative protocol establishes an Eighth Amendment violation only if the current protocol creates a substantial risk of serious harm that the alternative protocol would reduce." *Dickens*, 631 F.3d at 1150. For the reasons already given, Rhoades has not shown that, given

**MEMORANDUM DECISION AND ORDER - 39**

more time, he is likely to prove that a substantial risk of serious pain exists in Idaho's three-drug protocol.

Of the 36 death-penalty States when *Baze* was decided, no State had yet used a one-drug protocol, and Chief Justice Roberts wrote that "[t]his consensus [upon a three-drug protocol] is probative but not conclusive with respect to that aspect of the alternatives proposed by petitioners."  553 U.S. at 53.  The converse is applicable in this case.  Even though the decision of three States to employ a single drug protocol may be probative, it is not conclusive.  The Court is not persuaded that this change in three States proves either a trend or is the type of groundswell of support that shows a national consensus regarding a particular method of execution, particularly in the absence of any of the sort of scientific consensus found lacking by the Supreme Court in its consideration of the same question in *Baze*.  553 U.S. at 57.  It may well be that these three States simply decided to follow Justice Steven's suggestion that "States wishing to decrease the risk that future litigation will delay executions or invalidate their protocol would do well to reconsider their continued use of pancuronium bromide."  553 U.S. at 38.

**B.      Rhoades is Likely to be Irreparably Harmed Absent a Stay**

If the execution is not stayed, Rhoades will be executed on November 18.  That event is irrevocable.  Absent a stay, he will also lose an opportunity to litigate his claims to completion.  But Defendants argue that Rhoades "will not likely suffer irreparable harm in the absence of preliminary relief, because the safeguards in place are there to reduce the risk of severe pain during the execution procedure."  (Docket No.  22, p. 19.)  Defendants' argument assumes that

**MEMORANDUM DECISION AND ORDER - 40**

the focus of this element is on the likelihood of a legal injury to Rhoades that cannot be redressed rather than some other type of harm.

Some courts addressing this issue have conceded that, absent a stay, a prisoner will be "harmed" in all lethal injection challenges in which the prisoner seeks to litigate his claims on the merits before he is executed.  *See Jones v. Hobbs*, 604 F.3d 580, 581 (8th Cir.  2010) (finding that irreparable harm "is present in every § 1983 action challenging a proposed method of execution");  *see also*, *Workman v.  Bredesen*, 486 F.3d 896, 928 (6th Cir. 2007) (Coyle, J., dissenting) ("[n]obody contests that Workman will suffer irreparable harm if his execution is not stayed.").

Other courts have found that "the alleged irreparable injury is not the fact alone that [the prisoner] will die by execution.  That alone is not a cognizable constitutional injury."  *Powell v. Thomas*, 784 F. Supp.2d 1270, 1283 (M.D. Ala.  2011); *see also Jackson v. Danberg*, 2011 WL 3205453 at *3 (D.  Del.  2011) ("[i]rreparable harm, in the context of the death penalty, cannot mean the fact of death, as such an interpretation would make analysis of this factor meaningless.").  Under this view, "the alleged irreparable injury lies in [the prisoner's] assertion that, under present protocols, he may be conscious after being injected with [sodium thiopental or] pentobarbital and able to feel pain during the administration of the final two chemicals."  *Powell*, 784 F. Supp.2d at 1283; *see also Lambert v.  Buss*, 498 F.3d 446, 452 (7th Cir.  2007) (concluding that the plaintiff had "not shown the existence of irreparable harm through the mere possibility that some unforeseen complication will result in a lingering death"); *West v. Brewer*, 2011 WL 2836754 at *8 (D. Ariz. 2011) (finding no irreparable harm because safeguards

**MEMORANDUM DECISION AND ORDER - 41**

ensured that "Plaintiff West is fully anesthetized before the second and third drugs are administered.").

Notwithstanding a lack of binding authority on the precise issue, this Court finds that the harm in this instance is Rhoades's death and his inability to continue with the litigation, and that this harm is irreparable if a stay is not granted.  Even so, a finding in Rhoades's favor on this factor alone does not warrant a stay, in light of his inability to show a substantial likelihood of success on the merits or that the equities tip sharply in his favor and that it is otherwise in the public interest to delay the matter (discussed below).  *See, e.g.*, *Jones*, 604 F.3d at 581-81 (noting that the "likelihood of irreparable harm (which is present in every § 1983 action challenging a proposed method of execution) is not enough.").

## C.     The Equities do not Sharply Favor Either Side, but the Public Interest in Proceeding is Compelling

The Court is mindful that in cases where a prisoner has delayed bringing his claim seeking to stay an execution, the equities cut sharply against him.  *Hill v. McDonough*, 547 U.S. 573, 583-84 (2006).   Idaho, however, has not conducted an execution in over 15 years.  *Baze* was decided in 2008, yet Idaho did not adopt a revised lethal injection protocol until five weeks before Rhoades is scheduled to be executed.  On the other hand, Rhoades apparently exhausted IDOC's internal grievance procedure with a claim made over two years ago challenging the State's then-existing method of execution.  But, he did not file a lawsuit in federal court challenging any method of execution until September 22, 2011, very near the end of his habeas appeals when it was arguably foreseeable that an execution date would be set.  On such facts, the Court finds that equities do not tilt sharply to either side in this litigation.

**MEMORANDUM DECISION AND ORDER - 42**

However, the citizens of the State of Idaho and the families of the individual victims in this case have a compelling interest in seeing that Idaho's lawful judgments for the kidnappings and murders of Susan Michelbacher and Stacy Baldwin are enforced.  Those judgments have been pending now for well over two decades while Rhoades challenged his convictions and sentences in state and federal court.  There is much that has been said and written about the uncertainties and expense of death-penalty cases, and the impact that the length of time such cases place upon the families and communities of the victims, as well as the impact of such delay upon the *ratio decidendi* underpinning the death penalty in our society.  Continued delay compounds those uncertainties, expenses, and impacts, and therefore is not in the public interest.

## IV.  CONCLUSION

For the foregoing reasons, Rhoades has not demonstrated entitlement to injunctive relief. Therefore,  IT IS HEREBY ORDERED THAT Plaintiff's Emergency Motion for Preliminary Injunction or Stay of Execution (Docket No. 17) is DENIED.

DATED:  **November 14, 2011**

Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 43**