UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

SOUTHERN DIVISION

PAUL EZRA RHOADES,                    )     Case No. CV11-445-REB
                                      )
        Plaintiff,                    )
                                      )     Boise, Idaho
        vs.                           )     November 10, 2011
                                      )     1:00 p.m.
BRENT REINKE, et al,                  )
                                      )
        Defendants.                   )
                                      )
. . . . . . . . . . . . . . . )

VOLUME I OF I
MOTIONS HEARING
BEFORE THE HONORABLE RONALD E. BUSH
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:
For the Plaintiff:              MR. OLIVER W. LOEWY
                               MS. TERESA A. HAMPTON
                               MR. BRADY WARD-KING
                               MR. JONATHAN LIVINGSTON
                               Federal Defender Services of Idaho
                               702 West Idaho Street, Suite 900
                               Boise, Idaho  83702


For the Defendants:            MS. KRISTA LYNN HOWARD
                               MR. MARK KUBINSKI
                               MR. LAMONT ANDERSON
                               Office of Attorney General
                               Idaho Department of Corrections
                               1299 N. Orchard Street, Ste. 110
                               Boise, Idaho  83706


COURT RECORDER:                TRANSCRIPTION BY:

TRINIDAD DIAZ                  CANYON TRANSCRIPTION
U.S. District Court           P.O. Box 387
                              Caldwell, Idaho  83606
                              (208)454-1010


Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

I N D E X

PLAINTIFF'S WITNESSES:                          PAGE   LINE

        HEATH, Mark Sherman John, M.D.
            (by video)
Direct Examination by Mr. Loewy                    4      2
Cross-Examination by Mr. Anderson                 43     17
Redirect Examination by Mr. Loewy                 55     18


        ZMUDA, Jeffrey
Direct Examination by Ms. Hampton                 59     16
Cross-Examination by Ms. Howard                  115     14
Redirect Examination by Ms. Hampton              121      9


DEFENDANTS' WITNESS:

        ZMUDA, Jeffrey
Direct Examination by Ms. Howard                 154     14
Cross-Examination by Ms. Hampton                 155     16


PLAINTIFF'S ARGUMENT                             127      6
                                                 165      4

DEFENDANTS' ARGUMENT                             147     20


E X H I B I T S

PLAINTIFF'S EXHIBITS:                           PAGE   LINE

PXE 1 - SOP 135 (Dkt. 7-4)
     Admitted                                     62     21

PXE 3 - SOP 135 2011 Draft
    Protocol (Dkt. 1-4, Ex. 1)
     Admitted                                     66      9

PXE 9 - IDOC Policy (Dkt. 7-3)
     Admitted                                     61      7

1                    (Requested proceedings begin.)

2          COURT:  Dr. Heath, I'm informed that this last page

3     that for whatever reason didn't reach you the first time, it's

4     on its way to you.  While we're waiting for that, we're going to

5     have Ms. Case swear you in.

6          DR. HEATH:  Okay.

7          COURT:  She'll come to the podium so you can see her.

8          CLERK:  Dr. Heath, if you could stand and raise your

9     right hand, please.

10          DR. HEATH:  I have to adjust the camera I think.

11          CLERK:  Okay.  Thank you, sir.

12               (MARK JOHN SHERMAN HEATH, M.D., is sworn.)

13          CLERK:  Thank you.  And for our record, sir, if you

14     could state your full name and spell your last.

15          WITNESS:  Mark, M-a-r-k, John, Sherman, Heath,

16     H-e-a-t-h.

17          CLERK:  Thank you.

18          WITNESS:  Thank you.

19          COURT:  Also for the record, let's just make sure we

20     don't have any issues about proceeding in this manner.  Ms.

21     Howard, is there any objection from the State to Dr. Heath

22     appearing by video conference?

23          MS. HOWARD:  No, Your Honor.

24          COURT:  All right.  Mr. Loewy, you may inquire.

25          MR. LOEWY:  Thank you, Your Honor.  I see that the fax

1    is now being delivered to Dr. Heath.

2                                DIRECT EXAMINATION

3    QUESTIONS BY MR. LOEWY:

4    Q.  Dr. Heath, I think what you just received was Exhibit A?

5    A.  Yes, that's correct.

6    Q.  And you'll see that there were some redactions on that as

7    well as a few additions and those additions should parallel the

8    changes that were made in the text of the affidavit.

9    A.  I see that.

10   Q.  Thank you.  The reason for the redactions, not to delete

11   them from the affidavit or for the Court's consideration but

12   rather for sealing purposes so we may as we proceed and I ask

13   questions need to refer in very general terms to some the

14   redacted matter and we will proceed as we go.  I don't think

15   that should prove any difficulty but I just want to ask you to

16   please be cautious in answering your questions not to refer or

17   try not to refer to any matter which has been redacted?

18           Let's start with your background, Dr. Heath.  Can you

19   just summarize, please, for the Court your education.

20   A.  Yes.  Currently, I'm an anesthesiologist practicing at

21   Columbia University in New York City.  I attended Harvard

22   College for undergraduate work.  I attended the University of

23   North Carolina in Chapel Hill for medical school.  I performed a

24   year of medical internship at George Washington University in

25   Washington, D.C. and then I did my residency and fellowship in

1    anesthesiology and cardiac anesthesiology at Columbia University

2    in New York City.

3    Q.  And how long have you been with Columbia University in a

4    teaching capacity?

5    A.  I began my residency there in 1988 and I began teaching

6    residents there in 1993.

7    Q.  What department are you associated with, please?

8    A.  Anesthesiology.

9    Q.  Thank you.  Are you Board-certified in any particular

10   medical specialty?

11   A.  Yes.  I'm Board-certified in the practice of anesthesiology

12   and also in carrying out intra-operative echocardiographic

13   examinations in patients who are having cardiac surgery.

14   Q.  Thank you.  I put the cart a little bit ahead of the horse a

15   moment ago when I mentioned your teaching duties at Columbia

16   because I'm not sure that we actually got to your having been

17   teaching at Columbia but we've got that out now.  In addition to

18   teaching as a professor at Columbia -- well, let's get that out

19   of the way.  What is your appointment at Columbia, please?

20   A.  I'm assistant professor of clinical anesthesiology.

21   Q.  And do you also practice anesthesiology?

22   A.  Yes.  I'm a full-time clinical practitioner of

23   anesthesiology.

24   Q.  And is it accurate to say that you've been a practicing

25   anesthesiologist since your residency?

1   A.   That's correct.

2   Q.   And that was in 1988 as I recall?

3   A.   The residency began in 1988, yes, and I became an attending

4   physician and a Board-certified physician in the early '90's.

5   Q.   Thank you.  Can you describe in summary fashion publications

6   which are relevant to the questions before the Court regarding

7   lethal injection?

8   A.   Yes.  I've had a variety of publications regarding the

9   lethal injection issue.  One of them was invited commentary in

10   the (inaudible) proceedings regarding the practice of lethal

11   injection and some of the ethical considerations that attach to

12   it when physicians become involved.  I've also published a

13   number of abstracts and presentations at meetings -- at

14   professional meetings regarding the subject.

15   Q.   Have you presented in any other capacity on lethal injection

16   such as grand rounds?

17   A.   Yes.  I delivered grand rounds at the National Institutes of

18   Health in Washington, D.C. at the main teaching hospital in

19   Washington, D.C. or actually in Bethesda regarding issues

20   related to lethal injection.

21   Q.   And can you tell me whether anyone else in your department,

22   to your knowledge, at Columbia University has presented grand

23   rounds at the National Institute of Health?

24   A.   I don't believe anybody has.

25   Q.   Thank you.  From your medical practice experience, your

1   teaching experience, your education, are you familiar with the

2   three drugs which are used in Idaho's protocol, SOP 135?

3   A.  Yes, I am.  Just to clarify, there are actually four drugs

4   because of the possibility of using one other barbiturate.

5   Q.  Yes, thank you.  Are you familiar with the establishment and

6   maintenance -- well, with the establishing of peripheral IV

7   intravenous catheter lines?

8   A.  Yes.  It's a central feature of every clinical procedure

9   that I'm involved in and I either perform it myself or supervise

10  a resident or nurse in establishing the IV access.

11  Q.  And are you familiar with establishing femoral vein IV's or

12  central lines?

13  A.  Yes, I am.  Yes, I am.

14  Q.  Thank you.  Are you familiar with regard to both -- with

15  maintaining those lines as open, productive, patent lines?

16  A.  Yes, I am.

17  Q.  And are you familiar with how those lines might fail?

18  A.  Yes, I am.

19  Q.  I take it being an anesthesiologist that it would be true

20  that you are familiar with how to assess an individual's depth

21  of unconsciousness.

22  A.  That's a central feature of the practice of anesthesiology,

23  yes.

24  Q.  Thank you.  Now, you've had an opportunity to review the

25  IDOC SOP 135; is that correct?

1  A.  That's correct.

2  Q.  And as you mentioned before, there are three drugs but four

3  involved because there's a question as to whether the anesthetic

4  would be one or the other.  Is that accurate?

5  A.  That's correct.

6  Q.  The last drug which is administered is potassium chloride?

7  Is that correct?

8  A.  That is correct.

9  Q.  If potassium chloride were introduced into the bloodstream

10  of an entirely unanesthetized individual, what would be the

11  effect?

12  A.  As soon as the potassium chloride reached -- again, we're

13  talking in the quantities involved in the lethal injection

14  procedure.  The potassium chloride, as soon as it reached the

15  interior of the vein in the arm or hand or groin, wherever the

16  IV were placed, would cause immediate activation of all the

17  sensory nerve fibers that it came into contact with and that

18  would cause excruciating pain.

19  Q.  Are there more painful stimulants than potassium chloride?

20  A.  It's difficult to know exactly how to rank extreme --

21  extremely agonizing chemicals or stimulations but I would say

22  this:  Potassium chloride depolarizes or activates all the nerve

23  fibers with which it comes into contact.  So what that means is

24  that every single nerve fiber that the potassium chloride

25  contacts is activated.  If that nerve fiber is normally

1   responsible for carrying information about burning, then there

2   will be a burning sensation and it will be a maximal burning

3   sensation.  If that nerve fiber is responsible for carrying

4   information about stretching or tearing or grinding or chemical

5   injury or shearing or crushing or pinching, all those sensory

6   modalities, those forms of sensation, will be activated to the

7   maximal possible amount.

8   Q.  I take it that there is no appropriate time in a hospital

9   setting to introduce potassium chloride into an individual's

10  bloodstream absent appropriate anesthetic.  Is that correct?

11  A.  That's not correct.  We sometimes administer or frequently

12  administer very diluted potassium chloride to patients whose

13  blood levels of potassium have fallen to a dangerously low

14  level.  So if a patient, for example, is on diuretics to lower

15  their blood pressure and that has reduced the amount of the

16  potassium in their blood, that creates a real threat of cardiac

17  arrhythmias and cardiac arrest.  And so we like to rapidly

18  replete potassium by diluting it into a large IV bag and then

19  administering it slowly intravenously.  If we administer it too

20  quickly, then it causes severe pain and the patients complain

21  bitterly.

22  Q.  If, however -- if you, however, administer it at the rate

23  that you just described, the slow rate, it does not cause pain?

24  A.  Well, at the slow rate that we give, it often does cause

25  quite significantly -- a significant amount of pain and the

1    nurses will call the physicians and ask for some kind of pain

2    medication and often if we can, we can slow the IV down or

3    dilute the potassium further.  But again, we're talking

4    concentrations much, much lower and amounts much, much lower

5    than are being used for the purposes of lethal injection.

6    Q.  So to contrast with the much more concentrated amounts, the

7    pain is severe in comparison to the pain that you've seen and

8    know of patients getting with the diluted amounts?

9    A.  That's right.  Obviously nobody would deliberately

10   administer concentrated potassium to a conscious person in a

11   hospital because it would kill them very rapidly.  But there are

12   a number of reports in the literature of patients being

13   accidentally administered concentrated potassium because of the

14   failure of either a doctor to write the order properly that the

15   potassium is diluted or a failure of a nurse to carry out that

16   dilution.  When the patient is administered that large amount of

17   concentrated potassium, the response is that they scream in

18   agony, writhe and then very rapidly drop dead as the potassium

19   reaches their heart.

20   Q.  In the three -- I'm going to call it for shorthand the

21   three-drug protocol, understanding of course that the protocol

22   allows for one of two drugs but it also calls for the

23   administration of only three so for purposes of this proceeding,

24   I'm going to refer to the IDOC lethal injection protocol as a

25   three-drug protocol.  Okay?

1          COURT:  Counsel, can we make certain that our record is

2     clear as to -- I know what you're talking about.  Counsel for

3     defendant knows what you're talking about but so the reference

4     to the record is clear, which SOP are you talking about located

5     where in the record?

6          MR. LOEWY:  Judge, when I am referring to the IDOC

7     protocol and I think what I will do is adopt as nomenclature SOP

8     135, I am referring to the SOP which was adopted by the

9     defendants on October 14 and which is attached to their motion

10    to dismiss in this proceeding.

11         COURT:  All right.  So I think that's at Docket 7,

12    Exhibit 4 if I'm remembering.

13         MR. LOEWY:  I believe that is correct.

14         MR. ANDERSON:  Your Honor, I don't disagree with Mr.

15    Loewy's characterization but that motion was withdrawn.  I

16    don't -- I don't know where that leaves us for purposes of the

17    record.

18         COURT:  I just want -- I just don't want any argument

19    later on about what the hard copy document is that we're talking

20    about.  Right now, if we got a stipulation that it's the SOP 135

21    that was found in the form attached to the motion to dismiss now

22    withdrawn as Exhibit 4, is that all right with the State -- it

23    should be the defendants.

24         MR. ANDERSON:  Yes.

25         COURT:  Mr. Loewy.

1          MR. LOEWY:  Very good.  Thank you, Your Honor.

2          COURT:  All right.  Very good.  Go forward.

3    BY MR. LOEWY:

4    Q.  So with regard to SOP 135, Dr. Heath, which you have

5    reviewed and you've so testified and rather than refer to it I

6    think, as I said a moment ago, as the IDOC three-drug protocol,

7    I will now adopt as nomenclature for purposes of this hearing

8    SOP 135.  That way, we will be clear on the record to what you

9    are referring and to what I am referring.  Okay?

10   A.  Okay.

11   Q.  Great.  Keeping SOP 135 in mind, which of the drugs which is

12   administered actually kills the offender?

13   A.  The third drug, the potassium chloride that we've just

14   discussed is the drug that kills the offender.

15   Q.  And you mentioned -- you testified a moment ago about the

16   agonizing pain which the unanesthetized individual feels when

17   potassium chloride of the kinds of concentration being

18   administered pursuant to SOP 135 is administered.  If that is

19   administered -- let me start that sentence again.  I'm not even

20   sure where we are.

21          You testified a moment ago that if potassium chloride

22   in the concentrations called for by SOP 135 is administered to

23   an unanesthetized individual, they will suffer agonizing pain.

24   My question is what effect does pancuronium bromide have on

25   that?

1   A.   Pancuronium is the second drug administered in the three-

2   drug sequence specified in SOP 135.   Pancuronium would have no

3   effect on the sensation of pain or agony that would be produced

4   by potassium or, if I could clarify, it would actually

5   exacerbate the level of agony that would be present because in

6   addition to feeling all of the sensations of potassium, the

7   individual would be unable to move any of their muscles

8   including the muscles that they use to draw breath and so they

9   would be suffocating.

10         So again, in addition to experiencing the excruciating

11   pain of the potassium, they would also experience the sensation

12   of suffocating and they would also experience the sensation of

13   being locked in or chemically entombed, unable to move in any

14   way.

15   Q.   In describing the effect of pancuronium just now, you spoke

16   about the person being unable to breathe.   That would -- what

17   would that do with regard to the person's ability to signal that

18   they have just received an extremely painful stimulant?

19   A.   Well, in addition to being unable to phonate or vocalize or

20   cry out, again, it's important to remember that pancuronium

21   paralyzes all of the muscles in our body that we can -- that we

22   are able to control so they would not be able to say anything,

23   they would not be able to make a face to indicate any pain, they

24   would not be able to grimace, they would not be able to tense

25   any of the muscles in their arms or other parts of their body.

1    They would be completely flaccid because that is the effect of

2    pancuronium.  It produces a flaccidity of the entire body.

3    Q.  If the first drug were administered as contemplated which is

4    to say if the first drug reached the bloodstream in the quantity

5    called for by SOP 135, would the offender be affected in a way

6    that would impact his feeling of the pain caused by the

7    potassium chloride?

8    A.  SOP 135 calls for the delivery of 5 grams of thiopental into

9    the circulation of the prisoner.  If 5 grams of thiopental lead

10   to the circulation and circulates to the brain, it will render

11   any human being completely insensate, deeply unconscious and

12   unable to experience anything at all.

13   Q.  Now, there was a second drug, pentobarbital, which we've

14   alluded to.  Is the difference -- is there any material

15   difference, in your opinion, between thiopental and

16   pentobarbital with regard to your last statement?

17   A.  Before answering that, I'd like to make a clarification.

18   Pentobarbital is not a drug routinely used by an

19   anesthesiologist.  I have used it occasionally in the distant

20   past but it's not a particularly useful drug for inducing or

21   maintaining anesthesia and my experience with it is

22   substantially less than with thiopental.

23          That being said, a dose of 5 grams of pentobarbital, if

24   it is successfully delivered into the circulation of a human

25   being and delivered to the brain of that human being will

1   necessarily result in a deeply unconscious state where the

2   person is completely insensate and unable to experience anything

3   whatsoever including any pain or suffering.

4   Q.  The premise for my question about the effect of thiopental

5   if administered in the full dose and properly administered was

6   that it was properly administered.  What if a smaller amount of

7   thiopental was to reach the offender?  Would that necessarily

8   render him insensate to the pain of potassium chloride?

9   A.  No, it would not.

10  Q.  Can you talk -- can you tell us, please, if an amount which

11  is a clinical amount of thiopental -- well, let me ask you this

12  before we go there.  Is there a clinical amount or was there

13  when thiopental was being used a clinical amount that would be

14  used by an anesthesiologist?

15  A.  Yes, there was.  Typically for the healthy adult male

16  patient of normal stature and proportions, it would be typical

17  to use approximately 250 to 300 milligrams of thiopental to

18  induce anesthesia.  I should clarify that that amount of

19  thiopental would be expected to provide unconsciousness for a

20  very, very brief period of time which is our purpose for

21  selecting it for the induction of anesthesia.

22  Q.  And can you tell us how long a period of time that might be?

23  A.  It would depend on the individual's sensitivity to the drug

24  but it could be as short as a few tens of seconds.  And in fact

25  that is the reason -- one of the main reasons why thiopental was

1  selected as the induction agent so that if problems were

2  encountered during the induction and we were unable to assume

3  control of the patient's physiology and airway and breathing

4  that the drug would wear off so rapidly that the patient would

5  be able to assume their own control of those essential functions

6  and that would result in the patient not dying from the

7  induction.

8  Q.  Would it then be possible to administer or try to administer

9  a large dose of thiopental but in fact actually administer only

10  a small dose through IV administration?

11  A.  I believe you're talking about an inadvertent error and,

12  yes, an inadvertent error is certainly very possible and are our

13  main principal concerns during the induction of anesthesia.

14  Q.  So if there were inadvertent error of that sort with regard

15  to the administration of thiopental, keeping in mind that we're

16  speaking of SOP 135 and then the next two drugs, pancuronium

17  bromide and then potassium chloride being administered and

18  keeping in mind that there is a consciousness check after the

19  administration of the thiopental, what is your -- what in fact

20  might the result be for the offender with regard to his

21  consciousness at the time that the potassium chloride were

22  administered?

23  A.  Well, here is the core of the problem with SOP 135.  If an

24  inadequate dose of thiopental is administered, you can easily

25  have a situation where the prisoner appears to be unconscious

1   and based on a consciousness check that's performed by the

2   execution personnel is deemed to be unconscious and may in fact

3   or in fact be unconscious but then a few tens of seconds later,

4   be fully awake, if that situation occurs, then the prisoner

5   which again was deemed unconscious is now awake, has now been

6   exposed to the paralyzing effects of pancuronium, is now

7   experiencing complete flaccidity, complete immobility and unable

8   to move any of their muscles, to all appearances of everybody

9   else, of all the witnesses and anybody in the room, they would

10  appear to be peacefully unconscious as they had been at the time

11  of the consciousness check but in fact they would be wide awake,

12  experiencing first the inability to draw breath from pancuronium

13  and then when the concentrated potassium was introduced, they

14  would then experience the agonizing effects of death by high

15  dose concentrated potassium.

16  Q.  If we can shift for a few moments to assessing

17  unconsciousness, what, Doctor, is the purpose of administering

18  an anesthetic?

19  A.  We're talking about general anesthetics here as opposed to a

20  regional anesthetic which would just anesthetize part of the

21  body.  We're talking about a general anesthetic where the

22  central nervous system is depressed to the point where surgery

23  can be performed on any part of the body and the purpose of that

24  is to take a procedure that would be excruciating and painful

25  and cruel and render it completely comfortable for a patient so

1   that they have no experience of it so that a necessary surgical

2   procedure can be undertaken.

3   Q.  Is unconsciousness an either/or proposition?

4   A.  It's a very interesting and important question.  It's a

5   little bit different from, for example, being pregnant where one

6   is either pregnant or not pregnant.  In terms of

7   unconsciousness, a person can be deeply unconscious and

8   unarousable so that no matter what stimuli are applied to them,

9   it is impossible to elicit any kind of response or evidence of

10  consciousness, a moan or an opening of the eyes or anything.

11        It is also possible to be in a lightly unconscious

12  state, a state where a very minor stimulus, for example, just

13  lightly touching the shoulder and shaking the person would

14  rapidly bring them to a point of full consciousness.  So within

15  that realm of unconsciousness, there are I think it's

16  appropriate to talk about different depths of unconsciousness

17  and those can be characterized by the intensity of stimulus that

18  is necessary to elicit a response.

19  Q.  And how does an anesthesiologist assess whether a patient in

20  the operating room is sufficiently unconscious to allow surgery?

21  A.  That's a very complicated task that's a mixture of science

22  and art and it takes many years to acquire the skill set to be

23  able to reliably do it.  We monitor a continuous stream of

24  numerous sources of live feed information that tell us about the

25  physiology of our patient, things like their heart rate, their

 1   blood pressure, their skin moisture, their pupil size.  We

 2   integrate those streams of information with information from

 3   other monitors that we apply to our patients before we start the

 4   general anesthetic and that again provides us with continuous

 5   readouts that allow us to assemble an overall picture or sense

 6   of what the anesthetic depth or the unconsciousness depth of our

 7   patient is at any given time.

 8   Q.  If you were in a situation outside of an operating room

 9   where you had to assess consciousness and a depth of --

10   different depths of unconsciousness, are there ways to attempt

11   to do that?

12   A.  There are ways to attempt to do that but I have to clarify

13   that if a person has been given pancuronium, then it's

14   extraordinarily difficult or perhaps almost meaningless to try

15   to assess consciousness without the necessary equipment because,

16   again, all the tests that I would use outside of the operating

17   room would involve stimulating the patient and looking for some

18   kind of response from them.  If they are paralyzed by

19   pancuronium, they're completely flaccid and unable to move, they

20   would not be able to elicit a response whether they were wide

21   awake or deeply unconscious.  There would be no material

22   difference in what I could see except for some very subtle signs

23   to do with things like pupil size and skin moisture.

24   Q.  Can you characterize for the Court the depth of

25   unconsciousness which one must be at to not experience the pain

1   created by -- otherwise created by potassium chloride?

2   A.  Yes.  The surgical plane -- the plane of anesthesia that one

3   would need would be called a surgical plane.  It would be a

4   plane of anesthesia or a level of anesthesia, a depth of

5   unconsciousness where one could undertake surgery of essentially

6   any scope upon a person and they would not be sensible or

7   sensate to the pain of that surgery.  They would not experience

8   the ongoing surgery.  That's the necessary level of anesthetic

9   depth that is required for administering conscious -- a

10  concentrated potassium chloride.

11  Q.  And aside from monitoring various data on a patient that you

12  described before, the sort of data streams that you seek in the

13  operating room before you decide that the patient is

14  sufficiently unconscious to start surgery, are there ways which

15  one can try to establish the depth of unconsciousness through

16  stimulants rather than trying to get information from the

17  patient, give information to the patient and see what happens?

18  A.  The one thing that is sometimes done -- in fact I'll say

19  very often done is that prior to the -- after the patient is

20  anesthetized, after they have been fully prepped and they're

21  ready to start the surgery, the surgeon will say, "Is it okay if

22  I begin," and we'll apply what's called a test stimulus.  They

23  will do something to the patient that's -- would be painful to a

24  conscious patient and then that allows us to watch a response in

25  terms of heart rate or blood pressure or any of the myriad other

1   parameters that we're constantly monitoring to determine if the

2   patient really is in fact ready for surgery.

3   Q.  And is there a -- short of cutting into a patient -- and I

4   take it when we say "ready for surgery," certainly what I meant

5   and I guess I'll ask you this, Doctor, whether you meant the

6   same thing these last several minutes.  When I've said "ready

7   for surgery," I meant ready to take a scalpel and cut into the

8   person.  Is that consistent with what you meant?

9   A.  That's correct, yes, and to do things that are significantly

10  more stimulating than that.

11  Q.  Okay.  Aside from again looking at data coming back, blood

12  pressure data, heart rate data, is there other information which

13  you might receive from a patient if you were trying to, absent

14  that monitoring equipment, determine whether the patient were

15  sufficiently unconscious to undergo surgery or some other

16  extremely painful procedure?

17  A.  I'm sorry.  I need to clarify your question.  You said

18  absent all of the monitoring equipment that I normally use --

19  Q.  That's correct.

20  A.  -- which is a plethora of monitors and data streams.  You're

21  putting me in the nonexistent clinical situation where I'm in

22  the operating room but I don't have access to any of that

23  information but I would be trying to determine my patient's

24  anesthetic depth?

25  Q.  Correct.

1    A.   That would be an extraordinarily challenging situation,

2    particularly in my patients, almost all of whom are paralyzed

3    where they would not be able to move to tell me that they are

4    awake, if they are in fact awake or inadequately anesthetized.

5         There are things I could do.  I could look closely at

6    the patient's pupils.  Their pupils often dilate when a patient

7    is in extreme pain or agony.  I can look for lacrimation, the

8    formation of tears.  I can look for sweating.  These are inexact

9    measures that are deeply inferior to what is -- what is normally

10   a large suite of very sophisticated monitors that we've always

11   used to assess anesthetic depth.

12        MR. LOEWY:  Judge, if we could have a short discussion

13   at the bench, I think it might prove helpful.

14             (Side bar discussion had.)

15        COURT:  I wish they were always that easy.

16        MR. LOEWY:  I'm sorry.

17        COURT:  I wish they were always that easy.

18        MR. LOEWY:  Thank you, Your Honor.

19   BY MR. LOEWY:

20   Q.   Dr. Heath, give me just a moment, please.  Do you have in

21   front of you -- I think you do, Dr. Heath.  We just faxed it to

22   you recently -- the redacted affidavit of Jeff Zmuda?

23   A.   I do.

24   Q.   Can you please look at paragraph 21?

25   A.   Okay.

1    Q.   Thank you.  In light -- or rather keeping in mind that we

2    are speaking again of SOP 135 and the administration of

3    pancuronium and then potassium chloride after -- and the

4    administration of a barbiturate and I'm wondering whether you

5    can tell us, please, whether physically assessing the offender

6    for signs of consciousness through verbal stimulus would be an

7    adequate method of determining whether the offender is

8    sufficiently unconscious to not feel the, A, suffering of

9    suffocation and, B, the pain of potassium chloride.

10   A.   A verbal stimulus would be completely inadequate to make

11   that determination.

12   Q.   Same question with regard to soliciting an auditory

13   response.

14   A.   I'm not sure what exactly that means.  I think it means

15   asking the person to say something.  And again, the absence of a

16   response would not provide meaningful information as to whether

17   they were sufficiently anesthetized to be insensible to the

18   effects of pancuronium and potassium chloride.

19   Q.   Let's say that auditory response which I agree with you

20   seems not self-defining but let's suppose that auditory response

21   means yelling into the offender's ear.  With that understanding,

22   would that be sufficient?

23   A.   Just to clarify, that would -- that would not be an auditory

24   response.  That would be an auditory stimulus and then one would

25   be observing the response, if any, to that auditory stimulus.

1   Q.  Agreed.

2   A.  So I'm not quite sure how to answer the question but I think

3   in general terms, it's fair to say that a person's failure to

4   respond to an auditory stimulus such as yelling in their ear, to

5   use your example, is inadequate -- completely inadequate to

6   determine whether they are sufficiently anesthetized to endure

7   the effects of pancuronium and potassium chloride.

8   Q.  What about the next method, touching the offender's

9   eyelashes?  Same question.

10  A.  You can determine that for yourself by touching your own

11  eyelashes.  If you close your eye and just touch your own

12  eyelash, you'll see that it's not a particularly stimulating

13  event.  I believe it's the case that it's more stimulating if

14  somebody else touches your eyelashes when you're not expecting

15  it.  But if your eyes are open and you see it coming, then it's

16  not a particularly stimulating or painful thing to do to

17  somebody.  We would wipe the teary eyes of our child if they've

18  hurt themselves and no one would consider that to be an

19  agonizing thing to do to your child.

20  Q.  What about pinching the offender as a method of determining

21  a sufficient level of unconsciousness, Doctor?

22  A.  That depends on the intensity of the pinch.  I have a dog.

23  I like to grab him by the back of the neck and gently roll and

24  pinch the tissue between his shoulders.  He enjoys that as far

25  as I can tell.  It's also possible to pinch a person or an

1  animal obviously in a way that's excruciatingly painful.

2  Veterinarians, when they're assessing animals, if an animal is

3  sufficiently anesthetized to receive potassium chloride, tend to

4  use pliers and pinch very hard either on the toe pad or the tail

5  of the animal pinching extremely hard to determine if the animal

6  is responsive.  The description of a pinch is inadequate for me

7  to know what would actually be done and whether it would be

8  meaningful.

9  Q.  And finally, same question with regard to conducting a

10  sternal rub.

11  A.  Again, my pet dog loves to have his chest rubbed and I do it

12  in a way that doesn't hurt him.  It is possible to rub a person

13  or an animal's chest in a way that is, you know, pleasurable or

14  with a level of intensity that's very uncomfortable and it

15  really depends exactly on how it's done.  The description here

16  is inadequate for me to know how it would be done and therefore

17  inadequate to know whether it would bring to light a person who

18  is inadequately anesthetized to be exposed to concentrated

19  potassium and pancuronium.

20  Q.  If we can turn for a moment, please, to the affidavit at

21  page no. 4, paragraph 14, and we might also, if you would,

22  please, Doctor, take a look at Exhibit A which also provides

23  information about the medical team leader.  Is it your

24  understanding that the medical team leader will be conducting

25  the consciousness check in implementing SOP 135 should Mr.

1    Rhoades be executed?

2    A.  That is correct.  The SOP 135 is explicit that it would be

3    the medical team leader who would enter the room and conduct the

4    so-called consciousness check.

5    Q.  The medical team leader's experience as -- and credentials

6    as noted on page 4 and in Appendix A, can you tell us -- does it

7    allow you to assess whether that individual is competent at the

8    task of consciousness checking and specifically the necessary

9    consciousness or perhaps unconsciousness checking is the better

10   term here necessary in the context of a lethal injection

11   pursuant to SOP 135?

12   A.  No, I cannot.  The information presented to me is inadequate

13   to make that determination.

14   Q.  Can you tell us why?

15   A.  Yes, I can but I just want to be wary of inadvertently

16   straying beyond any boundaries regarding redaction or privacy or

17   confidentiality issues that pertain to this.  So if you sense

18   that I'm straying at all close to those areas, could you please

19   clarify the boundaries that I'm allowed to --

20          COURT:  It seems to me, Mr. Loewy, that you could

21   inquire as to what he thinks he would need to know.

22          MR. LOEWY:  Thank you, Your Honor.

23   BY MR. LOEWY:

24   Q.  Doctor, what do you think you would need to know in order to

25   determine whether an individual who is responsible for

1   determining whether or not an offender is sufficiently

2   unconscious to not experience the pain and suffering of the

3   pancuronium bromide and the potassium chloride?  What would you

4   need to know in order to assess whether that person is competent

5   at consciousness checking?

6   A.  The most important thing I would need to know is whether

7   that person is a currently actively practicing clinician who

8   provides active health care services hands-on to live patients.

9   Based on the information that's available to me in Mr. Zmuda's

10  affidavit, it is unclear to me whether person 1a or personnel 1a

11  possesses that requisite attribute.

12  Q.  Is consciousness checking a skill or a skill set which one

13  can get rusty at?

14  A.  Absolutely and it's important to bear in mind here we're

15  talking about consciousness checking from the administration of

16  a dose, either large or small, of an anesthetic drug.  We're not

17  talking about a consciousness check for a person who has been

18  hit by a baseball in their head or fallen off their bicycle or

19  perhaps suffered a cardiac arrest.  So absolutely, the

20  assessment of depth of unconsciousness or level of

21  unconsciousness, a level of anesthesia in a person who is

22  intoxicated by strongly sedative drugs is a complex task that

23  requires currency and active practice to maintain proficiency

24  in.

25  Q.  And if we can just hone in on that for a moment.  When you

1   say currency and active practice, do you mean someone who

2   regularly as part of their day job is doing consciousness

3   checks?

4   A.  That's exactly what I mean.  A person who part of their day

5   job, their routine clinical duties is either doing those checks

6   or in a position where at any time one of their patients would

7   warrant such a check being performed.

8   Q.  And such -- to remain current, such checks would need to be

9   performed on a regular basis.  Not merely that they might be

10  performed, they might be necessary but in fact that they are

11  performed on a regular basis.  Is that correct?

12  A.  Yes.  Proficiency does not come from the possibility of

13  performing a procedure.  It comes from having actually

14  repeatedly performed the procedure.

15  Q.  If we can take a look at the last sentence of paragraph 14

16  and also then at the right-hand column of Exhibit A, the top

17  line, the entry, can you tell us in your experience the

18  relationship between registered nurses who perform

19  administrative tasks, that is administrators, and those who are

20  clinicians?

21  A.  Well, you're using broad terms here but I think it's fair to

22  say a general breakout of medical professionals, the great

23  majority of whom maintain active clinical practices and have

24  hands on -- provide hands-on care to patients on a daily basis.

25  There are -- as in any industry, it's necessary for some

1    individuals who have efficiency within their profession to

2    assume administrative functions and what typically happens is

3    that a person who assumes administrative duties as they ascend

4    the administrative ladder becomes more and more remote from the

5    actual hands-on clinical provision of medical care.

6           So it's usually a binary thing.  A person is either a

7    medical administrator.  They deal with the many facets of the

8    profession that so warrant or they're a hands-on clinician who

9    provides daily hands-on care.

10   Q.  If we can shift for a few minutes to establishing

11   intravenous catheters and for purposes of this hearing, I'm just

12   going to use the abbreviation IV's for that, is establishing --

13   there's two types of IV's which are contemplated potentially by

14   SOP 135.  Is that correct?

15   A.  That's correct.

16   Q.  And what are those?

17   A.  The principal form of access -- of IV access contemplated is

18   what's called a peripheral access where a catheter is placed

19   into a vein.  It would probably be in the arm or hand or ankle

20   or foot according to SOP 135.  The other form of access is

21   what's called a central line.  It's a catheter that would be

22   placed in a much larger vein in the groin, the inner thigh of

23   the offender and that's a catheter that reaches up into the

24   upper abdomen and is a much larger catheter than a peripheral IV

25   catheter.

1  Q.  Would you describe for us, please, what it is you do --

2  well, let me, before I ask that question, back up and just

3  refresh that establishing and maintaining peripheral IV's is

4  something that you do on your day job.  Is that correct, Doctor?

5  A.  Yes, I do.  Yes, it is.

6  Q.  Thank you.  Could you describe for us, please, how you, in

7  summary fashion of course, establish a peripheral IV?

8  A.  It's a little bit like asking us how you're supposed to ride

9  a bicycle or how you're supposed to parallel park the car  but

10  I'll do my best.  I meet my patient before the surgery.  While

11  I'm talking with them, I'll be glancing at their arms to assess

12  the size and the scope of their venous access to see whether I

13  can put an IV in.  If it looks like they've had what we call

14  good or decent veins, then I would let my survey stop there.

15          If I don't see good venous access, I would probably

16  talk to the patient and ask them about their prior history of

17  venous access, try to find out if there are any favorite sites

18  where people have had more success or any techniques that are

19  helpful.

20          Once it gets to the point of actually placing the

21  intravenous catheter, I would put a catheter -- excuse me, a

22  tourniquet on the patient's upper arm assuming I've identified a

23  venous target in the arm or hand.  That would distend the vein.

24  I would then wipe the area with alcohol with an alcohol pad and

25  allow that to dry so that it did not cause a burning sensation.

1   I would then palpate the vein, feel the vein, try to fix it in a

2   position that did not roll and then use the IV catheter, the

3   needle of the catheter -- excuse me, I skipped a step.  I would

4   inject local anesthetic Lidocaine which numbs the skin and the

5   outside of the vein.  I would inject that over the site where I

6   was going to insert the catheter.

7           I would then insert the catheter looking for what's

8   called a flash or return of blood into the clear plastic cup of

9   that catheter.  Once I see a sustained return of blood into the

10  catheter, I would then ever so gently try to thread off the

11  catheter, the plastic catheter from the needle so that it was

12  gradually inserted into the vein.  I would then remove the

13  needle from the catheter, remove the tourniquet from the

14  patient's arm, apply pressure over the internal end of the IV

15  site and attach my IV tubing and assess for patency and

16  suitability, efficacy of that IV access site.

17  Q.  You've described all that sort of colloquially as trying to

18  describe how to ride a bicycle and you also described it using

19  another colloquial expression which frankly I can't remember

20  right now.  Do you, Doctor?

21  A.  I said parallel parking cars.

22  Q.  Thank you.

23  A.  I know how to do it but it's hard for me to describe in

24  words to a person who's never seen it done exactly what's

25  involved.

1  Q.  And is it true that there are some people who have seen it

2  done, have tried to do it, have had to do it but just are never

3  successful?

4  A.  Putting -- you're talking about intravenous catheters I

5  assume.  Not parallel parking.

6  Q.  Well, actually, I was kind of talking about both but the

7  subject matter here is intravenous catheters so let's stick to

8  that.

9  A.  Yeah.  So yes, it's -- it's a finicky task that requires

10  judgment and hand-eye coordination.  It's ineffable.  It's hard

11  to describe in words.  Some people are extremely good at it.

12  Some people are incompetent at it and never acquire competence.

13  It's a challenging thing -- endeavor that's not for anybody.  I

14  think anybody who's been in a clinical setting and needed an IV,

15  sometimes you get lucky and you have a good practitioner who

16  puts it in very elegantly and easily and other times, you're not

17  so lucky and it can be a painful struggle.

18  Q.  So if one were to qualify, were in a training program or

19  training someone on IV insertion, would it be important to you

20  to have some sort of failure rate in place, some sort of way of

21  assessing whether this is a person who should be inserting IV's?

22  A.  Yes, but I can't put a number on it.  I work with medical

23  students and residents elbow to elbow every day in the operating

24  room and I have to use my judgment as a teacher and as a

25  clinician whether it's proper for me to allow a given individual

1   to attempt IV access on my patient.

2   Q.  But you would insist, it sounds like, on you or someone who

3   knows how to do it well making that call?

4   A.  Oh, yes, and there are individuals that I -- that sometimes

5   come through the operating room who clearly in my and others'

6   opinion lack the requisite proficiency and skill set to

7   reasonably place intravenous catheters.

8   Q.  To go back for a moment to the analogy of riding a bicycle

9   or parallel parking, can you get rusty at inserting IV's?

10  A.  Yeah, I think my analogy is perhaps rather poor and breaks

11  down because one absolutely does get rusty at inserting IV's.

12  In terms of clinical practice, if I go away for vacation or what

13  have you, if I go away for a week, I can tell the difference and

14  as we joke among our colleagues, if I go away for -- if our

15  colleagues go away for a couple of weeks, then other people can

16  tell the difference.

17          So yes, it is a very precise refined hands-on technique

18  very much unlike riding a bicycle where people say, well, you

19  get back on a bicycle after five or ten years and you pick it up

20  right away.  It's the exact opposite of that.  You would not

21  want the person putting in your IV at the roadside or in the

22  emergency room having --

23          COURT:  Counsel, I'm understanding this.  Let's move

24  along.  All right?

25          MR. LOEWY:  Okay.  Thank you.

1  BY MR. LOEWY:

2  Q.  Generally speaking with regard to peripheral IV's and the

3  testimony you've given as to it being analogous to the riding of

4  the bicycle, the parallel parking, it being kind of an art and

5  the need for the training and the need for current experience in

6  order to do it competently today, does that also all hold true

7  for femoral vein central line IV establishment?

8  A.  Yes, and it holds true even more so than the peripheral

9  intravenous lines.

10  Q.  You're familiar, I take it, with the United States Supreme

11  Court Case Baze v. Rees?

12  A.  Yes, I am.

13  Q.  And since Baze, has additional relevant or has additional

14  evidence relevant to the question of whether an offender can

15  suffer or does suffer pain in a three-drug protocol, has

16  additional relevant evidence of that sort developed?

17  A.  Yes, it has.  When the justices -- the Supreme Court

18  Justices ruled regarding the case of Baze, there was very

19  important information that was unavailable to them that is

20  available now.  What has happened is that since the Baze

21  decision, a number of executions have been carried out -- lethal

22  injection executions have been carried out without the use of

23  pancuronium bromide and without the use of potassium chloride or

24  any similar or related drugs.  Those executions had not occurred

25  at the time that the Baze decision was issued and decided and

1   those executions, there are a total of 14 of them, are a matter

2   of legal and historical and scientific facts.  They're not my

3   opinion.  They're fact.

4   Q.  And I may have missed it, Doctor, but is it a fact that

5   those -- that there was no evidence that any of those executions

6   were painful for the offender?

7   A.  Obviously I was not present at any of those executions but I

8   read the media reports with great interest for those executions

9   and there was never any suggestion of any kind that there had

10  been any problem with the execution being carried out in that

11  fashion or that there had been any pain experienced on the part

12  of the offender.

13  Q.  Are you familiar, Doctor, with an affidavit written by a

14  prison official from Ohio referencing the one-drug protocol

15  executions in Ohio?

16  A.  I do not have a copy of it on me but I believe I'm familiar

17  with the document that you're referring to.

18  Q.  And are you familiar with that official's opinion or

19  statement with regard to those executions and whether they were

20  problematic at all?

21  A.  The assertion is that the executions conducted without

22  potassium chloride and without pancuronium bromide were in all

23  regards satisfactory from the point of view of the Department of

24  Corrections.

25  Q.  You of course have a broad knowledge with regard to lethal

1    injection.  You also brought experience with regard to lethal

2    injection.  You've worked on a variety of cases.  Is that

3    correct, Doctor?

4    A.  That's correct, yes.

5    Q.  And you've talked with probably more lawyers than you'd like

6    to talk with.  Is that correct, Doctor?

7    A.  I'm very impressed with attorneys so I enjoy talking with

8    them actually.

9    Q.  Thank you.

10          COURT:  That's always a good answer in a courtroom.  Go

11   ahead.

12   BY MR. LOEWY:

13   Q.  And are you familiar with any evidence of any warden from

14   or -- excuse me, prison official from Ohio wanting to return to

15   a three-drug protocol?

16          MR. ANDERSON:  Your Honor, I'm going to object.  That's

17   going to be based on hearsay.  We don't have those individuals

18   here and the issue is --

19          COURT:  The objection was hearsay.  Let's deal with

20   that first.  Mr. Loewy.

21          MR. LOEWY:  I'll withdraw the question, Judge.

22          COURT:  All right.  Next question, please.

23   BY MR. LOEWY:

24   Q.  I asked earlier about thiopental and what would happen with

25   an insufficient dose of thiopental.  I'd like to ask you about

1   the same question.  What would be the effect on the offender if

2   an insufficient dose of pentobarbital reached him then followed

3   by the pancuronium and the potassium chloride?

4          MR. ANDERSON:  Your Honor, I'm going to object.  This

5   has been asked and answered.  The doctor said it was basically

6   the same.

7          COURT:  Okay.  Okay.  Counsel, the objection is asked

8   and answered.

9          MR. LOEWY:  Your Honor, with respect, I don't actually

10  think that this particular question has been asked.  If counsel

11  is willing to stipulate that if an insufficient dose of

12  pentobarbital reaches the offender, he will suffer the sort of

13  pain and suffering that Dr. Heath has referenced with regard to

14  an insufficient dose of thiopental reaching the offender, then

15  I'll withdraw the question.  If not, I'd like to ask the

16  question of the witness.

17         MR. ANDERSON:  We'll absolutely stipulate, Your Honor.

18         COURT:  All right.

19         MR. LOEWY:  All right.  Very good.

20         COURT:  That's been stipulated.

21         MR. LOEWY:  If I may have one moment, please.  I'm

22  going to reput the question to -- at least I'm going to try to

23  reput the question, Your Honor, to Dr. Heath regarding the

24  opinions of prison officials in Ohio.  He's testifying as an

25  expert.  I've just been reminded that of course under Rule 702,

1   an expert may rely on hearsay.

2            COURT:  Well, all right.  Next objection.

3            MR. ANDERSON:  Your Honor, he can certainly rely upon

4   that information but he can't give the opinions of those

5   experts.  He can use it for his opinion but he can't use their

6   opinions and disclose those for the truth of their opinions.

7            COURT:  It was coming in in kind of a shaky form in the

8   question so I was trying to follow where you were going with it,

9   Mr. Loewy.  Ask the question again so I can get my arms around

10  just what it is you're inquiring about and then I can deal with

11  this objection.

12           MR. LOEWY:  I'm inquiring whether any --

13           COURT:  Ask the question.

14  BY MR. LOEWY:

15  Q.  Dr. Heath, are you aware of any prison official in Ohio who

16  has indicated a desire to return to the three-drug protocol that

17  they had before the one-drug barbiturate protocol?

18           MR. ANDERSON:  Objection.  Hearsay, Your Honor.

19           COURT:  I'm just going to allow you to make a proffer

20  here and link -- try to link this up because you're asking here

21  whether he has any awareness and then I assume that you need to

22  demonstrate that somehow it has some relevance to any opinion

23  that he's rendering.

24           MR. LOEWY:  Perhaps I can rephrase the question.

25           COURT:  Okay.

1    BY MR. LOEWY:

2    Q.  Dr. Heath, based on your conversations with -- well, let me

3    give -- let me ask you a couple other questions in advance,

4    please.  Dr. Heath, you've testified earlier that 13 of the 14

5    one-drug barbiturate protocol executions in the United States

6    since Baze have occurred in Ohio; is that correct?

7    A.  That's correct.

8    Q.  In your -- and have you -- are you aware of -- aside from

9    media reports, have you had any conversations with lawyers

10   regarding -- from Ohio regarding those executions?

11   A.  Yes, I have.

12   Q.  Have you had any conversations with prison officials

13   regarding any of those executions?

14   A.  No, I have not.

15   Q.  Have you read any depositions or statements by prison

16   officials regarding those executions?

17   A.  Yes, I have.

18   Q.  Do you have an opinion, Dr. Heath, as to whether the -- or

19   knowledge that any prison official in Ohio wishes to change

20   Ohio's current protocol to a three-drug protocol?

21           MR. ANDERSON:  Object, Your Honor.

22           COURT:  What's your objection?

23           MR. ANDERSON:  It's hearsay, Your Honor.

24           COURT:  Okay.  Counsel.

25           MR. LOEWY:  Let me try another question, Your Honor.

1  BY MR. LOEWY:

2  Q.  In evaluating the effectiveness of a one-drug protocol, did

3  you rely --

4        MR. LOEWY:  If you can give me a moment, please.

5  BY MR. LOEWY:

6  Q.  Did you rely on the warden's or other prison officials' from

7  Ohio statements in forming your opinion on the effectiveness of

8  the one-drug protocol in Ohio?

9  A.  Well, just to clarify, there's different meanings of the

10  word "effectiveness" as applied to a lethal injection procedure.

11  All of the procedures were effective in producing the rapid

12  death of the offender.  In terms of effectiveness of providing a

13  smooth procedure that was satisfactory from the point of view of

14  the Department of Corrections officials and other state

15  officials, all the evidence of that I saw was affirmative to

16  that and I saw no evidence that was contrary to that.  Nobody in

17  any reports that I saw voiced any dissatisfaction with that

18  procedure or desire to or interest in returning to the old

19  procedure.

20  Q.  Doctor, was there any pain -- evidence of pain whatsoever in

21  any of those executions to your knowledge?

22  A.  Again, I was not present at the executions.  I have to rely

23  on the reports by the prisoners' counsel who are present at

24  executions and also media witnesses.  There is no evidence of

25  any substantial or meaningful pain or discomfort.

1          MR. ANDERSON:  Your Honor, I'm going to object.  It's

2    based upon hearsay.  He was not present.

3          COURT:  I understand that.  Counsel.

4    BY MR. LOEWY:

5    Q.  Based on the statements made to you by --

6          COURT:  What's your response to the objection?

7          MR. LOEWY:  My response is that I'm asking for his

8    opinion as to whether there was any pain at these executions.

9    He can rely on hearsay to form his opinion.

10          COURT:  Well, all right, Counsel.  I'm going to allow

11    you to go ahead and continue this based upon what I gather to be

12    a representation that there is such an opinion and that you're

13    eventually going to elicit it and then the defendants can

14    cross-examine on that.  Go ahead.

15          MR. LOEWY:  Thank you, Your Honor.

16    BY MR. LOEWY:

17    Q.  Dr. Heath, based on the conversations you had with the

18    offenders' counsel regarding the offenders' executions and based

19    on reports that you have read regarding those executions, do you

20    have an opinion --

21          COURT:  I'm going to stop you there though, Mr. Loewy,

22    because I'm giving you a little leeway but I haven't heard

23    anything about the fact of such conversations.  I've heard

24    allusions to it but I don't recall any statement from Dr. Heath

25    that he'd had such conversations.

 1          MR. LOEWY:  I'm sorry, Your Honor.  Let me go back.

 2          COURT:  Go ahead.

 3   BY MR. LOEWY:

 4   Q.  Dr. Heath, have you had conversations with attorneys in Ohio

 5   regarding their clients' executions under the one-drug

 6   barbiturate protocol?

 7   A.  Yes.  To clarify, I've had conversations with attorneys who

 8   were present.  I've reviewed the prison execution logs from

 9   executions carried out by just a single drug without the

10   pancuronium, potassium.  I've read media witness reports about

11   these executions.  Taken in sum and without any -- there's no

12   evidence to the contrary.  Amongst the sum of that information,

13   those executions were carried out in a humane fashion.

14   Q.  Thank you, Doctor.  I'd like to ask you I think one final

15   question.  If you are executing an individual pursuant to a

16   one-drug barbiturate protocol, is there any purpose to having a

17   consciousness check?

18   A.  No, there would be no purpose whatsoever.  In the absence of

19   pancuronium and potassium, there is no drug being administered

20   that can cause any level of significant pain or excruciating

21   suffering and therefore there would be no need to determine

22   ahead of time that if a person was in a state to tolerate such

23   pain and suffering or to be unconscious in preparation for such

24   pain and suffering.

25   Q.  Thank you, Dr. Heath.

1          COURT:  Mr. Anderson, are you cross-examining?

2          MR. ANDERSON:  Yes, Your Honor.  If I can have just a

3  moment, Your Honor.

4          COURT:  All right.

5          MR. ANDERSON:  Your Honor, could I have just a moment

6  to converse with my co-counsel?  Just a moment?

7          COURT:  Yes, that's fine.

8          MR. ANDERSON:  Thank you, Your Honor.

9          COURT:  Counsel, ordinarily, I'd take a recess but we

10  were late getting to Dr. Heath and it's, what, 5:45 in Brooklyn

11  and I'm sure the folks at the courthouse are ready for him to be

12  done.  We'll see how quickly we can move along and I'm not doing

13  it just to make your life difficult.

14          MR. ANDERSON:  No.  I understand that, Your Honor, and

15  I would like to move along.  Thank you very much.

16          COURT:  All right.  Go ahead.

17                          CROSS-EXAMINATION

18  QUESTIONS BY MR. ANDERSON:

19  Q.  Dr. Heath, could you tell me when you were first contacted

20  by the federal defenders regarding this case?

21  A.  I've had a number of contacts with the federal defender's

22  office in Idaho about lethal injection litigation over the past

23  several years.  I don't know whether they referred specifically

24  to this case or not.  I was first, to my certain knowledge,

25  contacted specifically about this case on approximately October

1    27 I would guess.

2    Q.   That would be of this year, Dr. Heath?

3    A.   Correct, yes.

4    Q.   But you'd indicated you'd been working with them regarding

5    Idaho's method of execution for a number of years?

6    A.   It depends on what you mean by working with them.  I've had

7    a number of telephone conversations with different individuals

8    in the Idaho federal defender's office.  I've reviewed some

9    documents and protocols.  It's been very sporadic over what I

10   would guess would be a period of approximately something like

11   six or seven years.

12   Q.   In fact, Dr. Heath, you reviewed Idaho's I believe it was

13   2006 protocol prior to 2007; is that correct?

14   A.   As I sit here now, I can't remember whether I've done that.

15   You have to understand that I've reviewed numerous iterations of

16   protocols for numerous states and I just can't answer that

17   question for you either way.  I would consider it likely due to

18   the nature of the on again, off again back and forth discussions

19   I've had with members of the Idaho federal defender's office.  I

20   would consider it quite plausible.  Let's put it that way.

21   Q.   Dr. Heath, are you familiar with a case of Turner vs. Epps

22   out of the Northern District of Mississippi?

23   A.   Not by name.

24   Q.   You don't recall providing an affidavit in that -- a

25   declaration in that particular case?

1    A.  I may well have.  I've provided affidavits in a large number

2    of cases regarding lethal injection and you have to give me more

3    specific information than just the names of the parties.

4    Q.  Okay.  How many death penalty cases have you been involved

5    in?

6    A.  I think rather than refer to death penalty cases, since many

7    of these lethal injection cases involve a number of plaintiffs

8    who are joined into the case, I would estimate -- and this is a

9    very, very approximate number of the 30-odd states that have

10   lethal injection as a method of execution, I've been involved in

11   litigation in the majority of those cases and probably an

12   average of one or two times in those cases but possibly more in

13   some cases and less in other states.

14   Q.  Have you --

15   A.  Several kinds of cases.

16   Q.  And I apologize.  I didn't mean to interrupt you.  That was

17   my mistake.  Have you reviewed every state's protocol?

18   A.  No, I have not.

19   Q.  Which states have you not reviewed?

20   A.  For one thing, because of the ongoing litigation, protocols

21   are dynamic entities now that are being constantly revised but I

22   do not believe I've reviewed -- I'm not certain about this.  I

23   do not believe I've reviewed the protocol of New Hampshire which

24   to my knowledge has not carried out an execution or lethal

25   injection procedure in a long time.  I'm not certain if I've

1    seen the protocol of New Mexico which is a similar situation.

2         Illinois because it's a moratorium that's been present

3    there for quite a number of years and it preexisted the advent

4    of lethal injection litigation, I've never been involved in

5    litigation there and I don't believe I've ever seen at least an

6    active version of their protocol.  But in the great majority of

7    states, I've reviewed the protocols and many iterations of

8    protocols.

9    Q.  And have you ever reviewed, of those protocols that you have

10   reviewed -- let me rephrase that.  Have you ever found of the

11   protocols that you have reviewed one that you believe passed

12   constitutional muster?

13   A.  I believe the protocol that's used in Ohio as it has been

14   used thus far has produced constitutional executions.  That

15   protocol has a peculiarity which is a method of obtaining IV --

16   obtaining -- of carrying out the execution in the event that

17   intravenous access cannot be obtained and I take exception to

18   that aspect of the Ohio protocol.

19        That involves using intramuscular -- repeated

20   intramuscular injections of drugs and that is not a suitable

21   method for providing euthanasia for humans or animals and so I

22   take exception to that part of the Ohio protocol but that part

23   of the Ohio protocol has never been implemented and the 13 times

24   that the current protocol has been implemented, I have no

25   problem with what they have done.

1   Q.   Has Ohio's protocol been recently revised?

2   A.   Not to my knowledge but I might not be aware of it so I

3   can't answer that question either way yes or no.

4   Q.   Do you know if it's been --

5   A.   Recently -- if I could just clarify -- sorry.   There was the

6   recent revision I believe in 2009 where pancuronium and

7   potassium were removed.   I'm aware there's been litigation about

8   the protocol and more to the point litigation about whether the

9   protocol is in fact being followed and I'm not aware if that's

10   resulted in any fine-tuning of their protocol.

11   Q.   And is it your understanding, Dr. Heath, that there are

12   three -- only three states that use the one-drug protocol?

13   A.   It's in flux right now.   There are states that are in

14   litigation or proposing using one-drug protocol.   Right now the

15   only states --

16   Q.   And Dr. Heath, if I could interrupt you, Dr. Heath, what I

17   want to know is right now -- I don't want to know about

18   litigation.   What I want to know is right now, are there more

19   than three states that use a one-drug protocol?

20   A.   Could you tell me what states you're referring to, please?

21   Q.   I want to know if you know of more than three states.

22   A.   I do not know of more -- I do not know of more than three

23   states that have currently used a one-drug protocol but I have

24   to say not currently but historically have used a one-drug

25   protocol because no one's actually using any protocol right now

1    as we speak.

2    Q.  And those states would be Ohio, correct?

3    A.  Correct.

4    Q.  South Dakota.

5    A.  I'd like to clarify that I believe South Dakota is in flux

6    right now but I believe, yes, that would be more accurate than

7    not.

8    Q.  And Washington.

9    A.  Correct.

10   Q.  And all of the other states that use lethal injection use a

11   three-drug protocol; is that correct?

12   A.  That's correct.

13   Q.  And despite the fact that South Dakota uses a one-drug

14   protocol -- well, let me back up.  What did you mean by saying

15   that South Dakota is in a state of flux?

16   A.  I hesitate a little bit because I'm not sure to the extent

17   to which I'm at liberty to discuss it.  I'm serving as an expert

18   witness in the case.  There have been recent depositions within

19   the last month regarding the conduct of lethal injection as

20   planned in South Dakota and I think the best way of describing

21   it is it's an unsettled matter.  It's an active case and I don't

22   know how an execution would actually in fact be carried out in

23   South Dakota if and when one is to be carried out.

24   Q.  So are you telling us that you don't know if South Dakota

25   currently has a protocol that uses a one or a three-drug method?

1   A.   South Dakota's protocol lists both -- again, the most recent

2   protocol I've seen lists both methods.   It also has flexibility

3   or versatility in terms of the barbiturate drug that would be

4   used.   It's in active litigation.   I do not know the state --

5   there have been updates to the protocol.   I'm reluctant to

6   comment about its current stature.   That's the best answer I can

7   give.   It's in flux.

8   Q.   And so to make sure that I understand exactly what you're

9   saying, as far as your level of definitiveness, there are only

10  two states that use a one-drug protocol?

11  A.   That's correct.   Ohio and Washington.

12  Q.   Now, all of the pain -- I think you used the words

13  "excruciating pain" associated with the use of the last two

14  drugs and I'm not going to try to pronounce them, those are

15  eliminated if the first drug is properly administered.   Correct?

16  A.   If the first drug is properly administered and reaches the

17  circulation and the brain in the intended dose, then those --

18  there will be no pain or suffering of any kind from the second

19  drug pancuronium or the third drug potassium.

20  Q.   Dr. Heath, do you assume that there's going to be error in

21  the administration of that first drug?

22  A.   No, I do not assume that error will occur.   I always assume

23  that error may occur.

24  Q.   May occur.

25  A.   Absolutely.

1   Q.   Okay.

2   A.   It's an essential feature of cautious practice to assume

3   that error may occur and to be constantly on guard to detect and

4   correct error.

5   Q.   Now, as I understand the problems with infiltration, that

6   can cause some problems with the administration of the first

7   drug, correct?

8   A.   Could you rephrase the question, please?

9   Q.   Infiltration --

10  A.   Repeat the question.

11  Q.   Infiltration can cause problems as far as pain if that

12  occurs as far as the administration of the first drug and I'm

13  talking infiltration occurring as a result of the -- and I'm

14  going to use a -- implementation of the IV.

15  A.   Fair enough.   There are two ways that pain could occur, two

16  principal ways, if the thiopental infiltrates which means that

17  it does not get injected into the vein.   It is injected instead

18  into the surrounding tissue, in the arm.   It accumulates in the

19  arm.

20          The first way the pain could occur is that thiopental

21  is an irritating chemical and in some patients when thiopental

22  is infiltrated, that in itself is painful.   The second way that

23  pain can occur is if thiopental infiltrates into the arm, it

24  will not reach the circulation or the brain and the patient --

25  or the prisoner rather in this context can then be exposed to

1   the effects of pancuronium and potassium.

2           And the second --

3   Q.  Now, you indicated -- I'm sorry.  Go ahead.

4   A.  -- way in which pain could occur is if thiopental

5   infiltrates.

6   Q.  Now, you indicated that you're familiar with the United

7   States Supreme Court decision in Baze, correct?

8   A.  Yes, I am.

9   Q.  And are you familiar with the fact that Justice Roberts'

10  plurality opinion is indicating that infiltration was something

11  that was very obvious?

12  A.  I'd have to review that myself but as a clinician, I

13  disagree that infiltration is something that is necessarily very

14  obvious.  It is sometimes obvious and it is sometimes occult.

15  Q.  And you've also discussed in your affidavit the problems

16  with leakage associated with faulty equipment, correct?

17  A.  Not so much with faulty equipment but with improperly

18  connected equipment or deployed equipment but yes, I suppose

19  also faulty equipment.  That would be rare.

20  Q.  Now, is the use of -- and if I misstate this, Doctor, please

21  correct me but is the use of a three-gang or a three-way

22  manifold unique to Idaho?

23  A.  Well, I've never heard the term "three-gang" used in any

24  protocol or medical setting regarding the injection of drugs.

25  But I think you used the words "three manifold"?

1   Q.   Three-way manifold.

2   A.   Three-way manifold.   Yeah.   I don't have an exact picture of

3   the way things are set up in Idaho because SOP 135 is unclear on

4   that but I will say that compared to other states, it is typical

5   to have -- it is in fact necessary to have sites in the IV

6   apparatus where drugs can be introduced so that they can be

7   delivered and flow into a patient or a prisoner.

8   Q.   So the reality is that there's always at least a possibility

9   that leakage will occur any time you have a connection or a

10  joint with an IV line, correct?

11  A.   That's correct.   And that for example is why I would always

12  be right next to my patient standing next to their arm with the

13  entire IV apparatus completely under my direct visual

14  surveillance any time I was inducing general anesthesia.

15  Q.   Now, Dr. Baze (sic), once again, you indicated you were

16  familiar with the Baze decision, correct?

17  A.   That's correct, yes.

18  Q.   Are you familiar with the dissents contained -- the dissent

19  contained with that opinion?

20  A.   Not at a level that I'm comfortable discussing now without

21  the opinion in front of me.

22  Q.   Well, I believe as far as consciousness checks that Chief

23  Justice Roberts referred to them as rough and ready tests for

24  checking consciousness.   Are you familiar with that?

25  A.   I don't remember that terminology being used and again,

without the document in front of me, I can't comment upon it.
Q. So if the dissent talked about the use of calling out of an inmate's name, brushing his eyelashes or presenting him with strong noxious odors, you're not familiar with that part of Baze.
A. I recall discussions of those -- discussions of that nature but again, I can't comment upon it without the document in front of me. I haven't reviewed it in a number of months.
Q. And the real problem isn't consciousness check but proper administration of the pentobarbital, correct?
A. To clarify, Baze did not discuss pentobarbital. It discussed thiopental or Sodium Pentothal.
Q. Correct.
A. But the problem I think is two-fold. If inadequate thiopental is administered, then the prisoner would be subjected to the agonizing effects of the other two drugs. If the consciousness check is inadequate, then the drugs will be administered without first ensuring that the prisoner is properly anesthetized.
COURT: Counsel, I'm on top of this issue.
MR. ANDERSON: Very good, Your Honor. I just have a couple questions.
COURT: Okay. I mean you're welcome to argue the law to me. I don't know that it's helping me right now what you're doing.

1          MR. ANDERSON:  I just have a couple more questions,

2    Your Honor.

3          COURT:  All right.

4    BY MR. ANDERSON:

5    Q.  Doctor, are you familiar with Washington's protocol -- one-

6    drug protocol?

7    A.  I've reviewed it but I don't have -- I'm not familiar with

8    it off the top of my head, no.

9    Q.  Does it pass constitutional muster?

10   A.  I can't comment on it without reviewing it in front of me.

11   Q.  If Idaho adopted a one-drug protocol --

12   A.  Sir, that's also a legal question and not really a medical

13   question within the purview of my expertise.

14   Q.  If Idaho adopted a one-drug protocol just using one of the

15   first two drugs, would you be satisfied that it meets

16   constitutional muster?

17   A.  I'd have to review the protocol but what is very clear is

18   that it would -- if Idaho were to remove the use of pancuronium

19   bromide and related drugs and to remove the use of potassium

20   chloride and other such drugs that can cause agony, then there

21   would be no potential for those drugs causing an agonizing

22   execution.

23         MR. ANDERSON:  One moment, Your Honor.

24         COURT:  That's fine.

25   BY MR. ANDERSON:

1   Q.  Doctor, you indicated that you have -- and these are my

2   words.  I'm going to paraphrase -- a daily practice as far as

3   the use of anesthetic?

4   A.  Correct.

5   Q.  Do you actually administer the anesthetic?

6   A.  It varies.  Sometimes I am the person who injects the drugs

7   myself.  Other times because my job is to teach residents and

8   fellows how to be accomplished and safe anesthesiologists, I

9   supervise them doing it.  It depends on the level of advancement

10  of the individual person who I'm training on that particular

11  day.

12  Q.  Thank you, Doctor.

13          MR. ANDERSON:  That's all I have, Your Honor.

14          COURT:  Mr. Loewy, do you have additional questions?

15          MR. LOEWY:  Just a few, Your Honor.

16          COURT:  Please proceed.

17          MR. LOEWY:  Thank you.

18                         RECROSS-EXAMINATION

19  QUESTIONS BY MR. LOEWY:

20  Q.  Dr. Heath, you were asked a question something along the

21  lines of do you assume error in the administration of the first

22  drug.  In the context of a three-drug protocol such as SOP 135,

23  evidence of error in the administration of the first drug would

24  be what sort of evidence?

25  A.  There's myriad forms of evidence that there's been an error.

1   The most important and pronounced one would be if the prisoner

2   did not achieve of a deep level of unconsciousness.  There have

3   been executions -- there was an execution in Ohio where the

4   thiopental was administered and the prisoner laid there and then

5   raised his head after a few minutes and said something to the

6   effect of the drugs are not working because he was aware that

7   they had accumulated in his arm and he was still fully

8   conscious.  And for the remaining 90 minutes that it took them

9   to execute him, he was conscious.

10  Q.  And to --

11  A.  That's one pronounced and robust way in which one would have

12  evidence that a large dose of barbiturate certainly had not

13  reached a person's brain if they were able to be conscious in

14  that way.

15  Q.  So consciousness, as I understand your testimony, Doctor, is

16  the primary evidence of maladministration of the anesthetic?  Is

17  that correct?

18  A.  It's one of them.  If a patient is -- the person is

19  paralyzed, then I don't have a direct way of getting to

20  consciousness.

21  Q.  And that's where I'm heading in a second, Doctor, but let's

22  just before the paralytic is administered, consciousness is the

23  evidence of error that the anesthetic has not been properly

24  administered.  Is that correct?

25  A.  It would be one evidence of error but also as has happened

1    in executions in other states, if a large pool of fluid were to

2    begin forming on the arm board or the floor or the gurney or

3    what have you while the injection was proceeding, that would

4    certainly raise important concern that the thiopental were not

5    administered because of a leak.

6           If similarly a swelling were noted in the prisoner's

7    arm or the prisoner gave evidence of discomfort in their arm,

8    that the thiopental was infiltrated --

9    Q.  Barring those possibilities -- barring those possibilities,

10   Doctor, consciousness would be another piece of evidence,

11   correct?

12   A.  Yes, that's correct.  It's one of the pieces of evidence

13   that would be used.

14   Q.  And pancuronium bromide is a paralytic which would preclude

15   that evidence from ever coming forth; is that correct?

16   A.  Once pancuronium bromide has been delivered into the

17   circulation of a person, then it's very, very difficult to

18   determine whether a person is conscious and I would say

19   essentially impossible without the sophisticated equipment that

20   is routinely and always employed in operating rooms to prevent

21   that event from occurring.  It would not be possible in the

22   context of a lethal injection procedure in a prison.

23   Q.  Thank you very much, Doctor.

24          COURT:  All right.

25          WITNESS:  You're welcome.

```
1              COURT:  Any additional cross-examination?

2              MR. ANDERSON:  No, Your Honor.  Thank you.

3              COURT:  All right.  Counsel, can we have agreement that

4    Dr. Heath can go on his way then or did plaintiff want to have

5    him remain available?  What's your pleasure?

6              MR. LOEWY:  Judge, we are in agreement that Dr. Heath

7    can go on his way.

8              COURT:  All right.  What about the defendants?

9              MR. ANDERSON:  No objection, Your Honor.

10             COURT:  All right.  Dr. Heath, we've finished your

11   testimony today.  Again, thank you for your patience as we were

12   getting started and would you please tell the folks at the

13   courthouse there that we appreciate very much their assistance

14   in helping us today, particularly when there are people who have

15   had to stay past their normal end of the working day.  All

16   right.  You may be excused, sir.  We'll turn off this call.

17             WITNESS:  Thank you, Your Honor.  I'll do that.

18             COURT:  All right.  Then in light of that, Counsel,

19   let's take a ten-minute recess so everybody can catch their

20   breath and then we'll pick up again.

21             CLERK:  All rise.  The Court --

22                  (Recess taken.)

23             CLERK:  All rise.  The Court is again in session.

24             COURT:  Thank you.  Please be seated.  All right.  So

25   you want Mr. Zmuda up here I assume.
```

 1              MS. HAMPTON:  Yes, please, Your Honor.

 2              COURT:  All right.  Mr. Zmuda, you'll come into the

 3    well of the courtroom, please.

 4              CLERK:  Raise your right hand, please.

 5                   (JEFFREY DONALD ZMUDA is sworn.)

 6              CLERK:  Step around.  Please be seated.  For our

 7    record, sir, if you could state your full name and spell your

 8    last.

 9              WITNESS:  Jeffrey Donald Zmuda, Z-m-u-d-a.

10              CLERK:  Thank you.

11              COURT:  Do we have your microphone over there, Mr.

12    Zmuda?  There we go.  All right.

13              WITNESS:  Is that better?

14              COURT:  That's better.  You may inquire.

15              MS. HAMPTON:  Thank you, Your Honor.

16                        DIRECT EXAMINATION

17    QUESTIONS BY MS. HAMPTON:

18    Q.  Mr. Zmuda, is there a title that you go by that I should use

19    today?

20    A.  I'm the deputy chief in the Bureau of Prisons for the Idaho

21    Department of Correction so deputy chief.

22    Q.  All right.  We'll agree on that one.  Deputy chief.  Sir,

23    have you had an opportunity to look at the redacted version of

24    your affidavit?

25    A.  I have.  I've glanced at it, yes.

1   Q.  And do you have a copy with you, Officer?

2   A.  I do.

3   Q.  To start with, how long have you been deputy chief?

4   A.  Different titles but in essence in the same position for

5   approximately eight years.

6   Q.  So prior to January of 2009, you were deputy chief of the

7   Bureau of Prisons?

8   A.  Prior to 2009.  It was a different title but in essence the

9   same position.  Same position, yes.

10  Q.  And since 2009, have you held that position continuously?

11  A.  Yes, yeah.

12  Q.  And your experience, does that either as the deputy chief or

13  in any other facet, does that encompass any medical training?

14  A.  It does not.

15  Q.  Do you hold any certificates or licenses in the medical

16  field?

17  A.  I had a CPR certificate years ago.  That's expired.

18  Q.  All right.  And, sir, you are familiar with the Department

19  of Corrections policy no. 135, correct?

20  A.  I am.

21  Q.  And if you could take a look at Plaintiff's Exhibit No. 9

22  which I believe Mr. Gordon will help provide.  Are you familiar

23  with that?

24  A.  I am.

25  Q.  Does that appear to be a complete copy of what was filed as

1    document no. 7-3 on behalf of the defendants in this case?

2    A.  Yes.  It looks like a copy of our policy.

3         MS. HAMPTON:  Your Honor, we'd move to admit Exhibit

4    No. 9.

5         MS. HOWARD:  No objection, Your Honor.

6         COURT:  Admitted.

7              (Plaintiff's Exhibit No. 9 admitted.)

8         COURT:  Just a moment.  Just a moment.  All right.

9    Thank you.  Go ahead.

10   BY MS. HAMPTON:

11   Q.  Now, the policy document is different than what we've been

12   referring to in this hearing as the SOP 135.  That's correct?

13   A.  Yes, the policy is different than the SOP.

14   Q.  And it's under the policy statements that we get some of the

15   broad general requirements for the SOP.

16   A.  That's correct.

17   Q.  For example, if you look at the policy, the director and the

18   chief of operations -- or operating division is responsible for

19   developing and implementing a standard operating procedure.

20   A.  That's correct.

21   Q.  And there's also some discussion about the execution team

22   establishing the execution team responsibilities there on page

23   1?

24   A.  Yes.

25   Q.  And then over on page 2, determining the execution method.

1  How about I'll call that the execution procedures.  Would you

2  agree with that?

3  A.  Yes.  Some of the broad procedures, yes.

4  Q.  And this document was developed October 13, 2011.

5  A.  Yeah, that's the date on it.

6  Q.  Now, one of the requirements was to establish the execution

7  procedures.  Would that be -- well, first, could you take a look

8  at what's been marked as Plaintiff's Exhibit No. 1?  Sir, do you

9  recognize that exhibit?

10 A.  I do.

11 Q.  And does that appear to be a copy of what was filed in

12 support of the defendant's motion to dismiss as document 7-4?

13 A.  Yes.

14 Q.  And is that the standard operating procedure for execution

15 procedures for the IDOC?

16 A.  It is.

17         MS. HAMPTON:  Your Honor, we'd move to admit Exhibit

18 No. 1.

19         MS. HOWARD:  No objection, Your Honor.

20         COURT:  Admitted.

21         (Plaintiff's Exhibit No. 1 admitted.)

22 BY MS. HAMPTON:

23 Q.  Now, Deputy Director, SOP 135 and that's the short term that

24 I'll use when I forget the exhibit number but SOP 135, that's a

25 completely revised protocol; is that correct?

1    A.  Yes.  Most of it is revised, yes.

2    Q.  And it includes a significant role for you in the execution

3    procedures; is that correct?

4    A.  That's correct.

5    Q.  Security coordination is one of those roles.

6    A.  Yes.

7    Q.  And then also appointing staff to assist the warden.  That's

8    on page 2 if you want to double-check me.

9    A.  Go ahead.  Yes.

10   Q.  And then also activating various teams.

11        COURT:  Ms. Hampton, do you mind if I just clarify?  I

12   assume when you say "for him," you mean for him in the position

13   that he occupies?

14        MS. HAMPTON:  That's correct, Your Honor.

15   BY MS. HAMPTON:

16   Q.  I'm talking deputy director.  The protocol refers to the

17   deputy director --

18   A.  Deputy chief position, yes, yes.

19   Q.  Thank you very much.

20   A.  That's correct.  Deputy chief.  Yes.

21   Q.  And if I misspeak again on your position, please do correct

22   me.  I apologize.  Now, you were involved in developing SOP 135.

23   A.  That's correct.

24   Q.  And you describe it as being intricately involved?

25   A.  Yes.

1   Q.   And how long was that involvement?   When did that start?

2   A.   Over the course of months.

3   Q.   And how far back would that be?

4   A.   Well, a couple -- a couple years back starting to look at

5   different procedures and practices.

6   Q.   All right.   And were you also tasked with the duty of

7   developing the SOP 135?

8   A.   Yes.

9   Q.   Now, this -- this exhibit, No. 1, was final on October 14,

10   2011; is that correct?

11   A.   That's correct.

12   Q.   And I assume that it took more than the one day between the

13   policy and the SOP.

14   A.   Yes, it did.

15   Q.   All right.   When -- prior to publishing this Exhibit No. 1,

16   there was another SOP that was under -- was in a draft state; is

17   that correct?

18   A.   That's correct.

19   Q.   And that was version 2 of the SOP?

20   A.   I'm not sure about version 2.   We had an approved version I

21   believe around 2006.   We had an approved SOP I think in 2006 and

22   then we were working on a draft off of that I believe.

23   Q.   Right.   If you would turn to Exhibit No. 3 if you wouldn't

24   mind, Deputy Chief.

25   A.   Okay.

1   Q.  Do you recognize that as a draft protocol developed by the

2   department?

3   A.  I do.

4   Q.  And at the top where it says version, it says 2.0?

5   A.  It does say 2.0.

6          MS. HAMPTON:  Your Honor, we'd move for the admission

7   of Plaintiff's Exhibit No. 3.

8          COURT:  Any objection?

9          MS. HOWARD:  Your Honor, I guess I would object.  Well,

10   one, relevance and then, you know, if it is admitted, with the

11   understanding that this was not adopted by the department.  This

12   was only a draft.

13          COURT:  You're free to examine about that if you want

14   to.

15          MS. HOWARD:  All right.

16          COURT:  Your objection is on relevance?

17          MS. HOWARD:  Yes.

18          COURT:  Ms. Hampton.

19          MS. HAMPTON:  Your Honor, I believe that it is relevant

20   in the development of the current version and that Mr. Zmuda has

21   been intimately involved in it and can speak to any questions on

22   its correspondence with or carryover --

23          COURT:  Are you challenging this version that's no. 3?

24          MS. HAMPTON:  Your Honor, I'm not challenging that it

25   is -- was ever adopted but I do think it's relevant to the

1   process that the director -- that the --

2            WITNESS:  Chief.

3            MS. HAMPTON:  -- chief used in coming up with the final

4   version.  I'm certainly not indicating --

5            COURT:  I'll let you make your argument about why it's

6   important.  I'm not sure I'm following right now but I'll allow

7   it.  It's admitted.

8            MS. HAMPTON:  Thank you, Your Honor.

9                (Plaintiff's Exhibit No. 3 admitted.)

10   BY MS. HAMPTON:

11   Q.  Deputy Chief, this document was still being reviewed by the

12   department as late as March 25, 2011.  Is that correct?

13   A.  Yes, that's the date on there being reviewed.

14   Q.  Now, I'd like to turn back to the actually adopted SOP,

15   Exhibit No. 1 which is SOP 135.  One of the duties assigned to

16   your position is planning for the execution.  Would you agree

17   with me there?

18   A.  That's correct.

19   Q.  And part of that is developing the detailed execution

20   guidelines.  You approved those detailed execution guidelines.

21   A.  Actually, I don't approve those.  The chief of operations is

22   the person that approves the standard operating procedure and

23   that's right under the header there about maybe a third of the

24   way down the page.

25            COURT:  You're talking about Exhibit 3?

1          WITNESS:  I'm talking about Exhibit 1.  Sorry, Your

2    Honor.

3          COURT:  Exhibit 1, okay.

4          WITNESS:  Exhibit 1, if we're talking about the

5    standard operating procedure.

6          COURT:  Very good.

7    BY MS. HAMPTON:

8    Q.  No.  I misspoke.  I misspoke.  In developing the detailed

9    execution guidelines.  Not the SOP but the next level of detail,

10   the more intricate level of detail, are you involved in that,

11   developing the field memorandums or the -- pardon me, or the

12   guidelines that will be applied in the execution process itself.

13   A.  I would typically approve field memorandums associated -- I

14   think the SOP calls for me to approve field memorandums

15   associated with the process if that's what you're getting at.

16   Q.  That is and my name for that is not clear.  You're calling

17   that a field memorandum, the detailed guides?

18   A.  I don't believe -- I don't believe the field memorandum is

19   detailed.  Are you talking about a portion of the SOP document

20   or a separate document?

21   Q.  I'm talking about a separate document.

22   A.  Institutions have field memorandums and those are typically

23   approved outside -- if it's related to the SOP, I believe I'm

24   responsible for approving field memorandums related to the

25   execution procedure.  Is that what you're asking?

1   Q.  Yes.  Thank you very much.

2   A.  Okay.

3   Q.  And then there's a distinction between the field memorandum

4   and what's been called a post order.  Are you familiar --

5   A.  There is a difference, yes.

6   Q.  And those post orders you do approve as well?

7   A.  I believe related to the execution procedure, I would, yes.

8   Q.  Correct.  And really all my questions are directed towards

9   the execution procedure.  I'm not interested in any of the other

10  duties that I know that you perform but aren't relevant.

11  A.  Okay.

12  Q.  So the post orders, are those the detailed instructions

13  given to a particular member on a specialty team?

14  A.  They would -- they would read, review and understand them,

15  yes.

16  Q.  And so they're a step by step instruction of what the team

17  member should do as whatever designated position they have?

18  A.  That's correct, as a member of the team.

19  Q.  And are there post orders for the medical team?

20  A.  There are not.

21  Q.  Are there post orders for the injection team?

22  A.  There are not.

23  Q.  One of your -- one of the other duties assigned to your

24  position and that you've fulfilled in this particular case was

25  selecting personnel.  Would you agree with that?

1   A.   That's correct.

2   Q.   And one of those is selecting the medical team leader.

3   A.   That's correct.

4   Q.   And also selecting an alternative medical team leader.

5   A.   Yes.

6   Q.   And as well as the injection team leader.

7   A.   Yes.

8   Q.   And the alternative injection team leader?

9   A.   Yes.

10   Q.   Under the SOP 135 which is Plaintiff's Exhibit 1, you're

11   also responsible for identifying qualified personnel.  If you'll

12   look at page 8 of that document.

13   A.   What page, ma'am?

14   Q.   Page 8.  Down at the bottom, the medical team members,

15   selection and training.

16   A.   Okay.  Yes.

17   Q.   So you select the other medical team leader -- the other

18   medical team members as well.

19   A.   I approve them -- approve them, yes.

20   Q.   So if you don't approve them, they don't get on the team.

21   A.   That's correct.

22   Q.   And is that also true of the other specialty team members,

23   the injection team members?

24   A.   That's correct.  All of those specialty team members.

25        COURT:  What are we calling a specialty team?

1          MS. HAMPTON:  Your Honor, the specialty team members

2   are made up of three -- as I understand three teams.

3          COURT:  Are we talking about escort, medical and

4   injection?

5          MS. HAMPTON:  That's correct, Your Honor.

6          COURT:  I just wanted to make sure.

7   BY MS. HAMPTON:

8   Q.  Is that how you understand it too, Deputy Chief?

9   A.  The escort, the medical and the injection teams, specialty

10  teams.

11  Q.  When you are looking at your pool of qualified personnel,

12  you are requiring particular types of skills for each of the

13  different teams, the medical, the injection and the escort.  Is

14  that correct?

15  A.  That's correct.

16  Q.  And part of those specific to -- as I understand it,

17  specific to the medical team includes skills in inserting an IV.

18  A.  Correct.

19  Q.  Ensuring line -- the line functions properly or correctly.

20  A.  Correct.

21  Q.  Mixing chemicals.

22  A.  Correct.

23  Q.  Preparing syringes.

24  A.  Yes.

25  Q.  Supervising the administration of chemicals.

1  A.  Yes.

2  Q.  Monitoring in this case Mr. Rhoades or an offender?

3  A.  Correct.

4  Q.  And then checking the consciousness of the offender.

5  A.  Correct.

6  Q.  And you're also using some particular I'll call them

7  disciplines but they're the job types that an individual might

8  hold and just so you're clear, I'm looking at page 9 of the

9  protocol of SOP -- excuse me, SOP 135.

10  A.  Yes.

11  Q.  So you're looking at the types of individuals listed here,

12  the emergency medical technician.

13  A.  Yes.

14  Q.  And does that require a license from any state agency?

15  A.  I believe it says certification.

16  Q.  Is this certification by a state agency?

17  A.  I believe so.

18  Q.  There's also the licensed practical nurse or a registered

19  nurse.

20  A.  Yes.

21  Q.  That requires a state agency license.

22  A.  Yes.

23  Q.  The paramedic.

24  A.  Uh-huh.

25  Q.  Does that also require a license?

1   A.   I believe that's certification, is it not?

2   Q.   Certification.  All right.  By a state agency though.

3   A.   Yes.

4   Q.   A physician's assistant.  Would that require a license or

5   certification?

6   A.   I believe a license.

7   Q.   And then a physician, would that require a license by a

8   state agency?

9   A.   Yes.

10  Q.   And then the other three are kind of -- the medical --

11  excuse me.  Other medically trained personnel.  A phlebotomist

12  and a military corpsman.  Do you know if those require any

13  licenses from a state agency?

14  A.   I don't know.

15  Q.   Now, in earlier -- I don't believe you were in the courtroom

16  for earlier arguments on a different motion.  Is that correct?

17  A.   I was not in the courtroom.

18  Q.   So earlier, counsel argued that there was a potential of

19  discipline from licensing boards if individuals with these

20  licenses participated and were known to the licensing board.

21  Did you inquire of any particular licensing body whether the

22  individuals that you approved for the execution team held a

23  current license?

24  A.   I did not.

25  Q.   Now, the protocol also provides for the particular number of

1    team members for both the medical team or -- and the injection

2    team.  I assume the escort team as well but I'm really not

3    interested in the escort team right now.  Do you determine the

4    number of members on each of those specialty teams?

5    A.  Yes.

6    Q.  And when you do that, you considered the members'

7    qualifications as an integral part of meeting the United States

8    Constitution, the requirements to execute under the Eighth

9    Amendment?

10   A.  Yes.

11   Q.  All right.  And you recognize that importance because in

12   your affidavit, you recognize those as part of the safeguards

13   established under Baze.

14   A.  Correct.

15   Q.  Okay.  Now, the selection process that you did complete in

16   this case, you reviewed a pool of candidates I assume?

17   A.  That's correct.

18   Q.  And did you have more candidates for the open positions than

19   you had open positions?

20   A.  Well, I interviewed all of the candidates.  All of the

21   candidates were interviewed and then we selected -- candidates

22   were selected to serve on the team.

23   Q.  So you had -- for example, one of the positions -- I don't

24   care which one we pick.  2a, if there's a 2a, you may have had

25   three candidates for one position?  Could that have happened?

1   A.   In terms of their background, we could have considered them

2   for that position?   Is that -- is that what you're asking me?

3   Q.   You know, I'm not doing it very well but what I'm trying to

4   get to is how many people were in your pool of candidates versus

5   the number of positions actually filled.

6   A.   Versus the number of positions that we currently have

7   filled?   Is that what you're asking?

8   Q.   Currently filled, yes.   Thank you.

9   A.   Currently filled.   I had seven candidates and selected five.

10   Q.   And of the pool of the selected individuals, does that

11   include any backup individuals?

12   A.   Those are all active members on the team.

13   Q.   Are there any individuals who are alternates and by that I

14   mean are not presently members of the team but would become a

15   member should one of the five drop out?

16   A.   Not of the people that we initially interviewed.

17   Q.   Are there any current interviews going on?

18   A.   No.

19   Q.   And when you got the information of the candidates, I'd like

20   to talk about what you did to verify their qualifications if we

21   could.

22   A.   Okay.

23   Q.   In the first instance, did you make any employment contacts?

24   A.   No, I did not.

25   Q.   Did you look at -- you've already said you didn't contact

```
 1   any licensing boards.  Did you look at any experience or
 2   training records?
 3   A.  Yes.
 4   Q.  And what kinds of training records did you look at?
 5              COURT:  Hold on.  Counsel, approach, please.
 6                  (Side bar discussion had.)
 7              COURT:  Sometimes I'll have a side bar just because I
 8   want to stand up.  Go ahead.
 9              MS. HAMPTON:  Thank you, Your Honor.
10   BY MS. HAMPTON:
11   Q.  Going back to how you evaluated the members of the team, you
12   did have an interview process.
13   A.  Yes.
14   Q.  And you did that personally?
15   A.  Yes.
16   Q.  Any other individuals participate in that?
17   A.  Yes.
18   Q.  And who was that?
19   A.  The warden in charge of the execution and his backup,
20   another one of our wardens.
21   Q.  So Defendant Blades.
22   A.  Mr. Blades.
23   Q.  And then a backup warden?
24   A.  A backup warden for Warden Blades, Warden Cluney, and our
25   medical team leader.
```

1   Q.  And the medical team leader.

2   A.  And the medical team leader.

3   Q.  Okay.  Was the medical team leader involved in all of the

4   interviews so both the injection team and the medical team?

5   A.  Yes.

6   Q.  Okay.  And when you were looking at the qualifications of

7   the seven candidates that you whittled down to five, but of the

8   seven candidates, did you verify the -- did you verify the

9   proficiency of each candidate with regard to the listed

10  qualifications from the SOP 135 on page 9?

11  A.  Are you saying did we ask for a demonstration in the

12  interview?

13  Q.  I don't care how you verified but did you do it?

14  A.  In the interview, we asked the questions candidates -- the

15  candidates questions regarding their experience, education.

16  Asked them some questions related to the use of IV's, drawing

17  drugs into syringes, the administration of chemicals, that type

18  thing in the interview.

19  Q.  And then how did you verify the answers that you obtained?

20  A.  We're doing that through our mutual training and through

21  observation and verification in that initial training.

22  Q.  So the verification that they in fact hold the

23  qualifications that you were seeking are being verified through

24  the training process?  Do I understand it correctly?

25  A.  Not at this point in the training process.

1   Q.  Not at this point?

2   A.  In the initial training -- in the initial trainings, we had

3   them demonstrate some of those skills and we were able to

4   observe that and that gave us a sense of whether they were able

5   to perform the tasks or not.

6   Q.  And when did the -- when did the initial trainings begin?

7   A.  Shortly after the interview.  Late -- after the interviews.

8   Late October.

9   Q.  Would that be of this year?

10  A.  That would be of this year, yes.

11  Q.  So in late October of 2011, you did the interviews and began

12  the initial training review?

13  A.  Yes.

14  Q.  And at what point did you determine between late October and

15  today that the individuals were qualified to perform the tasks

16  outlined in the SOP on page 5 -- excuse me, 9?

17  A.  Would you repeat the question?

18  Q.  At what point between late October of 2011 and today's date

19  did you determine that the team members are qualified to perform

20  the tasks assigned?

21  A.  Well, you mean through demonstration or do you mean through

22  their education, training, experience and work history?

23  Q.  Well, I believe I understood it that you verified their

24  ability to perform the tasks under the SOP by reviewing their

25  training work.  Is that correct?

1   A.  Well, yeah.  I think -- through observations, we verified

2   that they are able to perform the tasks but I would add, if I

3   could --

4   Q.  Absolutely.

5   A.  -- that given their education, training, experience and work

6   history, there was -- it was highly probable that they had those

7   skills already or we would not have placed them on the team.

8   Q.  So let's go back to the observation.  When between late

9   October of 2011 and today did you make enough of an observation

10  to determine for your purposes that the individuals were

11  qualified?

12  A.  By that third training.

13  Q.  Third training.  So three times was the charm so to speak?

14  You won't go there.  After three times, you made the

15  observation.

16  A.  Not -- not all -- the first training was an orientation --

17  Q.  Okay.

18  A.  -- on the policy and the positions and the requirements of

19  the positions to familiarize them with that and expectations for

20  them.

21  Q.  All right.

22  A.  The second -- the second training, we were out getting

23  familiar with the equipment, the facility and some practical and

24  by the third, we were into all practical application.

25  Q.  All right.  Let's go to the no. 2 training when you say some

1    practical, what do you mean by that?

2    A.   I believe they did some IV work on an IV mannequin.

3    Q.   On an IV mannequin.   Not a live volunteer at this point?

4    A.   No.

5    Q.   All right.   How about the third session where you say it was

6    practical?   What did they do there?

7    A.   That was more of a complete -- starting to go through a

8    complete walk-through of the process from setting up the

9    equipment, establishing -- drawing the fluids, the syringes,

10   going through establishing the IV lines, administering the

11   chemical.

12   Q.   And what particular events occurred in establishing the IV

13   line in training session no. 3?

14   A.   I'm not sure I understand your question.

15   Q.   What did they do in session no. 3 to establish an IV line?

16   A.   Well, again, they were still practicing on a mannequin arm

17   which has -- requires that you have the proficiency to find the

18   vein.

19   Q.   Were they using fluids in this IV practice session?

20   A.   Were they --

21   Q.   Using any fluid when they were doing the practice session on

22   the mannequin arm.

23   A.   I don't believe they administered fluid through the IV that

24   went into the mannequin arm.   I can't recall for certain.

25   Q.   All right.   And when did they first practice on a live

1   volunteer?

2   A.   That's the next training.

3   Q.   That hasn't occurred yet?

4   A.   That has not occurred.

5   Q.   The other information that you indicated you look at in the

6   interview process was education.   What did you do to verify the

7   education?

8   A.   Reviewed the documentation that was provided.

9   Q.   And who provided those documentations?

10  A.   The candidates.

11  Q.   And what type -- in very general terms.   I'm not asking for

12  any identifying names but what kind of education records were

13  you looking at?

14  A.   Certificates, diploma, licenses.

15  Q.   And for the certificate, do you mean like a high school

16  equivalency or you mean a professional certificate?

17  A.   I mean like a professional certificate.

18  Q.   Okay.   So on the diploma, did you contact any educational

19  institute at any level to verify the diploma?

20  A.   I did not.

21  Q.   Okay.   On the training that was presented in the personal

22  interviews, what steps did you take to verify that each

23  candidate had the training they professed to have?

24  A.   I looked at the documentation that was provided to me by the

25  candidates.

1   Q.   And did you take any steps independent of reviewing the

2   candidates' information to determine if the training was

3   correct?

4   A.   No, I did not.   I did not contact those entities.

5   Q.   The experience, is that different than what you're

6   considering training?

7   A.   Work experience.

8   Q.   Work experience.   And my understanding is you did not

9   contact employers to verify any work experience.   Is that

10  correct?

11  A.   I did not contact employers.

12  Q.   Okay.   Now, we've talked about the IV experience.   I'm also

13  curious what types of checks you did to determine that each of

14  the members -- in this case I believe it's the medical team

15  leader who has the responsibility for consciousness checking.

16  What did you do to verify that the medical team leader was in

17  fact qualified to do a consciousness check?

18  A.   Well, the medical team leader -- I need to look at my

19  affidavit and see what's been --

20  Q.   Please.

21  A.   If I could just a moment?

22  Q.   Yes, absolutely.

23  A.   The medical team leader is a registered nurse with many

24  years of experience and in that capacity, nurses conduct

25  consciousness checks.

1   Q.   Okay.  So when -- when you interviewed I think it's

2   personnel 1a --

3   A.   Yes.

4   Q.   -- did you do the same kind of interview that you did for

5   the -- the other medical team members?

6   A.   Yes.  Asked about background and experience and education

7   and training.

8   Q.   And did you do the same level of verification?

9   A.   I did.

10  Q.   So -- so by that I mean did you contact any independent

11  references or any independent work employer or work history?

12  A.   I did not.

13  Q.   Any licensing board for the medical team leader?

14  A.   No.

15  Q.   In establishing the consciousness check that's required

16  under SOP 135, what information did you rely upon to set the

17  consciousness check and by that I mean the information that's

18  provided in your affidavit?  If you'll bear with me, I'll take

19  you to the paragraph.  Paragraph 21.

20  A.   Well, I did -- I discussed it with our medical team leader

21  as to what's the appropriate protocol for that.

22  Q.   All right.

23  A.   And if I'm not mistaken and I'm not going to get -- I'm not

24  going to get the document correct but I thought -- I thought

25  maybe in one of your filings, there was some reference to that.

1    I saw it in some research material somewhere also.

2    Q.  So from our documents, you developed your --

3    A.  No, no.  But I saw it as well I believe is all I'm saying.

4    Q.  I see.  I see.  Okay.  All right.  But in the development

5    that you did for the consciousness check --

6    A.  Right.

7    Q.  -- was this developed in late October of this year as well?

8    A.  Yes.

9    Q.  And just to clarify, in your affidavit on that same

10   sentence, it says the execution team leader.  I take that you

11   really mean the medical team leader.

12   A.  That's a typo.  I apologize for that.  Yeah, I saw that when

13   I was reviewing the document today.

14   Q.  Just -- there's just the one person.

15   A.  It's medical team leader.

16   Q.  And so when you came up with the verbal stimulus, solicit an

17   auditory response, touch the eyelashes, that was based upon your

18   conversations with the medical team leader?

19   A.  Yes.

20   Q.  And the stimulus to pinch the offender and conduct a sternal

21   rub, that was also based upon the medical team leaders's

22   experience?

23   A.  Yes.

24   Q.  And when you -- so is there a post order for the medical

25   team leader?

1   A.   There is not.   There's the Attachment A for that group in

2   SOP.

3   Q.   And anywhere in Attachment A, that's in Exhibit No. 1,

4   towards the back of it, correct?

5   A.   Yes.   Attachment A is towards the back of --

6   Q.   That's page 35 of 53 on the top?

7   A.   Yes.   That's where it begins.

8   Q.   Anywhere in here, is there a specific direction on the type

9   of pinch that must be given?

10   A.   I do not believe so.

11   Q.   And is there a specific direction on the type of sternal rub

12   that must be conducted?

13   A.   No, I don't believe so.

14   Q.   And the other three, the verbal stimulus and the auditory

15   response and touching the eyelashes, is there any specific

16   direction on how those types of stimulus will be given?

17   A.   I don't believe so.

18   Q.   Okay.   Now, Deputy Chief, when you conducted the interviews

19   in this case, did you document the qualifications yourself?   I

20   mean did you take in documents and did you make a report on the

21   qualifications of these individuals?

22   A.   Gathered the documents and reviewed them with the medical

23   team leader.

24   Q.   And are those documents still in your possession?

25   A.   They are not.

1    Q.  Were those destroyed?

2    A.  They were.

3    Q.  And how does one know that the qualifications are acceptable

4    if for some chance you're not available to discuss those with

5    say the director or the warden?

6    A.  They're not.

7    Q.  So there's no report on that?

8    A.  There is no report.

9    Q.  Deputy Chief, did you attend POST?

10   A.  I did not attend POST.  I attended -- are you talking for my

11   pre-service?

12   Q.  Correct.

13   A.  I attended Idaho Department of Correction Pre-Service

14   Academy.

15   Q.  And in that academy, did they go over various duties that

16   were -- were you a CO?

17   A.  I was not.

18   Q.  So what level did you enter the IDOC?

19   A.  I entered in an entry level in our construction group,

20   maintenance group.

21   Q.  And then you worked your way kind of through the --

22   A.  That's true, yes.

23   Q.  And you're familiar with writing reports.  This is not a new

24   think.

25   A.  I am.  I am.

1   Q.  But in this case, there's -- just to be clear, there's not a

2   file memo on the qualifications?

3   A.  No, there's not.

4   Q.  And there's no collected certificates or documents?

5   A.  There are not.  Not to my knowledge.  I don't have them.

6   Q.  And there's no written report?

7   A.  There is not.

8   Q.  And there's no electronic file?

9   A.  There's not.

10  Q.  Okay.  Now, one of the other requirements under the SOP as I

11  understand it is that you're also to run a background check of

12  each candidate; is that correct?

13  A.  That's correct.

14  Q.  And the background check, as I understand, would be a

15  criminal history check?

16  A.  That's correct.

17  Q.  And did you run that?

18  A.  That was run.

19  Q.  Did you run that?

20  A.  I did not.

21  Q.  How was that criminal history check done?

22  A.  I asked someone who had -- who had the ability to run a

23  criminal history check to do that.

24  Q.  And were the names put into the data base?  Did you use

25  NCIC?

1              MS. HOWARD:  Your Honor, I'm going to -- can we have a

2    side bar?

3              COURT:  All right.

4                   (Side bar discussion had.)

5    BY MS. HAMPTON:

6    Q.  So Deputy Chief, you did not -- first, was NCIC used as the

7    criminal background check database?

8    A.  We ran it through our department system.  ILETS/NCIC.

9    Q.  Okay.  ILETS, that's fine.  Now, you did not do it

10   personally.  Did someone in your department do it?  I'm not

11   asking for a name, Deputy Chief.  Did someone in your

12   department?

13   A.  Can I express my concern?

14   Q.  No.

15   A.  Okay.

16             MS. HAMPTON:  Well, then, Your Honor, I'd like a side

17   bar then.

18             COURT:  Let's clear the courtroom.  Let's get to the

19   bottom of this, please.  Where's our marshal?

20             CLERK:  In the hall.

21             COURT:  I need you to clear the courtroom, please.

22                  (Courtroom cleared.  Proceedings sealed.)

23             COURT:  Bring the people back in the courtroom, please.

24                  (Courtroom opened.)

25             COURT:  All right.  You may inquire.

1          MS. HAMPTON:   Thank you, Your Honor.

2    BY MS. HAMPTON:

3    Q.  So Deputy Chief, was there a background check run on each of

4    the individuals applying for -- or considered as a candidate for

5    the specialty teams?

6    A.  Yes.

7    Q.  And did you receive those prior to putting any of the

8    members on the final team?

9    A.  I received it shortly after we had interviewed them and

10   identified them as team members.  It took me a while to find the

11   person I wanted to run the background.

12   Q.  All right.  And when you -- when you had the requirement of

13   doing a background check, did you set any requirements or was

14   there any information from the background check that would

15   disqualify a member from participating?

16   A.  I think -- I think someone obviously with a violent

17   history -- there were no qualifications established.  Someone

18   with an inappropriate criminal background would not be on the

19   team.

20   Q.  But those -- what would be defined as inappropriate was not

21   established prior to running any of the background checks?

22   A.  It's not in the SOP.

23   Q.  All right.  Now, with regard to the individual personnel --

24   and if you will look at your affidavit at the Exhibit A to that

25   affidavit.  And going down the left-hand column as you look at

1   it, the personnel 1a, was there any information that you derived

2   that indicated 1a required any follow-up investigation in their

3   qualifications or training?

4   A.  I'm sorry.  Would you repeat it?

5   Q.  Was there anything about the information you received on

6   person 1a that would indicate you would need to do additional

7   investigation before the person was qualified?

8   A.  No.

9   Q.  And the same with 2c?

10   A.  No.

11   Q.  And 1b?

12   A.  No.

13   Q.  1c?

14   A.  No.

15   Q.  2c?

16   A.  I've already responded to 2c but no.

17   Q.  They're on twice.

18   A.  That's correct.

19   Q.  And 1d.

20   A.  No.

21   Q.  So you were satisfied from that initial interview and the

22   information you gathered that each of the individuals was

23   qualified to participate?

24   A.  With regard to placement on the team?

25   Q.  Correct.

1   A.   Yes.

2   Q.   And did you do any follow-up at all on any of them whether

3   you thought it was required or not?

4   A.   Follow-ups in what manner?

5   Q.   Any follow-up interviews with the individuals or any follow-

6   up discussions with the warden on the qualifications of the

7   individuals.

8   A.   After the interview, the -- after the interviews, the

9   interview panel discussed the candidates.

10  Q.   And that interview panel was you, the warden and the medical

11  team leader?

12  A.   Two wardens and the medical team leader.

13  Q.   Two wardens --

14  A.   And myself.

15  Q.   All right.  Now, Deputy Chief, I'd like to talk about the

16  facility itself, the F Block is its generic term but it's also

17  known as I believe the execution unit.  Is that correct?

18  A.   Go ahead.

19  Q.   The execution unit?

20  A.   A portion of F Block has been designated as the execution

21  unit.

22  Q.   All right.  And within that execution unit, there are

23  different rooms.  Would you agree?

24  A.   Within the unit, yes.  Within the execution unit, yes.

25  Q.   And there's the execution chamber as it's discussed in the

1    SOP.

2    A.  Yes.

3    Q.  And there are State's witness room.

4    A.  Yes.

5    Q.  And offender's witness room.

6    A.  Yes.

7    Q.  And then a chemical room I believe it's called.

8    A.  Yes.

9    Q.  All right.  Now, in your affidavit, if you look at that at

10   page -- excuse me, at paragraph 19, you indicate that the

11   execution chamber is complete.  Now, that's just the room that

12   the offender will be brought into and administered the

13   chemicals, correct?

14   A.  The execution chamber, yes.

15   Q.  All right.  And so when you indicate that the escort,

16   medical and injection teams have been engaged in training since

17   October 20 using the unit, was the entire unit completed on

18   October 20?

19   A.  No.  And the first training session was not conducted in the

20   unit.

21   Q.  All right.  So -- going back to your description of the

22   training sessions, that would be the protocol or --

23   A.  Correct.

24   Q.  Or orientation?

25   A.  The familiarization orientation protocol responsibilities.

1   Q.  So no. 2, the second one, becoming familiar with the

2   equipment and a little bit of a practical knowledge, was that

3   conducted in a completed execution unit?

4   A.  Substantially complete, yes.

5   Q.  All right.  And so what I mean by completed is that the

6   chemical room has all the equipment necessary.  It has the

7   lines.  Would you agree that completed means that?

8   A.  It has the what?

9   Q.  The lines that would be run through to the offender.

10  A.  Are you talking about the IV's?

11  Q.  Yes.

12  A.  Well, those wouldn't typically be part of the unit.  Those

13  would typically be part of the equipment that is brought out

14  when you're performing the execution.

15  Q.  All right.  So then let's understand each other when we say

16  completed.

17  A.  Yes.

18  Q.  You say it was substantially completed for the second

19  execution.  Could you tell me whether the monitoring system was

20  completed and working at the time of the second execution --

21  training session?

22  A.  The monitoring system for the execution chamber?

23  Q.  Correct.

24  A.  I think there was still some lines being hooked up, yes.

25  Q.  And what about the cameras that are supposed to be in the

1   execution --

2   A.  I don't know.  They may have been installed.  I don't know.

3   I think they were installed.

4   Q.  Were they working?

5   A.  You know, I don't recall.

6   Q.  Okay.

7   A.  I don't recall.

8   Q.  How about the microphone that was supposed to be over the

9   offender's --

10  A.  I don't recall if that was in or not at that time.

11  Q.  Was the -- if you turn to Appendix A, there's a discussion

12  about a three-gang, three-way manifold.  Is that something that

13  was present in the execution chamber?

14  A.  It was not in the execution chamber.  Again, that would be

15  part of the equipment.

16  Q.  All right.  So when you say "substantially completed," what

17  exactly do you mean by that?

18  A.  We were -- we were able to go in there and do training,

19  get -- effectively start training our staff on the protocols and

20  the practices.

21  Q.  And if you did not have the equipment to train on, what did

22  you use as a substitute?

23  A.  I'm not sure I understand what you're asking.

24  Q.  Well, you said you didn't have the three-way, three-gang

25  manifold.  Did you use a substitute piece of equipment to train?

1   A.  Yes.  We would have had a tray that was laid out with the

2   markings on it to lay the syringes out.

3   Q.  And in this second training, did you --

4        COURT:  Just a second.  The question you asked just a

5   moment ago, I may be unclear and obviously you must think it's

6   important.  Did you say, Mr. Zmuda, that you did not have the

7   three-way manifold at the time of the three -- or the second

8   training or just that it was part of the equipment --

9        WITNESS:  It's part of the equipment.  It's not -- it's

10  not a fixed portion of the executing unit.

11       COURT:  Can you clear that up for me, Counsel, because

12  then your follow-up question was you said you didn't have the

13  three-way manifold and I'm confused.

14       MS. HAMPTON:  All right.

15  BY MS. HAMPTON:

16  Q.  So in the second training session, you did not use -- as I

17  understand it, you did not use the three-way three-gang

18  manifold?

19  A.  I don't believe so.  I don't believe so.

20  Q.  All right.  And instead, you believe that they used syringes

21  laid out on a tray?

22  A.  Yes, I believe so, on the table or the counter, yes, labeled

23  and color coded.

24  Q.  All right.  So for that training session, the purpose would

25  be to -- the injection team would be able to identify what color

1   went with what drug?

2   A.  Correct, and the amount.

3   Q.  And the amount, right.  Okay.  And those -- so there was no

4   injection actually being done at that point?

5   A.  Injection into a mannequin or a person?

6   Q.  Yes.

7   A.  Not -- certainly not into a person.

8   Q.  Was it done into a mannequin?

9   A.  You know, I don't recall.  I don't believe so.  I don't

10  believe so.

11  Q.  All right.  Okay.  Now, if we go back to Exhibit No. 1, the

12  SOP, on page 10, if you wouldn't mind looking at that.  One of

13  the -- one of the requirements up at the very top with the

14  specialty team training is to establish minimum training

15  sessions for each of what we've been calling the specialty

16  teams.  Do you see that part at the top?

17  A.  I do see that, yes.

18  Q.  Okay.  So how many of the training sessions occurred after

19  SOP 135 has been finalized?

20  A.  All.

21  Q.  And how many were those?  Just the three?

22  A.  No.

23  Q.  There's more than three?

24  A.  Pardon me.  Yeah, there's been more than three training

25  sessions, yes.

1   Q.  Okay.  So what's -- how many training sessions have there

2   been?

3   A.  Five.

4   Q.  Five.  Okay.  So we know the first three.  What's the fourth

5   one?

6   A.  Back in the execution unit going through the protocol,

7   hooking up the IV's.

8   Q.  So in this particular instance, now training session no. 4,

9   was that hooking up an IV to a volunteer or was that to the

10  mannequin again?

11  A.  Up to this point, all the IV's -- any IV's that have been

12  hooked up have been to the mannequin.

13  Q.  Okay.  And no. 5, what training did that encompass?

14  A.  That -- again, that was going through the protocol,

15  establishing how -- how to load the syringes, place them in the

16  manifold, establish how you're going to hook up the IV on the

17  offender and we did not push -- did not push -- we did push

18  chemicals.  That's right, we did in the fifth one, yes.

19  Q.  In the fifth one, you pushed into the mannequin?

20  A.  I don't -- I think we did push it into the -- I'm not

21  certain.  I was back in the chemical room for that portion of

22  it.

23  Q.  Okay.  Now, the training sessions are supposed to be

24  recorded, correct?  Not recorded in the sense of filmed but

25  there is supposed to be a record of the training sessions that

1  occur.

2  A.  There's -- I don't -- there's an agenda, there's an outline

3  but not -- I don't know what you mean other than that.

4  Q.  Well, there's a warden's execution long.  Isn't that

5  correct?

6  A.  The warden maintains an execution log.

7  Q.  And the training sessions would be documented in that?

8  A.  That's correct.

9  Q.  And would it include all of the steps that are taken during

10  the particular training session?

11  A.  Not -- I don't believe in that execution log.  Really,

12  you're just establishing events.

13  Q.  All right.  So the most we would find from that execution

14  log would be that in fact on day X, a training occurred, X

15  people were involved?

16  A.  Yeah.  It would say on such and such a day, training session

17  for medical and injection team.

18  Q.  Okay.  Fair enough.  In the training from the protocol that

19  requires that after receiving a death warrant, the teams will

20  train weekly before the scheduled execution date.  Do you see

21  that?

22  A.  That's correct.

23  Q.  So the death warrant came down on the 19th of October.

24  A.  That's correct.

25  Q.  And it's now the 10th so is that about three weeks?

1  A.  That's correct.

2  Q.  And have they had three training sessions?

3  A.  Well, they've had more than three.  I think I indicated

4  we've had five.

5  Q.  Right.  But I'm more interested in whether they're having

6  them since -- have they had three training sessions since the

7  death warrant has been issued?

8  A.  Yes.

9  Q.  Okay.  Now, there's a distinction in the protocol that I'm

10  not quite sure I understand between a training session and a

11  rehearsal session.  Can you tell me what is included in a

12  training session?

13  A.  Training session would principally be limited to the team --

14  the team, the wardens, myself if I'm able to be there and just

15  working on their portion of the execution.

16  Q.  All right.  And during the training sessions, we've already

17  kind of talked about how the IV's worked but what about the

18  consciousness check?  Is there training on the consciousness

19  check?

20  A.  We would simulate the consciousness check on a person and

21  have --

22  Q.  So for the consciousness check, you would use a live

23  volunteer?

24  A.  We have.

25  Q.  And in those particular instances, have you used a volunteer

1   that has had any amount of anesthetic?

2   A.  No.

3   Q.  So these are volunteers who are fully conscious?

4   A.  Yes.

5   Q.  Okay.  Now, the rehearsal session, what is the distinction

6   between a rehearsal session and a training session?

7   A.  Rehearsal session would be a more expanded version.  It

8   would include other teams.  Maybe all of the teams, our

9   director.  A more expanded version including all of the entities

10  that play a role or most of the entities that play a role.

11  Q.  So a rehearsal session seems to me to be exactly as you

12  would anticipate in like a theatrical setting?

13  A.  Correct.

14  Q.  It's a dress rehearsal?

15  A.  More like that, yes.

16  Q.  All right.  And so you're going to step through each and

17  every part of the protocol, the appendix and any post orders?

18  A.  We're going to go through it by the numbers, what we're

19  going to do at the event.

20  Q.  All right.  And those have not happened yet because they're

21  only due 48 hours in advance.

22  A.  Yes.

23  Q.  Is there anything in addition to the protocol Appendix A and

24  post orders that will be done in the rehearsal session?

25  A.  I'm sorry?

1   Q.  Is there anything in addition to the protocol or the

2   Appendix A or the post orders that will be done in a rehearsal

3   session?

4   A.  I can't think of anything that we would do, no.

5   Q.  And in the rehearsal session, will you be using a live

6   volunteer for the IV setting?

7   A.  Yes.

8   Q.  And will you be pushing any fluid into the live volunteer

9   assuming -- I assume it's going to be like a saline flush.

10  A.  Yes.

11  Q.  And will you be doing any consciousness checking on the live

12  volunteer?

13  A.  Yes.

14  Q.  And will that volunteer be under any anesthetic?

15  A.  No.

16  Q.  Now, kind of going back to the team members and how they

17  interact with the protocol, what did -- what did you rely upon

18  to know that an individual had the ability to determine

19  sufficient unconsciousness for the purposes of the execution?

20  A.  Well, the person's a nurse.  Has -- had multiple years of

21  experience, worked in various capacities to include emergency

22  room and has lots of experience with the administration of

23  chemicals and checking consciousness.

24  Q.  All right.  And we kind of went over the medical team

25  leader's qualifications but one of the things that we haven't

1    discussed is the distinction between the medical team leader's

2    clinical practice and their administrative practice and that's

3    over in your affidavit, no. 14.

4    A.  Yes, yes.

5    Q.  So let me understand if I might what you mean by

6    administrative experience.  Could you describe that for me?

7    A.  Experience supervising others in the medical field,

8    monitoring processes, practices in the medical field.

9    Q.  And some of that would include what we would typically

10   understand to be administrative duties like filling out

11   insurance forms or paperwork or those kinds of requirements?

12   A.  Some paperwork -- yeah, paperwork.  Some, yes.

13   Q.  In the clinical experience, is that limited to the

14   information that's included in the -- in the paragraph?

15   A.  In the paragraph in my affidavit?

16   Q.  Correct.

17   A.  At least that experience, yes.

18   Q.  Was there other information that you obtained that would

19   indicate that the person's ability to determine sufficient

20   unconsciousness -- proficiency in determining a sufficient state

21   of unconsciousness?

22   A.  Just that information, yes.

23   Q.  All right.  Okay.  Now, when we also look at the development

24   of Exhibit 1, SOP 135, I believe in your affidavit, you talked

25   about it, paragraph 6, and also at paragraph 5 the process that

1   you took to develop this SOP.  Do you see that in your

2   affidavit?

3   A.  In the affidavit 5 and 6?  That's what you're referring to?

4   Q.  Yes, yes.

5   A.  Yes.

6   Q.  So I'd like to discuss with you what steps you actually took

7   in coming up with the development of the SOP.  So you indicate

8   that you were tasked with the duties to develop the SOP; is that

9   correct?

10  A.  That's correct.

11  Q.  All right.  And you say you looked at -- you say the IDOC

12  looked at other states' policies as a guide.  Did you personally

13  look at any other states' policies?

14  A.  I did.

15  Q.  All right.  Which states did you look at?

16  A.  I looked at Arizona's and I looked at Ohio's and I believe I

17  looked at Washington's.

18  Q.  And what were the effective dates of the protocols that you

19  looked at?

20  A.  I don't recall the effective dates.  The dates that they had

21  approved theirs?

22  Q.  Correct.

23  A.  It was the most recent -- the most recent versions at the

24  time and twice -- twice on Arizona.

25  Q.  Twice on the Arizona?

1    A.  Twice on Arizona.

2    Q.  All right.  And so on Arizona --

3    A.  They updated theirs.

4    Q.  I'm sorry.  I cut you off.

5    A.  I'm sorry.  They updated theirs.  They had updated theirs.

6    Q.  So you looked at the updated Arizona one?

7    A.  I did.

8    Q.  And that was a three-drug protocol?

9    A.  Yes.

10   Q.  The Ohio protocol that you looked at, was that their three-

11   drug or their one-drug?

12   A.  I believe when I looked at Ohio's, it was one drug I

13   believe.

14   Q.  And the Washington protocol, when you looked at it, was it

15   the three-drug or the one-drug?

16   A.  I can't remember Washington's that much.

17   Q.  So Washington really wasn't influential in your decision

18   making?

19   A.  And neither was Ohio's really.

20   Q.  All right.  Now, when you say that countless hours were

21   spent on this task, you're kind of lumping the entire department

22   into that project.

23   A.  That's correct.

24   Q.  Okay.  But you personally spent hours on it.

25   A.  Yes, ma'am.

1  Q.  All right.  When you did your investigation, did you look at

2  anything other than the actual SOP's from the other states --

3  from Arizona and from Ohio and Washington?

4  A.  I had staff pull some additional research information off of

5  the internet, what was going on with the different chemicals

6  being used in executions.

7  Q.  Did you happen to look at any of the states' policies or

8  statement of purpose in why they adopted the particular

9  protocol?

10 A.  I don't recall that.

11 Q.  And when you look at the states' protocol and the additional

12 information, did that include contacting any of the officials,

13 what I will call the Department of Correction counterparts in

14 either Ohio or Arizona or Washington?

15 A.  I have talked to people -- I've talked to people in Arizona

16 and Ohio and some others in our organization have talked to

17 people in Washington.

18 Q.  When you talked with the Department of Corrections

19 counterpart in Arizona, did you ask about their experience and

20 how effective their protocol was?

21 A.  I spent a great deal of time doing that with Arizona to

22 include a site visit.

23 Q.  And with Ohio, did you speak with any of the Department of

24 Correction officials there to ascertain their experience with

25 one-drug protocol?

1   A.  I don't recall that conversation.

2   Q.  Did you have any conversations with the Ohio department?

3   A.  Yeah, I did talk -- I did talk to Ohio.

4   Q.  And did you discuss any of the concerns that Ohio had with

5   their protocol?

6   A.  No.

7   Q.  Did they express any concerns?

8   A.  I don't recall that.

9   Q.  Now, when you were talking with Arizona and discussing their

10  three-drug protocol, you understand what the purpose of each of

11  the three drugs are in the protocol, correct?

12  A.  I do.

13  Q.  And the first -- for example, the pancuronium bromide,

14  that's the paralytic.

15  A.  That's not the first administered though.

16  Q.  I agree.

17  A.  Okay, okay.  I'm just making sure.

18  Q.  But the pancuronium bromide is the paralytic?

19  A.  Yes.

20  Q.  It produces the suffocation?  It can produce the

21  suffocation?

22  A.  Okay.

23  Q.  Did you learn that or not?

24  A.  It's a paralytic and it can affect the muscles around the

25  lungs, involuntary muscles, and the breathing.

1   Q.  Okay.

2   A.  As I understand it.

3   Q.  All right.  And the potassium chloride, you understand that

4   to be the cardiac arrest drug?

5   A.  I do.

6   Q.  And that drug will have a painful effect if the individual

7   is not sufficiently unconscious.  You understand that too?

8   A.  I would imagine so, yes.

9   Q.  Well, you understand from the requirement under Baze to

10  provide for a humane method.

11  A.  Yes, I do.

12  Q.  Okay.  All right.  Now, the risk that comes from the

13  three-drug protocol comes back to insufficient state of

14  unconsciousness.  Would you agree with me?

15  A.  Repeat that, please.

16  Q.  The pain that arises from a three-drug protocol comes

17  because of an insufficient state of unconsciousness.

18  A.  If the condemned was not sufficiently sedated, they could

19  experience pain?

20  Q.  Yes.

21  A.  Yes, yes.

22  Q.  So you agree with that.  All right.  Now, were those facts,

23  the suffocation, the cardiac arrest, the intense burning and the

24  purpose of the anesthetic, were those facts taken into account

25  when you did your development of the Idaho protocol?

1   A.   Talking about the sedative?

2   Q.   No.  Not the sedative.  The fact that there's a risk of pain

3   from the pancuronium bromide and the -- excuse me, the potassium

4   chloride.

5   A.   Yes.  We're aware of that.

6   Q.   And you were also aware of the pentobarbital's use in a

7   three-drug protocol?

8   A.   It's an option in ours, yes.

9   Q.   Right.  And the other option was just sodium thiopental?

10  A.   Yeah.

11  Q.   And the purpose of those two is to reduce the consciousness

12  level.

13  A.   Yes, to render the person unconscious.

14  Q.   Correct.  And the dose that you have outlined I believe is 5

15  grams for both.  Correct?

16  A.   Yes.

17  Q.   And are you aware of pentobarbital's use in a three-drug

18  protocol in which it was not effective in sufficiently rendering

19  the individual unconscious?

20  A.   I'm aware that there is an instance or instances.

21  Q.   Okay.  Are you also aware of the use of pentobarbital in a

22  one-drug execution process?

23  A.   I'm aware that there's a one-drug process.

24  Q.   And when you talk to Ohio, did you ask them about their use

25  of one-drug protocol?

1   A.  I don't believe I had that conversation.

2   Q.  Did you look at the length of time for death in one-drug

3   protocol out of Ohio?

4   A.  Did not.

5   Q.  Did you look at the length of death of time -- the length of

6   time for death in the Washington execution in 2010?

7   A.  I did not.

8   Q.  Were you -- the other anesthetic that was used -- that can

9   be used in Idaho is the thiopental, sodium thiopental?

10  A.  Yes.

11  Q.  And were you aware at the time that you developed this

12  protocol of a case out of Florida using thiopental in a

13  three-drug protocol that was botched and that's the Diaz

14  (phonetic) case?

15  A.  I'm aware that there's cases where that's occurred.

16  Q.  Okay.  Now going back to the actual protocol and how the

17  chemicals will be injected, the first drug, the anesthetic is

18  injected and then there's a wait until the consciousness check,

19  correct?

20  A.  That's correct.

21  Q.  And that's a three-minute wait time?

22  A.  That's correct.

23  Q.  And is that from the beginning of the injection or at the

24  completion of the injection that the three-minute wait time

25  occurs?

1   A.   Completion.

2   Q.   And when you do that, is there a difference in the wait time

3   if you use the thiopental versus the pentobarbital?

4   A.   The pentobarbital versus the pentothal -- what we refer to

5   as pentothal?  Sodium Pentothal versus the pentobarbital?

6   Q.   Yes.

7   A.   A wait time -- we would have the same wait time.

8   Q.   Same wait time.  All right.

9   A.   Let the sedative have an opportunity to work.

10  Q.   And how long from the time that you do the consciousness

11  check and you run the flush through the line until you inject

12  the first -- excuse me, until you inject the second drug, the

13  paralytic?  How long is that time?

14  A.   Well, that would depend on if the offender was determined to

15  be unconscious.

16  Q.   And if --

17  A.   And how long the consciousness check would take.

18  Q.   And if at the end of the consciousness check the offender is

19  still deemed unconscious by the medical team leader, how long

20  until the injection of the -- of the pancuronium bromide?

21  A.   Well, the protocol is that the medical team leader -- if the

22  medical team leader deems that the offender is not unconscious,

23  that person reports that to the warden.

24  Q.   Right.

25  A.   And then the warden makes a determination on how to proceed

1    from there.

2    Q.  Right.  But what I'm asking is once the medical team leader

3    determines that the offender is sufficiently unconscious.

4    A.  Okay.  I'm sorry.  I misunderstood.

5    Q.  Right.  From that time, how long until the pancuronium

6    bromide is injected?

7    A.  Well, the medical team leader has to make it back into the

8    chemical room so you're probably about two minutes.

9    Q.  Okay.  Now, the dose under SOP 135 for the anesthetic,

10   either one, is 5 grams.

11   A.  That's correct.

12   Q.  At the end of your development of the protocol, Exhibit

13   No. 1, did you present a report to the director for selection or

14   approval of the protocol?

15   A.  The SOP -- the SOP went to the chief of prisons for

16   approval.  The chief of operations.  I'm sorry.  Chief of

17   operations.

18   Q.  And then from there to the director?

19   A.  Well, the director has an opportunity to review it.  The

20   official approval is the chief of operations.

21   Q.  And could the director change any part of SOP 135?

22   A.  Yes.

23   Q.  And when you presented the information to the chief of

24   operations --

25   A.  Yes.

1   Q.  -- did you include information on the one-drug protocol in

2   your information?

3   A.  I did not but I believe -- I believe he's aware of one-drug

4   protocols.

5          MS. HAMPTON:  Your Honor, if we could just give me a

6   moment to consult with co-counsel.

7          COURT:  That would be just fine, Ms. Hampton.

8          MS. HAMPTON:  Your Honor, they want to make me earn my

9   keep here.  Your Honor, those are all my questions.  Thank you

10  very much.

11         COURT:  Thank you, Ms. Hampton.  Will there be any

12  examination from the State or from the defendants I should say?

13         MS. HOWARD:  Yes, Your Honor.

14         COURT:  Go ahead.  Sir, do you have some water up

15  there?

16         WITNESS:  I'm in good shape.  Thank you, Your Honor.

17         COURT:  Very good.  You may inquire.

18         MS. HOWARD:  Thank you, Your Honor.

19                         CROSS-EXAMINATION

20  QUESTIONS BY MS. HOWARD:

21  Q.  Deputy Chief, I want to talk briefly about when the medical

22  team leader does his consciousness check.  Have you actually

23  timed how long it takes for him to walk from the execution

24  chamber back to the staging area of the injection room?

25  A.  I've not timed that but it takes him less than a minute.

1   Less than a minute.

2   Q.  Okay.  So I believe you testified it was maybe two minutes

3   that it takes him to go from --

4   A.  I said before -- I think the question was -- was when would

5   we start administering the next chemical.  Wasn't that the

6   question?  I'm not sure.

7   Q.  You do the three-minute -- the three-minute consciousness

8   check or you have a three-minute window there and then he -- is

9   that from the beginning or -- from the beginning of the

10  injection or after the injection?

11  A.  No.  At the end of the -- at the end of the injection of the

12  sedative, there's a three-minute wait and then the team leader

13  comes from the chemical room around to the execution chamber and

14  performs the consciousness check.

15          COURT:  Ms. Howard, let me see you and Ms. Hampton up

16  here just one second.

17                  (Side bar discussion had.)

18  BY MS. HOWARD:

19  Q.  Deputy Chief, I just want to clarify that I used the gender

20  him when asking about the medical team leader and I am using

21  that generically.  It could be a he or a she as is -- I

22  understand the SOP is the same way.

23  A.  That's correct.

24  Q.  Okay.  So you're talking about the two minutes that you said

25  occurred would be from the two minute -- two minutes would be

1   when he went in to do -- when the medical team leader went in to

2   do the consciousness check and then returned back to the

3   injection room.

4   A.   From the time the consciousness check was completed till the

5   time the medical team leader is back in the chemical room and

6   ready to proceed with the next chemical -- injecting the next

7   chemical is probably two minutes.

8   Q.   But you have not actually timed that?

9   A.   I have not timed that.

10  Q.   And the distance from the execution chamber to the injection

11  room, approximately how many feet is that?

12  A.   Yeah.   Probably 60 to 70 feet.   I'm guessing.   My best guess

13  from the execution chamber to the chemical room.

14  Q.   And do those rooms connect --

15  A.   They are not connected.   There's -- there's two other rooms

16  that you must pass through between the two.

17  Q.   When did you visit Arizona?

18  A.   October 2010.

19  Q.   Were you the only one who went to Arizona?

20  A.   I was not.

21  Q.   Who went to Arizona?

22  A.   My boss at the time, the chief of prisons, Pam Sonnen;

23  Warden Randy Blades.   Then deputy warden over virtual prisons

24  Shannon Cluney who's now a warden in our facilities and myself.

25  Q.   What did that visit entail?

1  A.  We visited the site, met with the warden and some of his

2  staff that play a role in the execution process, discussed

3  issues related to processes, practices, procedures, how they do

4  things.  We went down and visited their execution chamber and

5  looked at it to see how it was set up, talked about, you know,

6  how that worked for them and what issues they might have and got

7  a good sense of how they do business.

8           MS. HOWARD:  Something's beeping over here.

9           CLERK:  Yes, it is.  Just a second, please.

10          MS. HOWARD:  Okay.

11          CLERK:  It will take just a moment.  Sorry about that.

12          COURT:  There we go.  Go ahead.  Nope, I lied.

13          CLERK:  Okay.  You're on.

14          COURT:  Go ahead.

15          MS. HOWARD:  Thank you, Your Honor.

16  BY MS. HOWARD:

17  Q.  I want to briefly talk about the training sessions.  You

18  indicated that there are two rehearsals which would be more of a

19  dress rehearsal and you talked about training 1 wasn't an actual

20  training in the execution unit?

21  A.  It was not.

22  Q.  And then training 2, you began -- was training 2 in the

23  execution unit?

24  A.  It was.

25  Q.  Okay.  So since you've been training in the execution unit,

1  are you doing walk-throughs of the execution protocol?

2  A.  Yes.  If -- yes.  Doing functional duties and/or

3  walk-throughs is part of it.

4  Q.  Okay.  So you're taking Appendix A and the SOP and going

5  through that in your rehearsal -- or your training sessions what

6  each person's role is and actually --

7  A.  Each person has a role and each person is performing that

8  role in the trainings.

9  Q.  And you did testify that you've completed five trainings,

10  correct?

11  A.  Yes.  We've completed five trainings.

12  Q.  And you represented in your affidavit that there would be

13  ten training sessions.

14  A.  Ten to include at least two rehearsals, yes.

15  Q.  When you interviewed your candidates for the specialty

16  teams, was there a specific discussion about their experience

17  related to what was needed -- what was needed to be performed in

18  regards to the execution protocol?  Specifically did you ask

19  them how to do an IV or how to inject drugs or push drugs?  Were

20  those kind of questions asked when you interviewed the

21  candidates?

22  A.  Yes.  The medical team leader led asking those questions and

23  presented circumstances to them.  What if you encountered this,

24  what would you do?  That was part of the interview.

25  Q.  And all of the candidates that were interviewed had at least

1  one year of experience in their relevant professional field?

2  A.  Much more than one, yes.

3  Q.  I know that you were asked you don't have any written

4  documents regarding your candidates -- any information related

5  to the candidates when you interviewed them or their credentials

6  or anything like that?

7  A.  No.  They were reviewed and they were disposed of.

8  Q.  And you destroyed those, disposed of them?

9  A.  I did.  I did.

10 Q.  And I'm assuming that you destroyed those to maintain

11 confidentiality?

12 A.  I did.

13 Q.  And you didn't write a report to maintain confidentiality as

14 well?

15 A.  I did.  I reported verbally to my superiors.

16 Q.  Through this whole process of developing the SOP, have you

17 reported to your superiors?

18 A.  Yes.

19 Q.  And who would that be?

20 A.  The chief of operations, Kevin Kempf, and the director of

21 the department Brent Reinke.

22 Q.  And regarding your training sessions, have you reported to

23 your superiors how those training sessions are going?

24 A.  Yes.

25 Q.  Is it fair to say that the director has been apprised of

1   this whole process since you've started the training?

2   A.  Yes.

3   Q.  Have you had direct communication with the director?

4   A.  I've talked to the director about the trainings.

5   Q.  Have you talked to the director about the candidates?

6   A.  In very general and broad terms.

7   Q.  Is it safe to assume that you didn't contact candidates'

8   employers to maintain confidentiality?

9   A.  That's correct.

10          MS. HOWARD:  If I could just have a minute, Your Honor.

11  I have no further questions, Your Honor.

12          COURT:  All right.  Ms. Hampton.

13          MS. HAMPTON:  Thank you, Your Honor.

14                      REDIRECT EXAMINATION

15  QUESTIONS BY MS. HAMPTON:

16  Q.  Deputy Chief, when you talked about the -- when you talk

17  about the walk-through sessions, is that the tasks that are

18  assigned under Appendix A alone?

19  A.  No, not alone.  Are you talking about the rehearsals or

20  trainings?  The trainings?

21  Q.  No, sir.  You were asked about walk-through sessions and you

22  indicated those were functional duties.

23  A.  Yes, yes, functional duties for the team and the warden, his

24  role which I don't -- some of that's outlined in Appendix A,

25  yes.

1   Q.  And the other duties are described in the post orders or in

2   some other document?

3   A.  Any other duties that the warden might have would be in the

4   SOP.

5   Q.  All right.  And any other duties that the specialty team

6   members would have, are those in addition to the duties we've

7   already previously discussed?

8   A.  I don't believe so, no.

9   Q.  All right.  Now, when asked questions about the interviews

10   that you conducted for the candidates, you were discussing

11   specifically the types of questions that you asked and you

12   indicated that the medical team leader would pose hypotheticals,

13   if I could use that word, to the candidates.  Is that correct?

14   A.  Yes.

15   Q.  And sometimes they would say if you encountered X event,

16   what would you do?

17   A.  Yes.

18   Q.  And so did they discuss particularly any -- if they

19   encountered a problem with setting the IV, what would you do?

20   A.  Yes.

21   Q.  And if you encountered that the offender was conscious, what

22   would you do?

23   A.  I don't believe we discussed that.

24   Q.  And what would you do to determine -- did you discuss or

25   pose a hypothetical about how the team member would determine if

1   the offender was unconscious?

2   A.   We didn't ask those team members that.

3   Q.   You talked about the experience of the team members and

4   indicated that they had much more experience than one year

5   experience.  Did they have -- did they have the experience

6   between October of 2010 and October 2011?

7   A.   October 2010 --

8   Q.   2010 and October 2011.

9   A.   Yes.  In their field, yes.

10  Q.   All right.  So in their field, their daily -- their

11  qualifications -- excuse me.  The experience that led them to be

12  qualified for the position occurred between October '10 and

13  October '11?

14  A.   They had experience beyond that but they all have one year

15  or more of that experience.

16  Q.   And that one year or more of experience that they have, did

17  that include daily experience in their professions?

18  A.   Yes.

19  Q.   So for each of the team members, they had daily experience

20  in their profession from October 10 to October 11?

21  A.   Their work history has them in the medical field performing

22  duties similar to what they're performing today through that

23  period they've been in the medical field for that and previous

24  to that.

25  Q.   So for just that one year time period, they have -- for

1   example, the individual who is charged with consciousness

2   checking has daily experience in determining whether an

3   individual is sufficiently unconscious?

4   A.  In that time period?

5   Q.  Yes.

6   A.  No, no.

7   Q.  And for the individuals who are setting the IV's, they have

8   daily experience during the time period of October '10 to

9   October '11 of setting IV's?

10  A.  Yes.

11  Q.  Each of them?

12  A.  There's two of them, yes.

13  Q.  And the same for the injector teams.  Their medical

14  experience is daily and it's between this time period?

15  A.  They are in the medical field for that time frame.

16  Q.  I appreciate that they're in the medical field but are they

17  doing the assigned duties under the protocol daily?

18  A.  For the injectors?

19  Q.  Yes.

20  A.  They -- not necessarily daily.

21  Q.  All right.  Thank you.  Those are all my questions.

22          COURT:  Okay.  Ms. Howard, anything further?

23          MS. HOWARD:  No, Your Honor.

24          COURT:  Mr. Zmuda, you may step down.  Thank you, sir.

25          WITNESS:  Thank you.

1          COURT:  Any further evidence from plaintiff?

2          MR. LOEWY:  Judge, we'd like to move for the admission

3    of Dr. Heath's affidavits.  They have both been attached to

4    pleadings.  Docket 18-4 in Exhibit 5 to (inaudible) stay which I

5    believe was sealed.

6          COURT:  Which exhibit is the -- oh, I'm -- you're

7    asking to move for purposes of this hearing --

8          MR. LOEWY:  Right.

9          COURT:  -- the affidavit of Dr. Heath or the --

10         MR. LOEWY:  That's correct.

11         COURT:  Any objection?

12         MR. ANDERSON:  Your Honor, could I inquire as to

13    whether it's Exhibit 4 or 5 or both?

14         MR. LOEWY:  Well, let me look.  Very good question.  It

15    is -- we have on the list that we presented today 4 and 5.  It

16    is -- does that answer your question?

17         COURT:  Well, I guess I'm understanding these are

18    already part of my record for purposes of the motion to stay.

19         MR. LOEWY:  Okay.  Then we're fine.

20         COURT:  Yeah.

21         MR. LOEWY:  Thank you.

22         COURT:  Am I missing something?

23         MR. LOEWY:  No.

24         COURT:  Okay.  All right.  So they're there.  Anything

25    else from plaintiff?

1          MR. LOEWY:  No, Your Honor.

2          COURT:  Okay.  All right.  Anything from the defendants

3    by way of evidence?

4          MS. HOWARD:  No, Your Honor.

5          COURT:  All right.  Counsel, I'd like to hear argument

6    from you.  I don't know if you understood that that would be

7    part of what we'd be doing here and I understand that we're late

8    but we may be late today but we're short on time in the context

9    of the case.  So I'd propose that we take another ten minutes so

10   everybody can relax and catch their breath again and then I'll

11   hear argument.  All right?

12         CLERK:  All rise.

13              (Recess taken.)

14         CLERK:  All rise.  The Court is again in session.

15         COURT:  Thank you.  Please be seated.  Counsel, so my

16   record's clear, it appears that for purposes of this hearing and

17   this motion, Exhibits 1, 3 and 9 have been admitted.  Is that

18   what you have?

19         MS. HAMPTON:  That's correct, Your Honor.

20         COURT:  Okay.

21         MS. HOWARD:  That's the State's understanding, Your

22   Honor.

23         COURT:  All right.  Very well.  Okay.  Ms. Hampton,

24   will you be arguing?

25         MS. HAMPTON:  No, Your Honor.  Mr. Loewy will take over

1    now.

2              COURT:  All right.  Mr. Loewy, then I'll hear from you.

3              MR. LOEWY:  Thank you.

4              COURT:  It would assist me as well as whoever argues on

5    behalf of the defendants if you will focus very closely to the

6    standards that I have to consider in a preliminary injunction

7    context and -- because this case is -- it's a little different

8    than some of the cases that have raised similar sorts of

9    challenges because of the timing and a variety of issues and

10   obviously I'm focused on all of that.  So go ahead, Mr. Loewy.

11             MR. LOEWY:  Thank you, Your Honor.  Of course to start,

12   we rely on all the legal and factual arguments we've made in our

13   pleadings thus far as well as the argument I'm about to make

14   now.  It's late in the day and of course I fear missing

15   something.

16             COURT:  I understand that.

17             MR. LOEWY:  To go to the standard, I don't think that

18   there's any disagreement that the burden is on the plaintiff

19   seeking a stay or preliminary injunction to establish that he's

20   likely to succeed on the merits, that he's likely to suffer

21   irreparable harm absent the preliminary relief sought, that the

22   balance of equities tips in his favor and that preliminary

23   relief is in the public interest.  And we've cited in our papers

24   and I'll just for convenience cite here to <u>Winter v. Natural</u>

25   <u>Resources Defense Council, Inc.</u>, a '08 Supreme Court decision.

1          Baze v. Rees articulates a standard more specific to

2     the lethal injection context and what Baze tells us is that a

3     stay may be granted only where the applicant shows that the

4     challenged lethal injection protocol, one, creates a

5     demonstrated risk of severe pain and, two, that the risk is

6     substantial when compared to the known and available

7     alternatives.

8          Baze of course also held that a state with a lethal

9     injection protocol substantially similar to the protocol we

10    uphold today -- and now I'm quoting from Baze and that protocol

11    of course was the Kentucky protocol would not create a risk that

12    meets the standard.  That is the stay standard.

13         Your Honor, I think it is clear especially after

14    today's hearing that a stay is in order.  Rhoades is likely to

15    succeed on the merits.  It's settled.  There's no dispute that

16    the anesthetic injected first, if administered improperly, will

17    create a substantial constitutionally unacceptable risk of

18    suffocation from the administration of pancuronium and pain --

19    severe pain from the injection of the potassium.

20         Baze so held in '08.  The Ninth Circuit recently

21    reaffirmed in Dickens.  You heard testimony from -- I'm pointing

22    toward really the ethers because it was Dr. Heath but I believe

23    that Mr. Zmuda agreed and the fact is that no court has

24    disagreed and no expert has disagreed.  That's just accepted

25    fact.  I assume that opposing counsel will agree with that as

1   well.

2          The facts before and after Baze bear this proposition

3   out.  Before Baze, there were multiple three-drug protocol

4   executions in which the offender suffered severe pain.  In 2 of

5   the 16 three-drug protocol executions using pentobarbital after

6   Baze, the offender suffered severe pain.  On the other hand, as

7   we have heard today, there have been 14 single protocol --

8   excuse me, single drug -- I'm talking of course about the

9   barbiturate protocol executions and in none of those is there

10  any evidence that the offender suffered any pain and you've

11  heard expert testimony today that it is his expert opinion, that

12  is Dr. Heath's, that indeed the offender did not suffer any pain

13  in any of those 14 cases.

14         In other words, comparing the defendants' SOP 135 to

15  the alternative that Mr. Rhoades proposes, one-drug protocol,

16  shows the risk of severe pain going from a 12.5 percent chance

17  to a 0 percent chance.  The 12.5 percent chance is based on

18  three-drug pentobarbital protocol executions.

19         COURT:  So you just want me to derive a mathematical

20  equation from the executions that have occurred since Baze?

21         MR. LOEWY:  The what?  I'm sorry.

22         COURT:  The executions that have occurred since Baze

23  and make that my litmus test?

24         MR. LOEWY:  I think that it -- I don't ask you to

25  consider those exclusively but I do think that those are very

1    important.  I don't know that --

2              COURT:  But all of that was before the court at the

3    time of Baze, the evidence of allegedly botched executions and

4    the court in Baze didn't conclude from that that that meant that

5    there should never be a three-drug protocol again.

6              MR. LOEWY:  That's absolutely correct and the reason

7    the Court drew that conclusion is because the Court also noted

8    and it based its conclusion on this that one-drug protocol that

9    was being proposed by Mr. Baze was undeveloped, untested and

10   never been tried and there was no evidence to support its

11   efficacy.  We now have 14 cases which have not had any problem

12   whatsoever.  We are not any longer --

13             COURT:  Was this issue before the circuit in the

14   Dickens case?

15             MR. LOEWY:  No.  This particular issue was not before

16   the circuit in the Dickens case.  This question -- rather this

17   evidence is new evidence.  It takes us out of the holding of

18   Baze.  Baze is based on the evidence which Your Honor just

19   articulated.  It could not have considered the 14 executions

20   using a one-drug pentobarbital execution because in fact those

21   had not yet occurred.

22             COURT:  Go ahead.

23             MR. LOEWY:  But I said a moment ago that I was asking

24   Your Honor to consider not only the numeral that I did derive

25   obviously, 12.5 percent, not only those executions but also the

1    fact that in executions using the three-drug protocol, the

2    paralytic of course will prevent the only evidence or primary

3    evidence of a botched execution.  That is consciousness.  There

4    is no signal possible that one can give of consciousness after

5    the paralytic is given.

6         So if the consciousness check is inadequate, if for

7    example the person appears conscious to a lighter stimulus than

8    needed, is then given the paralytic and is then given the

9    potassium chloride, they are going to feel the potassium

10   chloride pain and that is what Dr. Heath testified to today.

11        And thus, with the thiopental executions since Baze, we

12   cannot know -- we can't know, it's not possible to know how many

13   of those were botched and if we are meant to meet a standard of

14   proving that some certain number of them were botched when that

15   standard is literally impossible to meet because of the

16   pancuronium, I would suggest that standard is in violation of

17   due process.

18        COURT:  Well, are you asking me to make new law when

19   you're saying that?  How do you square that with the ruling in

20   Baze, the plurality decision that talks about that it's not a

21   guarantee that nothing will ever go wrong?  It's that there are

22   standards that are put in place intended to protect against

23   those possibilities and that those standards become the

24   protection that the Eighth Amendment would require and you're

25   suggesting to me that the Court should assume that there -- that

1    there's always the possibility of a botched execution even if

2    appropriate standards may be in place.  Is that your argument?

3            MR. LOEWY:  My argument, Your Honor, is that when you

4    can go from a percentage of risk to zero which is what we have

5    shown today, that the percentage of risk is a substantial risk.

6    But I have a further argument as well of course which is that

7    the testimony today clearly shows that the Baze requirements

8    have not been complied with.

9            Let me, however, correct a misstatement I made or it

10   will be perceived as a misstatement I'm afraid.  In fact,

11   Dickens addressed the question of pentobarbital one-drug

12   protocol executions but the evidence wasn't quite there.  There

13   had been only at that point five cases.  There are now 14 cases.

14           COURT:  So did it change at 6 or at 14?

15           MR. LOEWY:  Judge, of course I don't know where it

16   changed.  What I do know is that when you get sufficient

17   evidence and I would suggest that 14 cases with a rate of zero

18   problems and an expert in anesthesiology who testifies that

19   there can be no pain with one-drug protocol --

20           COURT:  Dr. Heath was also the expert in the Baze case.

21           MR. LOEWY:  That's correct.

22           COURT:  Okay.  And the Baze court could have picked up

23   on his argument in that regard and ruled differently but chose

24   not to.

25           MR. LOEWY:  But they chose not to in a context where

1   there had never been any evidence that the protocol -- that

2   there had never been an execution pursuant to that protocol and

3   in a -- I believe that Baze was also concerned with

4   pentobarbital which has not been subjected to the same level of

5   peer-reviewed scrutiny that thiopental has been subjected to but

6   now with, again, the number of cases we've seen, I would suggest

7   that the context has changed substantially.

8          COURT:  All right.  As you might imagine, my questions

9   would suggest that I'm focused on this significant risk of

10  serious harm that Chief Justice Roberts talked about and it

11  seems to me that I have to get to that point before I can even

12  start to consider whether or not one-drug protocol is an

13  alternative that is viable that significantly reduces the risk

14  of severe pain and so obviously what I'm looking at here very

15  closely are these procedures.  So you're probably about to get

16  to that and I don't want to take anymore of your time.  Go

17  ahead, please.

18         MR. LOEWY:  I am.  Let me just end with this comment:

19  A 12.5 percent risk -- and goodness knows how high the risk

20  actually is because of the paralytic is not a risk that I

21  imagine you and I know certainly I would not be willing to take

22  if I were on, for example, some sort of heart medicine which

23  were necessary to actually sustain me.  It seems to me a heck of

24  a risk but do let me move on, please, to the Baze safeguards.

25         It's our position that even before we reach the

1    testimony that we heard today that there are two provisions in

2    the SOP which are troubling.  The first is that any IDOC staff

3    member or contractor can withdraw at any time -- any time

4    without prejudice and that's at SOP 135 at page 6.

5          So even if the individuals who are currently in place

6    had been properly vetted and were entirely competent to do the

7    tasks which they are assigned by SOP 135, there is no assurance

8    that if one of them pulls out that someone else isn't going to

9    be substituted in who doesn't have the requisite competency.

10         But let's go to the particular Baze safeguards.

11         COURT:  How does that ever change?

12         MR. LOEWY:  I'm sorry?

13         COURT:  How does that ever change?  I mean if I follow

14   that argument and adopt that argument, then aren't I in essence

15   entering an order that creates a de facto ban on executions?

16         MR. LOEWY:  No.  No, no.  I disagree --

17         COURT:  How does it ever change?

18         MR. LOEWY:  Well, I think there is an answer and I was

19   surprised that the answer wasn't implemented frankly.  It

20   changes when you have adequate backup.  You have at least one

21   person who can go into the place if someone else pulls out.  I

22   understand.  I'm not making some ad infinitum argument.  I'm

23   simply arguing that there should be someone, some one person at

24   least as backup and we don't got that here.

25         But with regard to the medical credentials plus one

1  professional year --

2      COURT:  Now, are you speaking there of the particular

3  role assessing consciousness or any role?

4      MR. LOEWY:  I think any of the roles because each of

5  the roles are critical to the execution but I think especially

6  of course the consciousness role.

7      COURT:  Go ahead.

8      MR. LOEWY:  The requirement that there be an

9  appropriate medical credentials plus one year professional

10  experience, we did hear testimony from Mr. Zmuda today regarding

11  daily experience which is different from the one year but also

12  one year experience.  He testified I believe that each team

13  member, except for the ones I'm about to say, had daily

14  experience in their profession from 10/10 -- from October of

15  2010 to October of 2011.  That clearly is one year of

16  professional experience and one year of daily experience.

17      And he testified I believe that the individuals who

18  were responsible or will be responsible for establishing IV's

19  and for injecting have that.  He also, however, testified that

20  the individual responsible for consciousness checking does not.

21  He also testified that consciousness checking is the key to an

22  SOP 135 execution without severe pain.  Clearly, the first Baze

23  requirement is not met.

24      COURT:  Is that a situation, Mr. Loewy, that the

25  Supreme Court, at least certainly a number of them in the Baze

1    decision, were concerned about if -- and seems to have caused

2    the current standstill in California that if the protocol is one

3    that inherently depends upon members of the medical profession

4    whose code of ethics precludes them from participating in the

5    execution process, then there's no place to go and so when you

6    say that you think that the law requires that there be someone

7    who has daily experience assessing consciousness, what -- other

8    than someone who's engaged in the medical practice in

9    anesthesiology or a nurse practitioner in anesthesiology, what

10   type of medical provider do you think has such daily experience?

11            MR. LOEWY:  Judge, it is apparent that RN's might have

12   that experience if they have the year's experience in the

13   appropriate setting.  It appears perhaps that physician

14   assistants have that experience if they are so experienced with

15   the year's experience in the appropriate setting.

16            COURT:  And where do you -- and on this particular

17   finite point --

18            MR. LOEWY:  Yes.

19            COURT:  -- where do you draw that from in the cases?

20   Is that -- is that coming from Baze?

21            MR. LOEWY:  The point that a person who is --

22            COURT:  The person who assesses consciousness needs to

23   be daily experience doing so for a year prior to the execution

24   date.

25            MR. LOEWY:  I am making two points.  One is I believe

1   daily experience is needed and the second I think is a year's of

2   professional experience is needed.

3          COURT:  But can you point me to where that -- where you

4   pull that from the authority?

5          MR. LOEWY:  In one moment, I will with some help.  On

6   page 55, Your Honor, is where the court in Baze discusses daily

7   experience that's needed.  My reading of Baze is that a

8   consciousness check is also required.

9          COURT:  Are you talking about the language that says

10   the most significant of these and we're talking about safeguards

11   is the written protocol's requirement that members of the IV

12   team have at least one year professional experience?

13          MR. LOEWY:  I am speaking about that.  I am speaking

14   about daily experience establishing IV catheters.  I am talking

15   about redundant measures being required.

16          COURT:  But I'm talking about the specific point that

17   you're arguing to me.  I appreciate that you want -- that you

18   would like me to conclude that that ought to be required here.

19   I just want to know whether there's a case that says that

20   absolutely is required because I don't remember that there is.

21          MR. LOEWY:  Judge, if you give me just one moment,

22   please.  Judge, I would refer the Court to page 59 of Baze where

23   the Court notes that at the outset, it is important to

24   re-emphasize that a proper dose of thiopental obviates the

25   concern that a prisoner will not be sufficiently sedated.  All

1    the experts who testified at trial agreed on this point.

2    Elsewhere -- and I'm afraid, Your Honor, that I cannot find it

3    right now, the Court does speak about the warden's presence in

4    the -- in the chamber as a -- as an additional -- so a redundant

5    measure regarding the consciousness check.

6            I understand the Court's point to be why do you need a

7    consciousness check if you've got the other safeguards in place.

8    Aren't the other safeguards sufficient?

9            COURT:  No, no, that's not -- that's not what I was

10   asking.  I was asking the specific point that you were arguing.

11   I'll look at the case again and make sure that I'm not missing

12   something but what you're talking about is part of the Idaho

13   protocol as well.  The warden's going to be in the execution

14   chamber.  Move to your next point because I want to make sure --

15   I'm -- I hope you all can tell I'm focused very clearly on this

16   case.  I want to make a decision that's appropriate under

17   applicable law and the facts of this case and I want to have the

18   best benefit of your best arguments.  So go on, please.

19           MR. LOEWY:  Judge, in the examination of Mr. Zmuda, he

20   indicated that he had done no verification beyond simply looking

21   at documents provided him by the candidates with regard to

22   education, training, certifications, the qualifying knowledge.

23   He did no verification of that before selecting the particular

24   individuals for the teams.

25           There was -- he contacted no educational institution.

1    He contacted no former employers.  He contacted no institution

2    to verify any training whatsoever.  So in addition to

3    education --

4           COURT:  That presumes they're former employers,

5    correct?  I mean that has my attention but you're arguing it in

6    the context of as if they're being hired for some full-time job

7    here and that's not what my understanding is happening.

8           MR. LOEWY:  Well, I think that's correct but the --

9           COURT:  In other words, they could be employed

10   somewhere else and being brought in to be part of this

11   particular team and so you're really not talking about

12   contacting former employers like you would if you were hiring a

13   new employee for some particular task.

14          MR. LOEWY:  But I'm not -- and certainly I don't

15   believe Mr. Zmuda limited his testimony and the questions were

16   not limited to former employers.  It was employment.

17          COURT:  Yeah, yeah.  Yeah.

18          MR. LOEWY:  And so that -- that is very troubling

19   indeed.  The training that was conducted was conducted -- as to

20   date there have been no IV's, as I understand it, established on

21   a live human being and yet Mr. Zmuda testified that he was able

22   to verify the relevant knowledge, the relevant training,

23   education and know-how in setting IV's at these trainings.

24          It seems to me hard to believe that one can verify that

25   someone knows how to set an IV and monitor the IV for failure

1   absent seeing them actually do it.  I'm not disputing that you

2   could verify someone's ability by just watching them.  What I'm

3   disputing is whether Mr. Zmuda had an opportunity to do that or

4   rather perhaps what I'm disputing is whether Mr. Zmuda took an

5   opportunity to do that.

6        What Mr. Zmuda considered relevant in the background

7   check as an excluding factor in his criminal history checks was

8   entirely undefined.  He defined it as what he considered

9   inappropriate.  That's it.  That is troubling as well.

10        COURT:  For what reason?  Are you suggesting that there

11   needs to be a laundry list of disqualifying things in the

12   background and that the -- that the deputy warden who's in

13   charge of the process can't be allowed to use his or her

14   judgment as to whether there's something in someone's background

15   that would make that person a bad candidate, a poor candidate

16   for this team or one of these teams?

17        MR. LOEWY:  I'm suggesting in light of the fact that

18   we -- I am suggesting, Your Honor, that I think the judgment in

19   this particular instance is somewhat questionable.  We have done

20   absolutely no verification for a critical procedure of whether

21   the people in place to do that procedure have the appropriate

22   qualifications.  That I think spills over --

23        COURT:  For the reason that you say that they haven't

24   been verified.  Do you contest what was described as the

25   evidence of their qualifications or training as Mr. Zmuda

1    testified to that he received from these individuals about their

2    particular backgrounds?

3         MR. LOEWY:  I contest that that information -- was that

4    the question, Your Honor?

5         COURT:  You contest the adequacy of that as distinct

6    from whether or not the defendants then did anything to verify

7    in the form of calling educational institutions or calling

8    employers and the like.

9         MR. LOEWY:  I'm not sure I understand the distinction,

10   Your Honor, and maybe it just is late in the day.

11        COURT:  Well, my question was do you contest -- let's

12   assume for the moment that the qualifications are as Mr. Zmuda

13   described them.  Do you contest whether they're qualified if all

14   of those things are true?

15        MR. LOEWY:  If in fact the certificate -- if in fact

16   what the candidates told Mr. Zmuda was accurate, something which

17   as I understand Mr. Zmuda's testimony was never verified and as

18   I understand Mr. Zmuda's testimony, they indicated that he

19   was -- that they had this experience, yes, I would agree with

20   that with regard to the medical team leader, certainly.  But

21   there wasn't the verification.  There wasn't independent

22   verification -- you know, we've had status conference calls with

23   Your Honor over discovery where we wanted to do background

24   checks.

25        COURT:  Okay.

1          MR. LOEWY:  To check that their background check was

2     adequate and it seems that the verification did not take place

3     by anyone.

4          COURT:  Okay.  All right.

5          MR. LOEWY:  With regard to the particular consciousness

6     check itself as noted in SOP -- that is particular methods, the

7     modes I guess of doing the consciousness check by the medical

8     team leader, we know from Dr. Heath's testimony that the first

9     several are entirely inadequate to the task.  That really, only

10    the sternal rub is adequate and then of course only when done

11    correctly.  What we don't know of course is any detail about how

12    that sternal rub would be done.

13         What we also know is that Mr. Zmuda from his testimony

14    drafted that section of SOP 135, the section which deals with

15    the particular methods of consciousness checking, excuse me, in

16    consultation with the medical team leader.  It would suggest

17    that the medical team leader, having suggested apparently to Mr.

18    Zmuda several consciousness check methods which are inadequate

19    to the task, it does call into question it seems to me the

20    medical team leader's competence at consciousness checking.

21         It also calls into question it seems to me the fact

22    that there's no detail whatsoever, just a sternal rub, the

23    medical team leader's competence in consciousness checking.  But

24    clearly the most -- the strongest argument I think we have is

25    there's been no verification.  There's been no background check.

1    There's been -- they've brought candidates in.  They've asked

2    the candidates, excuse me, to say what their qualifications are

3    and they say, okay.  They bring in some certificates or what

4    purport to be certificates or diplomas and no one picks up the

5    phone and does the most basic of checks.

6        COURT:  We have a record that indicates there were

7    criminal background checks done.

8        MR. LOEWY:  Well, but I'm speaking about -- I agree

9    with that but I'm speaking about -- well, to go directly to the

10   point, the lack of course of the criminal background doesn't

11   mean that you have the competence.

12       COURT:  I understand that.  I'm going to have some

13   pointed questions for the defendants with this issue but Mr.

14   Zmuda says, all right.  I didn't call the employer.  I didn't

15   call the college to make sure that in fact they had a record of

16   so and so obtaining such and such a degree but we have the

17   training system in place and we're going through these steps and

18   they're demonstrating to the satisfaction of me and the medical

19   team leader as I understood what he was saying that in fact

20   these folks have the clinical skill to do what their paperwork

21   would say that they have the education and experience to do.

22       So I assume the defendants' argument is that that

23   constitutes the safeguards and that the need to contact an

24   employer or an institution is unnecessary.

25       MR. LOEWY:  That I'm sure is the defense position, Your

1    Honor.

2           COURT:  So what's your response to that?

3           MR. LOEWY:  My response is that Mr. Zmuda, the person

4    who's making that assessment, has absolutely no medical

5    credentials whatsoever beyond an expired CPR certificate from

6    years ago according to his testimony.

7           COURT:  Well, who would you have do it?

8           MR. LOEWY:  Someone who has been adequately vetted to

9    perform the task competently.

10          COURT:  All right.  Move on.

11          MR. LOEWY:  I would also note, Your Honor, that, again,

12   there has not been a single IV set in a live person to date.

13   The training which Your Honor referred to --

14          COURT:  How should I deal with that in the context of

15   the equities that are at play in a preliminary injunction

16   setting?  You -- and I'm concerned I'm going to have to -- I

17   want to hear from the defendants about this too.  I have two

18   things going on here.  I have a lawsuit that you filed on behalf

19   of your client a month and a half ago and I have an execution

20   that was scheduled consistent with Idaho state law about 20 days

21   ago that the warrant calls for execution on November 18 and I

22   have a state correction system that to some degree looks like

23   it's playing catch-up.

24          But I got you filing a lawsuit shortly before any of

25   this came to play and the cases talk about -- when you're

1    talking about injunctive relief, I got to consider the State's

2    interest in seeing that their judgments are enforced and there's

3    some pretty strong language in some of these cases about the

4    fact that if it's injunctive relief, that's pretty strong

5    interest.  How would you have me balance those equities?

6         MR. LOEWY:  Well, I think you know how I'd have you

7    balance them, Your Honor.

8         COURT:  Well, but make your argument about why it is

9    that way.

10        MR. LOEWY:  Precisely.  First, the State can as they

11   did on October 19, five days I believe after they adopted their

12   protocol -- their completely revised protocol in the space of a

13   morning obtained an execution warrant -- a death warrant under

14   Idaho state law which you referenced earlier.  There's

15   absolutely nothing which would prevent the State from obtaining

16   an execution warrant again in the space of a morning.  It's a

17   very simple thing to do.  There's a statute which is on point

18   and they've proved that it's quite simple.

19        The rush here really has been created not by the

20   plaintiff but by the defense.  There wasn't a protocol until

21   October 14.

22        COURT:  There was a protocol.  It just wasn't the one

23   that's in place now.

24        MR. LOEWY:  Well, correct.

25        COURT:  You could have brought an action earlier on

1    seeking -- maybe that's too broad of statement and you can

2    correct me if I'm wrong -- seeking some ruling from the Court in

3    a 1983 Eighth Amendment context as to the protocol that then

4    existed.

5            MR. LOEWY:  Judge, we attempted, through a variety of

6    means, to obtain the protocol from the State over a space of

7    years.  Our first public record --

8            COURT:  What my record reflects is that you made a

9    request that was turned down and I can't recall when that was.

10           MR. LOEWY:  That was in March of 2011.

11           COURT:  Okay.  But does my record have anything else in

12   it about any of this?

13           MR. LOEWY:  Your record presently does not but I would

14   proffer into your record additional evidence based on this line

15   of questioning which had not come to fore earlier.

16           There was a public records request made in 2005 to the

17   Idaho Department of Corrections for protocol.  Since that time,

18   the federal defenders have made further requests, each time

19   being told that it was being revised, each time being told hold

20   the phone, we're getting it revised.  We'll get it to you.

21           Mr. Rhoades himself filed grievances seeking a lethal

22   injection protocol which was in compliance with Baze.  He did

23   that I believe in 2009 and then most recently as Your Honor just

24   noted, we made a public records request again in March of 2011.

25   We've detrimentally relied in good faith on the IDOC's repeated

1    representations to us that it was revising its lethal injection

2    protocol and would provide it when completed.

3         COURT:  Okay.  I think that's a pretty strong argument.

4    I don't need to hear anymore on that.  I want to hear from the

5    defense about that.  Go ahead.

6         MR. LOEWY:  If I may note just that the -- actually the

7    grievances co-counsel just noted -- I erred -- are in the

8    record.  They're attached to the affidavit --

9         COURT:  Yeah, that's my recollection.

10        MR. LOEWY:  Yeah.  Thank you.

11        COURT:  Okay.  All right.  Who's going to argue for the

12   defendants?

13        MS. HOWARD:  I am, Your Honor.

14        COURT:  Ms. Howard, will you begin right with this

15   issue I just left off with Mr. Loewy?

16        MS. HOWARD:  Sure, Your Honor.

17        COURT:  Why should I give any benefit of the weighing

18   of the equities to the State's interest in enforcing its

19   judgment when the execution protocol that you want to implement

20   was enacted -- give me the date again.

21        MS. HOWARD:  October 14, Your Honor.

22        COURT:  October 14 and the first execution that's been

23   scheduled in Idaho in nearly 20 years is scheduled for November

24   18?

25        MS. HOWARD:  Right, Your Honor.  I believe that --

1    well, let me start with this:  The IDOC has had a three-drug

2    protocol in effect since 2006.  It's not a new concept.  That's

3    five years.  Mr. Rhoades has been incarcerated for well over

4    five years.  In fact, he grieved and exhausted his

5    administrative remedies I believe in 2008.

6              COURT:  Did your department anticipate it would need to

7    make revisions to its protocol after the U.S. Supreme Court

8    issued its decision in Baze?

9              MS. HOWARD:  Yes, Your Honor.

10             COURT:  Okay.  And that was issued in --

11             MS. HOWARD:  2008.

12             COURT:  -- January, 2008.

13             MS. HOWARD:  Correct, Your Honor.

14             COURT:  So what about the five years almost -- five

15   years plus since then?

16             MS. HOWARD:  Well, Your Honor, Mr. Zmuda testified that

17   he was down in Arizona a year ago -- I believe he said a year --

18   I believe he testified it's been in the last year down to

19   Arizona looking at their -- they actually went down there for a

20   site visit to see how they execute their lethal injection

21   protocol.  He did indicate in his testimony that he has been

22   working on this SOP for a couple of years.  Granted, it didn't

23   get finished until recently.  I would concede that but it's not

24   as if this protocol has not been -- there was a protocol.  It

25   may not have or it may have met the Baze standards but it hadn't

1    been challenged until suddenly the last month and a half.

2         COURT:  But when you produced it to -- my record

3    indicates to the University of California-Berkeley Law School

4    who apparently was doing some project about such things, you

5    produced it then with the caveat that, well, don't -- this is

6    being revised.  And then the plaintiff says that when they had

7    asked you for it in I don't -- I'd have to go ferreting through

8    the record to find that date, but most recently in a public

9    records request, that request was denied.  So what would you

10   have them filing a lawsuit about?

11        MS. HOWARD:  Well, Your Honor, when Berkeley Law made

12   that request, they were told that this is a draft.  It shows

13   that the department was working on an SOP.  They weren't just

14   sitting around idly --

15        COURT:  That's not my point.  The issue is what does

16   the condemned inmate review and consider and act upon if he or

17   she wants to challenge the method of execution as violative of

18   Eighth Amendment protections against cruel and unusual

19   punishment?  It sounds like it's a moving target.

20        MS. HOWARD:  The 2001 -- the 2006 which had been

21   approved.  I mean that was the SOP in effect.  It was still a

22   three-drug protocol.  It was in effect.  Since then, there has

23   been revisioned -- yes, I concede that they are revising it and

24   they did revise it but it was still a three-drug protocol in

25   2006.  Mr. Rhoades knew that.  He exhausted his administrative

1    remedies on that saying it was unconstitutional.

2          COURT:  I think he did that in 2009, wasn't it, but it

3    was on that protocol?

4          MS. HOWARD:  I'm not sure if it was 2009 or 2008 but

5    yes, he did exhaust his administrative remedies.

6          COURT:  Go ahead.

7          MS. HOWARD:  Are there other questions you want me to

8    address before I jump into my argument or --

9          COURT:  No.  Go ahead and start with your argument,

10   please.

11         MS. HOWARD:  Okay.  Your Honor, it appears that the

12   plaintiff is arguing that they either want the SOP to be exactly

13   the same as Baze with the exact same language or they want to

14   add additional safeguards.  What Baze says is it only has to be

15   substantially similar.  These additional safeguards that the

16   plaintiff is really focusing on are safeguards that Baze didn't

17   really -- not that they didn't address but those are safeguards

18   that weren't the ones that they found the Kentucky protocol

19   contained.

20         Specifically, there's this issue of the consciousness

21   check.  Well, Baze doesn't really address that in the plurality

22   opinion.  What Baze talks about is the warden and the deputy

23   warden in the execution chamber are qualified to determine

24   infiltration because three experts testified that the average

25   person would be able to see the signs.  That's what Baze talks

1   about.

2        Baze talks about qualifications.  They talk about

3   having at least one year of professional experience.  Mr. Zmuda

4   testified that his candidates that he selected have at least one

5   year of professional experience.  Now the plaintiffs want them

6   to have one year of professional experience in addition to daily

7   training or daily experience with these techniques.  That's not

8   what Baze says.  Baze said that the most significant requirement

9   was the one year professional experience.  It then goes on to

10  say Kentucky currently used a phlebotomist and an EMT personnel

11  who have daily experience establishing IV catheters for inmates

12  in Kentucky's prison population.  It doesn't say that that is

13  the requirement.  It says that their people do.

14        I don't believe that that is a true safeguard that in

15  order to be constitutional, you have to have daily training and

16  daily experience in order to reduce any substantial risk.

17        Baze also talks about the training sessions.  They say

18  that the Kentucky members, in their protocol, that they have to

19  participate in ten sessions per year.  Jeff's affidavit -- Mr.

20  Zmuda's affidavit sets forth that there will be ten sessions

21  from the time of October 20 until the execution.  Granted it's

22  not annually but they are working to meet this ten practice

23  sessions that's outlined in Baze.  There are two full rehearsals

24  scheduled 48 hours prior to the execution.  Those rehearsals

25  include actual -- actual inserting of the IV's.

1          Mr. Zmuda testified --

2          COURT:  Sometimes when a new show opens on Broadway,

3     the producers get started with it and they go, "This isn't as

4     good as it could be.  We're going to close the doors for a

5     little while and work on it and then we'll bring it back."  I

6     say that by way of analogy to some of the discomfort that I'm

7     feeling here in trying to sort out in terms of how the law would

8     apply to it about this sense that I have that the department's

9     trying to play catch-up to get everything in place for this

10    execution and I worry about that.  Where should I find the

11    comfort in what's going on that these safeguards are going to be

12    not just structurally in place but substantively in place by

13    November 18?

14         MS. HOWARD:  Well, Your Honor, let me approach it this

15    way:  Mr. Zmuda testified -- although he didn't verify the team

16    members' employ with their employers or their education, Mr.

17    Zmuda testified that he verified their credentials that were

18    provided to him.  He had the medical team leader present that

19    posed hypotheticals to the candidates specific to the different

20    roles that these persons would be playing, these team members

21    would be --

22         COURT:  But we're a week away from the execution date

23    and, as I understand it, there's been no rehearsal or there's

24    been no practice done with persons -- with real persons

25    receiving the IV's, with the use of saline IV solution to go

1    through to practice using all that equipment and --

2              MS. HOWARD:  Well, Your Honor --

3              COURT:  But here's where -- I'm troubled about that.  I

4    mean it's one thing to say we're going to go down and be

5    available to assist in the hospital with these things but what

6    we're talking about is an execution and I would think that the

7    department wants to have people who have been through this so

8    that they're acting from the benefit of this practice because

9    it's inevitably going to be a different day than any other day.

10             MS. HOWARD:  Right.  Your Honor, I could answer that

11   question but it's not in evidence.  I have the answer to that

12   question.

13             COURT:  All right.  Well, if it's not in evidence, I

14   guess I'm limited to what I have.  I've told you the thing that

15   gives me pause so try to respond to it the best way you can

16   then.

17             MS. HOWARD:  I understand your concern, Your Honor.  I

18   will say this, that --

19             COURT:  You shouldn't say anything that you would be

20   concerned about any of these issues that we've raised before

21   about creating problems for that.  If you think there's

22   something else I need to know, I guess you can consider whether

23   you need to supplement the record but --

24             MS. HOWARD:  Well, Your Honor, I could put Mr. Zmuda

25   back on the stand.

1          COURT:  All right, Counsel.  I'm going to allow for

2     this because on this discrete issue, I'm struggling with it and

3     I'll give you an opportunity to cross-examine.  Mr. Zmuda, come

4     back to the stand.

5          MS. HAMPTON:  Your Honor, Mr. Zmuda -- I mean we would

6     object.  Mr. Zmuda has been present for the entire argument at

7     this point and I realize that he was released because we didn't

8     think he was going to be a witness anymore.

9          COURT:  I didn't think he was going to come back to the

10     witness stand either.  Your objection is noted.

11          MS. HAMPTON:  But counsel -- okay.  Thank you.

12          COURT:  Your objection's noted.  I'm going to hear from

13     him.

14          MS. HAMPTON:  Thank you, Your Honor.

15          COURT:  Mr. Zmuda, you're still under oath.

16          (JEFFREY ZMUDA was previously sworn.)

17          COURT:  Counsel.

18          MS. HOWARD:  Thank you, Your Honor.

19                         DIRECT EXAMINATION

20     QUESTIONS BY MS. HOWARD:

21     Q.  Mr. Zmuda, you've obviously heard the Court's concerns and

22     the SOP directs that you'll have two rehearsals in the 48 hours

23     prior to the execution.  I'm assuming that in this -- that at

24     least those two rehearsals, you're going to use live volunteers

25     for the IV's.  Are there other trainings in which you have

1   volunteers planned to be -- or you have planned for volunteers

2   to be present so that the team members can initiate IV's?

3   A.  Yes.

4   Q.  And how many trainings will that consist of?

5   A.  From this point forward, from the next training, the sixth

6   training on.

7   Q.  So that would be four trainings or five trainings?  I

8   apologize.  I think you testified that you had already completed

9   five trainings?

10  A.  That's correct.  And so six, seven, eight and the two -- at

11  least two rehearsals so ten.  Number six, seven, eight and then

12  the two rehearsals will all have live sticks if you will, IV's.

13  Q.  So that will be five -- at least five training sessions with

14  volunteers that will be used to insert IV's; is that correct?

15  A.  That's correct, and volunteers include myself, the two

16  wardens and the medical team leader.

17         MS. HOWARD:  I have nothing further, Your Honor.

18         COURT:  All right.  Ms. Hampton, I'll allow you to

19  cross-examine if you'd like on this subject.

20         MS. HAMPTON:  Thank you, Your Honor.

21                        CROSS-EXAMINATION

22  QUESTIONS BY MS. HAMPTON:

23  Q.  So Deputy Chief --

24  A.  Yes, ma'am.

25  Q.  -- there's going to be at least one session in which the

1   person who's supposed to oversee whether the members are doing

2   it correctly is the volunteer, correct?  There's one session in

3   which the person who's overseeing the qualifications of the IV

4   people is the volunteer?

5   A.  You're referring to the session where I'll be -- an IV will

6   be inserted in me?  I'm not the only person that oversees that

7   but, yes, I'll --

8   Q.  Well, the only person that has training in this is the

9   medical team leader.

10  A.  Correct, yes.

11  Q.  And they're a volunteer.

12  A.  Yes.

13  Q.  And then there's a session in which you're going to be the

14  volunteer.

15  A.  Correct.

16  Q.  And you have no medical experience to determine whether or

17  not it's being done correctly.

18  A.  No, I do not.

19  Q.  And the other person involved in this is did I understand

20  the warden?

21  A.  Yeah, both of our wardens that are involved in the process.

22  Q.  Both wardens so that's Warden Blades.

23  A.  And Warden Cluney.

24  Q.  And Warden Cluney.  And Warden Blades, does he have any

25  medical training to know whether or not the IV is being set

1    properly?

2    A.  No medical training, no.

3    Q.  And how about Warden Cluney?

4    A.  Not that I'm aware of, no.

5    Q.  And for -- is that all the volunteers then?  Someone's going

6    to get to do this twice?

7    A.  No, no.  There's -- there's other volunteers from within our

8    staff.

9    Q.  The other staff member that's going to be the volunteer, do

10   they have any medical training in determining whether or not the

11   IV line is set appropriately?

12   A.  You know, I don't know who those volunteers are.  Warden

13   Blades has that information.

14   Q.  So to the best of your knowledge right now today, the answer

15   would be no?

16   A.  To the best of my knowledge.

17   Q.  All right.  And in this training session that you plan to

18   have between today, the 10th, and the 18th and when the

19   execution -- now, correct me if I'm wrong.  There will be no

20   training session on the 18th; is that correct?

21   A.  There's no training session on the 18th, no.

22   Q.  So that's one less day.  We're down to seven days, correct?

23   Because there will be no more training today.

24   A.  Yes.  The trainings will be conducted between now and the

25   last of the trainings will be on the 17th, the last -- the

1   rehearsals.

2   Q.  So you have seven days to conduct these five trainings.

3   Will there be multiple volunteers during these training

4   sessions?

5   A.  Yes.

6   Q.  And in these -- do any of -- in any of these training

7   sessions, will the team set an IV in which fluids will be

8   introduced?

9   A.  Yes.

10  Q.  Are any of these fluids anesthetic?

11  A.  No.

12  Q.  It's all saline?

13  A.  Yes.

14  Q.  And your experience in determining whether the IV is

15  appropriately set, you're relying upon the medical team leader?

16  A.  In the outcome, yes.

17  Q.  And how long will the IV be set?

18  A.  You know, I don't know that.

19  Q.  Wouldn't that inform your decision on whether it was

20  appropriately set?

21  A.  The length of time that it remained in?

22  Q.  Yes.

23  A.  Yes.

24  Q.  And what experience do you have in determining whether or

25  not there's an infiltration that has occurred in the IV?

1   A.  I don't have any experience.  I've not witnessed it.

2   Q.  How about Warden Blades?  Does he have any experience in

3   determining whether or not an IV is infiltrating?

4   A.  Not that I'm aware of.

5   Q.  Warden Cluney?

6   A.  Not that I'm aware of.

7   Q.  Any of these other staff members?

8   A.  The staff that are volunteering to have --

9   Q.  Correct.

10  A.  Not that I'm aware of.

11          MS. HAMPTON:  If I might have just a moment, Your

12  Honor.

13          COURT:  That's fine.

14          MS. HAMPTON:  Thank you, Your Honor.

15          COURT:  Okay.  Sir, you may step down.  Ms. Howard,

16  I'll have the rest of your argument.

17          MS. HOWARD:  Your Honor, I'll move on to -- unless you

18  have anymore questions from the ones that I've covered, the next

19  safeguard that Baze talks about and that's the redundancy that

20  the IV team established both primary and backup lines and

21  prepared two sets of injection drugs.  The SOP clearly has this

22  redundancy set in it.  The SOP allows or it does not -- it

23  dictates that there will be three sets of chemicals prepared for

24  the execution.  It also dictates that there will be a primary

25  and backup line for the offender which Baze only talked about

1   two sets of chemical drugs and the SOP is talking about three.

2   I believe that this redundancy safeguard is met.  I know that

3   the plaintiff will argue that because the team members lack the

4   experience and the daily training that it's not met but I would

5   disagree that the experience is met and that the training is

6   there and that this safeguard is met.

7          Regarding the consciousness check, going back again to

8   what Baze said, Baze talked about infiltration and that they had

9   three experts testify that the average person could determine

10  whether there was infiltration and their safeguard was that the

11  deputy warden and the warden were in the execution chamber and

12  that they could observe this.  The SOP states that the warden

13  will be in the execution chamber.  There will be a camera

14  monitoring Mr. Rhoades at all times or the offender.  There's

15  also -- I believe the director will be in the room at all times

16  and based on Baze stating that the average person can determine

17  that infiltration is there, that standard is met.

18         The SOP goes one step further and inserts the

19  additional safeguard of the consciousness check.  Although it

20  doesn't specifically state what that consciousness check is, it

21  says whatever -- I believe it talks about what's medically --

22  medically appropriate methods.  Mr. Zmuda in his affidavit

23  testified -- or set forth what those medically appropriate

24  methods would be which would be conducted by the medical team

25  leader who is qualified to do these consciousness checks.  Baze

1   doesn't say that you have to have everyday experience in this --

2   in the consciousness checks.

3            In fact, <u>Baze</u> doesn't talk about the daily experience

4   or training that the plaintiffs would like and their own expert

5   testified that he doesn't always every day insert IV's.  He

6   testified he's a training -- he's an instructor.  He testified

7   that people get rusty.  He testified that people that go on

8   vacation -- doctors that go on vacation for a week get rusty.

9   He himself is not practicing what he's preaching.

10           I'd also like to point out that the SOP has a

11  contingency plan.  It's the last page and it talks about that

12  the warden can stop the execution if things aren't right.  If

13  the offender is not unconscious, the warden is not going to

14  proceed with the -- with administering the second and third set

15  of drugs.  There's a provision in the SOP that says if he is

16  unconscious and it has been determined that the warden can

17  instruct that the same drug be administered from the second set.

18           It's not going to be, well, we administer the first set

19  and then we move on.  The SOP is set up to make sure that Mr. --

20  or the offender is unconscious before moving on to the next set

21  of drugs.

22           COURT:  Your protocol says that both the primary and

23  backup IV lines will be placed unless in the opinion of the

24  medical team leader it is not possible to reliably place two

25  peripheral lines.  Do I understand from that that the medical

1    team leader can conclude there's just not a good spot to put a

2    second one and so the execution could proceed with just one?

3         MS. HOWARD:  I'm sorry.

4         COURT:  Let me read it to you again.  "Both the primary

5    and backup IV lines will be placed unless in the opinion of the

6    medical team leader it is not possible to reliably place two

7    peripheral lines."  And part of your argument about safeguards

8    that I understand you're just making to me is this, that there's

9    two lines and the second line can be used if there's some issue

10   that develops with the administration through the first line.

11        MS. HOWARD:  Right.  It's my understanding that if

12   those two lines didn't work, then they would resort to placing a

13   central line in the femoral line.

14        COURT:  But this raises a question as to whether

15   there's two lines to begin with.

16        MS. HOWARD:  I'm sorry.  Could you restate your

17   question, Your Honor?

18        COURT:  The issue is there seems to be a discretion

19   whether or not to establish a second site, a second line, rather

20   than a requirement.  Then are the safeguards that you would

21   argue exist based on redundancy, are they really there?

22        MS. HOWARD:  Yes, Your Honor, I believe so because if

23   placing the first one and the second backup are not possible and

24   the medical team leader believes that a femoral line is

25   necessary and still can't do it then, the warden has the option

1    to stop the execution at that point and reschedule it at another

2    date or another time.

3          COURT:  Okay.  All right.  Go ahead.

4          MS. HOWARD:  Just to briefly hit on the completion of

5    the facility, Mr. Zmuda testified that it was substantially

6    completed by October 26, that they've been training in the

7    facility, the execution unit.  I really don't know what more to

8    say other than he's testified that it's complete.  His affidavit

9    says -- although it says execution chamber, that was my fault.

10   It should have said execution unit but he testified that the

11   execution unit is complete, that they have been training in it.

12   He testified that the first training that they conducted was not

13   done in the execution unit and it had not been substantially

14   completed but I believe in training no. 2 and there forward,

15   there were -- or maybe it was 3 and forward that they were

16   training in the execution unit and at that point, it was

17   substantially completed.

18         I believe that the SOP -- SOP 135 meets the

19   substantially similar requirement set forth in Baze.  I believe

20   that it meets the safeguards that are set forth in Baze.  I

21   don't believe that they have to be -- they have to mirror Baze

22   because Baze states it just has to be substantially similar.  I

23   do not believe that SOP 135 is going to put Mr. -- or the

24   offender at risk -- a substantial risk of harm.  Mr. Zmuda

25   testified that the team members are qualified pursuant to what

1    the Baze requirements are.

2            It appears that the plaintiffs -- the plaintiff either

3    wants to adopt a whole new protocol, therefore -- they're asking

4    you to say that this three-drug protocol is unconstitutional in

5    light of the Baze holdings but Baze has stated that there is

6    going to be some risk of pain and it's inherent in an execution

7    and that the Constitution does not demand avoidance of all risk

8    of pain.

9            Furthermore, in Dickens, the Court stated that the

10   failure to adopt an alternative protocol establishes an Eighth

11   Amendment violation only if the current protocol creates a

12   substantial risk of serious harm that the alternative protocol

13   will reduce.  I don't -- I believe -- or SOP 135

14   substantially -- is substantially similar to the Kentucky

15   protocol.  It is not unconstitutional and there is not a

16   substantial risk of harm to the offender.

17           It is the plaintiff's burden in meeting these standards

18   set forth for the injunction.  The very first one is that they

19   are likely to succeed on the merits.  I would argue that they're

20   not likely to succeed on the merits because the SOP does meet

21   the safeguards that are set forth in the Kentucky protocol.  I

22   don't believe that there is any irreparable harm that the

23   offender will suffer because the safeguards are in place to

24   prevent that.

25           The balance of equity does tip in favor of the State

1   and it's not in the public interest to stay this case.  The

2   State has an interest in forcing death warrants for the victims

3   and they have an obligation to comply with State law.  <u>Baze</u> is

4   good law, Your Honor.  The three-drug protocol is

5   constitutional.  SOP 135 conforms with those constitutional

6   standards.

7        COURT:  All right.  Thank you very much, Ms. Howard.

8   Mr. Loewy.

9        MR. LOEWY:  Very briefly, Your Honor.  I'd like to

10  point out to Your Honor where it was that I couldn't find in

11  <u>Baze</u> earlier.  It's on page 56.  It refers to the Kentucky

12  protocol and the requirement that the warden redirect the flow

13  of chemicals to the backup IV if the prisoner doesn't lose

14  consciousness within 60 seconds.

15       Our position is you simply can't read <u>Baze</u> as a whole

16  and come away from it thinking that a consciousness check is not

17  critical.  It is.  That's the point of saying that if the

18  thiopental or the pentobarbital is not properly administered,

19  the person is going to feel incredible pain.  What that means is

20  he's not going to be unconscious.  That's all we've got.  Thank

21  you.

22       COURT:  Counsel, thank you for your good work today and

23  in the last several weeks while we've been working hard on this

24  case.  As I'd indicated to you earlier in the week, I'm going to

25  try to have a decision out on Monday.  There's still a lot of

1   mulling over that I need to do on this particular record while I

2   sort through these things but certainly your fine work on behalf

3   of your respective clients will make that task easier for me.

4          Will there be anything else that you want to take up

5   today?  Any further record that you need to make, Ms. Howard?

6          MS. HOWARD:  Well, Your Honor, just on another matter,

7   the Amended Complaint was served on us and it's due -- our

8   response to the Amended Complaint is due Monday.  I guess we

9   would be asking, in light of the nature of this hearing -- I

10  mean from my understanding, the Court considers this a

11  dispositive motion as does the plaintiffs, that we be given

12  until Tuesday or Wednesday to respond until after you've ruled

13  on the motion to stay.

14         COURT:  Any objection to that from plaintiff?

15         MS. HAMPTON:  No, Your Honor, there's no objection.

16         COURT:  Why don't we make your deadline then Wednesday.

17         MS. HOWARD:  Thank you, Your Honor.

18         COURT:  All right.  Mr. Loewy, anything further you'd

19  like to make a record on behalf of the plaintiff?

20         MR. LOEWY:  No, Your Honor.  Thank you.

21         COURT:  Very well.  We'll be in recess.

22         CLERK:  All rise.

23             (Proceedings concluded.)

24

25

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


  /s/ Tamara A. Weber                      11/13/11

Signature of Approved Transcriber          Date


  Tamara A. Weber

Typed or Printed Name